UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **EDCV 20-2352 JGB (SPx)** | Date | September 24, 2021 |
|---|---|---|---|
| Title | ***Rosanne Vrugtman, et al. v. It's Just Lunch International LLC, et al.*** | | |

Present: The Honorable    JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE

| MAYNOR GALVEZ | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| None Present | None Present |

Proceedings:     **Order (1) GRANTING IN PART AND DENYING IN PART
Defendants' Partial Motion to Dismiss (Dkt. No. 32); and (2)
VACATING the September 27, 2021 Hearing (IN CHAMBERS)**

  Before the Court is a motion to dismiss filed by Defendants It's Just Lunch International LLC, IJL US LLC, and IJL Canada (collectively, "Defendants") pursuant to Federal Rule of Civil Procedure 12(b)(6). ("Motion," Dkt. No. 32.) The Court determines this matter is appropriate for resolution without a hearing. See Fed. R. Civ. P. 78; L.R. 7-15. After considering all papers filed in support of and in opposition to the Motion, the Court GRANTS-IN-PART and DENIES-IN-PART Defendant's Motion and VACATES the September 27, 2021 hearing.

## I.  BACKGROUND

  On November 11, 2020, Plaintiffs Rosanne Vrugtman and Tammy Gillingwater filed a complaint against Defendant It's Just Lunch International LLC. ("IJL International") ("Complaint," Dkt. No. 1.) On March 15, 2021, Plaintiffs filed a First Amended Complaint. ("FAC," Dkt. No. 17.) The FAC added Plaintiff Nicole Kruzick, as well as Defendants IJL US LLC and IJL Canada Inc.

  On June 11, 2021, the Court approved a stipulation to allow Plaintiffs Vrugtman, Gillingwater, and Kruzick (collectively, "Plaintiffs") to file a second amended complaint. (Dkt. No. 28.) On June 14, 2021, Plaintiffs filed a second amended complaint against Defendants IJL International, IJL US LLC, and IJL Canada Inc. (collectively, "Defendants"). ("SAC," Dkt. No. 29.)

The SAC alleges ten causes of action.  First, on behalf of Plaintiff Kruzick ("Kruzick") and the California Subclass, Plaintiffs allege the following four California law claims against Defendants IJL US and IJL International: (1) violations of the Consumers Legal Remedies Act, Cal. Civ. Code § 1750 et seq.; (2) violations of the Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 et seq.; (3) false advertising in violation of Cal. Bus. & Prof. Code § 17500 et seq., (4) fraud and deceit in violation of Cal. Civ. Code § 1709, 1710; and (5) actual fraud in violation of Cal. Civ. Code § 1572.

Second, on behalf of Plaintiff Vrugtman ("Vrugtman") and the Virginia Subclass, Plaintiffs allege violations of Virginia Consumer Protection Act, Va. Code Ann. § 59.1-196, et seq., against Defendants IJL US and IJL International.

Finally, on behalf of all Plaintiffs, Plaintiffs allege the following four Nevada common law and statutory claims against all Defendants: (1) violation of the Nevada Deceptive Trade Practices Act ("NDTPA"); (2) fraudulent inducement; (3) fraud; and (4) unjust enrichment.

On July 16, 2021, Defendants filed the Motion.  (Dkt. No. 32.)  Plaintiff filed her Opposition on August 27, 2021.  ("Opposition," Dkt. No. 34.)  Defendants replied on September 3, 2021.  ("Reply," Dkt. No. 35.)

## II.   FACTUAL ALLEGATIONS

The following allegations are accepted as true for the purposes of this Fed. R. Civ. P. 12(b)(6) Motion.

Plaintiffs are former subscribers to a matchmaking service operated by IJL International. (SAC ¶¶ 11–14, 38, 50, 64.)  IJL International operates in the United States and internationally through independently owned franchisees.  (Id. ¶¶ 3, 18-19.)  IJL Canada Inc. ("IJL Canada") and IJL US LLC ("IJL US") are two such franchisees.  IJL International's matchmaking services are standardized, and include an interview with the client, a designated number of matches based on information provided by the client, and arrangement of dates at a designated time and place. (Id. ¶¶ 20–23.)

Plaintiff Gillingwater ("Gillingwater") resides in Toronto, Canada.  (Id. ¶ 13.)  On or before September 24, 2019, Gillingwater had a telephone call with a matchmaker and sales representative employed by IJL Canada.  (Id. ¶ 34.)  During that call, the matchmaker asked Gillingwater to describe her ideal partner.  (Id. ¶ 35.)  As Gillingwater described a fit man with a healthy lifestyle, the sales representative remarked, "John!"  (Id.)  The sales representative told Gillingwater that John was one of the men she had in mind for her.  (Id. ¶ 36.)  The matchmaker told Gillingwater that she also had "a couple people in mind" for her and, if Gillingwater signed up for IJL Canada's service, the matchmaker would set her up with a date within forty-eight hours of signing the contract.  (Id. ¶¶ 36–37.)

In light of the representations made, on September 24, 2019, Gillingwater signed a six-month subscription with IJL Canada and paid $6,160 CAD, which is approximately $4,700 USD. (Id. ¶¶ 13, 34, 38.)  IJL Canada did not provide Gillingwater with a first date within forty-eight hours.  (Id. ¶ 39.)

Kruzick resides in Venice, California.  (Id. ¶ 11.)  On or before June 25, 2020, Kruzick had a telephone call with an IJL US representative.  (Id. ¶¶ 11, 62.)  During the call, IJL US's representative asked Kruzick to describe her ideal date.  (Id. ¶ 62.)  Hearing the description, the representative said that she "already had someone in mind" for Kruzick.  (Id. ¶ 63.)  The representative also promised to set Kruzick up with two or three dates every month in California. (Id. ¶ 62.)  Induced by the representations, Kruzick signed a subscription on June 25, 2020 with IJL US for either twelve dates or six months of service, and paid $2,495.  (Id. ¶¶ 60, 64.)  IJL US did not provide Kruzick with two to three dates every month and did not introduce her to the individual the IJL US representative had in mind.  (Id. ¶ 65.)

Vrugtman resides in Staunton, Virginia.  (Id. ¶ 12.)  On or before July 20, 2020, Vrugtman had a telephone call with an IJL US matchmaker.  (Id. ¶¶ 46–48.)  During the call, Vrugtman expressed her interest in meeting me with similar interests in or near the Charlottesville, Virginia area.  (Id. ¶ 48.)  The matchmaker appeared to confirm that IJL US had matches available in the Charlottesville area.  Id. ¶ 49.)  In light of the representations made, on July 20, 2020, Vrugtman signed a twelve-month subscription with IJL US and paid $2,595.  (Id. ¶¶ 46, 50.)  While subscribed to IJL US, Vrugtman spoke to another matchmaker employed by IJL US, who told her that IJL US had matches in the Charlottesville area.  (Id. ¶¶ 53, 55.)  IJL US did not provide Vrugtman with any dates in the Charlottesville area.  (Id. ¶¶ 51–59.)

### III.   LEGAL STANDARD

Defendants move to dismiss all but count seven of the SAC pursuant to Federal Rule of Civil Procedure Rule 12(b)(6).  A Rule 12(b)(6) motion tests the legal sufficiency of the claims asserted in a complaint.  "Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory."  Mendiondo v. Centinela Hosp. Med. Ctr., 521 F.3d 1097, 1104 (9th Cir. 2008).  Factual allegations must be enough to "raise a right to relief above a speculative level."  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007).

Rule 12(b)(6) must be read in conjunction with Federal Rule of Civil Procedure 8(a), which requires a "short and plain statement of the claim showing that a pleader is entitled to relief," in order to give the defendant "fair notice of what the claim is and the grounds upon which it rests."  Id.; see Horosny v. Burlington Coat Factory, Inc., 2015 WL 12532178, at *3 (C.D. Cal. Oct. 26, 2015).  In considering a Rule 12(b)(6) motion to dismiss, a court must accept all material allegations in the complaint — as well as any reasonable inferences to be drawn from them — as true and construe them in the light most favorable to the non-moving party.  See Doe v. United States, 419 F.3d 1058, 1062 (9th Cir. 2005); ARC Ecology v. U.S. Dep't of Air Force, 411 F.3d 1092, 1096 (9th Cir. 2005); Moyo v. Gomez, 32 F.3d 1382, 1384 (9th Cir. 1994).

Determining whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555 (citations omitted). Rather, the allegations in the complaint "must be enough to raise a right to relief above the speculative level." Id.

Federal Rule of Civil Procedure 15 provides that leave to amend "shall be freely given when justice so requires." Fed. R. Civ. P. 15(a). The Ninth Circuit has held that "[t]his policy is to be applied with extreme liberality." Eminence Capital, L.L.C. v. Aspeon, Inc., 316 F.3d 1048, 1051 (9th Cir. 2003) (quoting Owens v. Kaiser Found. Health Plan, Inc., 244 F.3d 708, 712 (9th Cir. 2001)). Generally, a "district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by allegation of other facts." Lopez v. Smith, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc) (internal quotation marks and citation omitted).

## IV.   DISCUSSION

Defendants move to dismiss Plaintiffs' causes of action one through six, arguing that those claims "run afoul of the Nevada choice of law provision that bind Plaintiffs." (See Mot.) Defendants also move to dismiss Plaintiffs' causes of action eight through ten, arguing the economic loss doctrine under Nevada law precludes intentional tort claims that are not extraneous to the contract. For the reasons described below, the Court disagrees.

### A. Counts One through Six: Choice of Law

Defendants argue that Plaintiffs' causes of action arising under California law and Virginia law must fail because Plaintiffs are barred by the choice-of-law provision in their respective contracts with Defendants. Plaintiffs' respective contracts contain the following choice of law provision:

This Agreement is governed in accordance with the laws of the State of Nevada, except to the extent that any law expressly requires application of broader consumer protection laws of the state in which Client resides.

(Mot. at 4; Mot., Ex. A.) Defendants argue, because Plaintiffs did not bring their claims under Nevada law, the claims must be dismissed.

//
//
//

**CIVIL MINUTES—GENERAL**                 Initials of Deputy Clerk MG

"A federal court sitting in diversity ordinarily must follow the choice-of-law rules of the State in which it sits." In re Facebook Biometric Info. Privacy Litig., 185 F. Supp. 3d 1155, 1167 (N.D. Cal. 2016). In turn, the law of the state in which a court sits determines the enforceability of a choice-of-law clause. Id. at 1168. "This applies to actions brought under the Class Action Fairness Act as well, since CAFA is based upon diversity jurisdiction." Id. Thus, this Court applies California's choice of law rules.

California courts apply a two-pronged test[1] to determine whether a choice-of-law clause is enforceable. Wash. Mut. Bank, FA v. Superior Court, 24 Cal. 4th 906, 916 (2001). The test considers: "(1) whether the chosen state has a substantial relationship to the parties or their transaction, or (2) whether there is any other reasonable basis for the parties' choice of law." Id. "If neither of these tests is met, that is the end of the inquiry, and the court need not enforce the parties' choice of law." Id. However, "[i]f either prong is met the choice of law will be enforced unless 'contrary to a fundamental policy' of the alternative state… and if the [alternative] state 'has a materially greater interest in the determination of the particular issue.'" Williams v. Facebook, Inc., 384 F. Supp. 3d 1043, 1056 (N.D. Cal. 2018) (quoting Wash. Mut. Bank, 24 Cal. 4th at 917). California law "reflects a strong public policy favoring enforcement of freely negotiated choice-of-law clauses." Colaco v. Cavotec SA, 25 Cal. App. 5th 1172, 1188 (Ct. App. 2018), reh'g denied (Aug. 10, 2018), review denied (Oct. 24, 2018).

### 1. Substantial Relationship

Defendants argue, and Plaintiffs do not dispute, that Nevada has a substantial relationship to the parties and transactions at issue. The Court agrees: Nevada is Defendant IJL US's state of incorporation, and Defendant IJL US is physically located in Carson City, Nevada. (Reply at 3–4; Mot. at 8; SAC ¶ 15.) Thus, the Nevada choice-of-law clause satisfies the first prong of the test to determine its validity. See Bridge Fund Capital Corp. v. Fastbucks Franchise Corp., 622 F.3d 996, 1003 (9th Cir. 2010) (finding a substantial relationship where the choice-of-law state was the defendant's "principal place of business" and the place it receives royalties and franchise fees"); Reddy v. Mediscribes, Inc., 2020 WL 2220202, at *3 (C.D. Cal. Feb. 18, 2020) (citing Nedlloyd Lines B.V. v. Superior Court, 3 Cal. 4th 459, 467 (1992)) (finding a substantial

---

[1] The Court notes that some courts in this circuit combine the substantial relationship and the reasonable basis analyses into one prong, and then consider whether enforcement of the choice of law clause is contrary to a fundamental policy as the second prong. See, e.g., Ruiz v. Affinity Logistics Corp., 667 F.3d 1318, 1323 (9th Cir. 2012) (stating that the "threshold matter" is "whether the chosen state has a substantial relationship to the parties or their transaction, or … whether there is any other reasonable basis for the parties' choice of law"). Other courts have characterized the latter step as the third prong of the test. See, e.g., King v. Bumble Trading, Inc., 393 F. Supp. 3d 856, 865 (N.D. Cal. 2019) (describing California's choice of law analysis as "a three-part test"). These cases all apply the same framework articulated in Nedlloyd Lines B.V. v. Superior Court, 3 Cal. 4th 459 (1992), which applies Section 187(2) of the Restatement (Second) of Conflict of Laws. Because the Court must still consider each step, the label of the framework as two-pronged or three-pronged has no effect on the final analysis.

relationship where the choice-of-law state was where defendant "is physically located" and "was incorporated").

### 2. Any Other Reasonable Basis for the Parties' Choice of Law

While establishing one prong of the test is sufficient to enforce the choice-of-law clause, the Court can find a "reasonable basis for the parties' choice of law" when "one of the parties resides in the chosen state, the parties have a reasonable basis for their choice." Reddy, 2020 WL 2220202, at *3 (citing Nedlloyd Lines B.V., 3 Cal. 4th at 467). Here, Defendant IJL US resides in Nevada. Thus, there is a reasonable basis for Nevada as the choice of law state.

Plaintiffs contend that California's "stronger connection to the allegations in this Complaint" demonstrate "there is no reasonable basis to enforce Nevada law." (Opp'n at 7.) This argument fails; even if California has a stronger connection than Nevada, the test, at this stage, only requires a "reasonable basis" for the choice of law state, not a more reasonable basis. In California, that just one of the parties resides in the chosen state provides a reasonable basis. Nedlloyd Lines B.V., 3 Cal. 4th at 467. Accordingly, the Court concludes that the second prong of the test to determine the choice of law clause's validity has been satisfied.

### 3. Whether Nevada Law Is Contrary to a Fundamental Policy of California or Virginia

Because the Nevada choice-of-law clause satisfies both prongs of the test, the Court must determine whether enforcing the provision for Counts One through Five would be "contrary to a fundamental policy" of California, and, if there is a conflict, whether California "has a materially greater interest in the determination of the particular issue." Wash. Mut. Bank, 24 Cal. 4th at 1078. "California requires the court to conduct a separate choice-of-law analysis with respect to each issue in a case." Brazil v. Dell, 585 F. Supp. 2d 1158, 1161 (N.D. Cal. 2008) (citing Wash. Mut. Bank, FA v. Superior Court, 24 Cal. 4th 906, 920 (2001)). Accordingly, the Court conducts an independent choice-of-law analysis for Counts One through Five. For Count Six, the Court must decide whether enforcing the choice-of-law clause would be contrary to a fundamental policy of California or Virginia, and, if a conflict exists, whether California or Virginia has a materially greater interest in the determination of the particular issue than Nevada.

A court first looks to the alternative state's "Constitution, laws, and judicial decisions," as well as "the applicable principles of the common law" to determine "the public policy of a state." King v. Bumble Trading, Inc., 393 F. Supp. 3d 856, 866 (N.D. Cal. 2019) (quoting First Intercontinental Bank v. Ahn, 798 F.3d 1149, 1156 (9th Cir. 2015). The court must then "determine whether the applicable rules of law of the potentially concerned jurisdictions materially differ." Stanley v. Novartis Pharm. Corp., 11 F. Supp. 3d 987, 995 (C.D. Cal. 2014). "If there is no material difference, there is no choice-of-law problem and the court may proceed to apply California law." Id. Where the laws differ, "[t]he mere fact that the chosen law provides greater or lesser protection than California law," is "not [a] reason[] for applying California law." Walter v. Hughes Comm'cns, Inc., 682 F. Supp. 2d 1031, 1040 (N.D. Cal. 2010). Nor is "[t]he question [ ] whether the California and [choice-of-law state] laws are

'comparable,' whether they cover the same conduct, or whether the differences 'merely' concern remedies." Id. at 1041.  Instead, the question is whether a law conflicts with California law and a fundamental California policy.

To determine which state has a materially greater interest in the outcome, "[t]he fundamental question … is 'which state, in the circumstances presented, will suffer great impairment of its policies if the other state's law is applied.'"  will suffer greater impairment of its policies if [Nevada's] law is applied." Ruiz v. Affinity Logistics Corp., 667 F.3d 1318, 1323 (9th Cir. 2012) (listing factors).[2]

Generally, the party opposed to the enforcement of the choice-of-law clause bears the burden of establishing that enforcement of the clause would be "contrary to fundamental policy" of the alternative state, or that the alternative state has a "materially greater interest" in the determination of the issues presented. Pitzer Coll. v. Indian Harbor Ins. Co., 8 Cal. 5th 93, 100–01 (2019).  This burden shifts, however, when a cause of action arises from California's Consumer Legal Remedies Act ("CLRA"). Walter, 682 F. Supp. 2d at 1038.

Because the six counts Defendants seek to dismiss implicate different provisions and policies, the Court considers the application of Nevada law for each cause of action.

   a.  **Count One: California's Consumer Legal Remedies Act, Cal. Civ. Code § 1750 et seq.**

Count One alleges violations of the Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750 et seq., on behalf of Kruzick and a putative California subclass against Defendants IJL US and IJL International.  The Court considers whether application of Nevada law to this claim is contrary to a fundamental policy of California.  Because Count One arises under the CLRA, Defendants—not Plaintiffs—carry "the burden of proving that the choice-of-law provision is enforceable" for this cause of action. Walter, 682 F. Supp. 2d at 1038.

Defendants argue that Nevada law is not contrary to the CLRA because Nevada has a "similar" consumer protection law, the Nevada Deceptive Trade Practices Act ("NDTPA"). (Reply at 5.)  But the mere fact that Nevada has a consumer protection law does not demonstrate the absence of a fundamental conflict. See e.g., Lloyd v. Navy Fed. Credit Union, 2018 WL 1757609, at *5 (S.D. Cal. Apr. 12, 2018) (finding application of Virginia Consumer Protection Act contrary to the CLRA.  Defendants assert that the NDTPA was "enacted 'primarily for the protection of consumers.'" (Reply at 5 (quoting Sobel v. Hertz Corp., 698 F. Sup. 2d 1218, 1224

---

   [2] In Ruiz v. Affinity Logistics Corp., the Ninth Circuit applies a five-factor test to determine which state has a materially greater interest in the outcome of the case: "(1) the place of contracting; (2) the place of negotiation of the contract; (3) the place of performance; (4) the location of the subject matter of the contract; and (5) the domicile, residence, nationality, place of incorporation, and place of business of the parties."  667 F.3d 1318, 1234 (9th Cir. 2012) (citing 1-800-Got Junk? LLC v. Superior Court, 189 Cal. App. 4th 500, 513 n.10 (2010)).

(D. Nev. 2010)).) But this only shows that the law may be "comparable" to the CLRA, which is not enough. <u>Walter</u>, 682 F. Supp. 2d at 1041 (finding application of "comparable" Maryland Consumer Protection Act contrary to the CLRA). Defendants must prove that the application of the NDTPA under the circumstances is not contrary to any fundamental policies embodied in the CRLA

Plaintiffs contend that the NDTPA is contrary to the CLRA, because only elderly persons or persons with a disability have an express private right of action under the NDTPA and because Kruzick could not seek punitive damages. (Opp'n at 8.) Defendants correctly refute this argument: Both the Nevada Supreme Court and the Ninth Circuit have stated that any "person who is a victim of consumer fraud," including a "deceptive trade practice," has a private cause of action under Nevada law. <u>Nev. Power Co. v. Eight Judicial Dist. Court</u>, 120 Nev. 948, 955 n.7 (2004) (citing Nev. Rev. Stat. § 41.600(2)); <u>Del Webb Cmtys., Inc. v. Partington</u>, 652 F. 3d 1145, 1152 (9th Cir. 2011) (finding the same and quoting <u>Nev. Power Co.</u>).[3]

Defendants, however, fail to address Plaintiffs' second point: that "CLRA expressly allows punitive damages," which Kruzick seeks in the instant action. (Opp'n at 8; SAC ¶ 94.) Plaintiffs do not explicitly state that Kruzick cannot recover punitive damages under the NDTPA, but the Court notes that the NDTPA only authorizes punitive damages for a deceptive trade practice cause of action under limited circumstances:

> If an elderly person or a person with a disability suffers damage or injury as a result of a deceptive trade practice, he or she or his or her legal representative, if any, may commence a civil action against any person who engaged in the practice to recover … punitive damages, if appropriate, ….

Nev. Rev. Stat. § 598.0977. Because Kruzick is "neither elderly nor disabled," she could not seek punitive damages under Section 598.0977. (Opp'n at 8.) Similarly, Section 41.600(2), the general provision providing a private right of action for deceptive practice claims, only provides for "damages," but not punitive damages. <u>Id.</u> at § 41.600(2). Because Kruzick would lose the ability to pursue her desired remedy of punitive damages under the NDTPA, there is a "direct[] conflict[]" between Nevada and California laws. <u>Ruiz</u>, 667 F.3d at 1324.

The NDTPA further conflicts with the CLRA's express anti-waiver provision, which states that "[a]ny waiver by a consumer of the provisions of this title is contrary to public policy and shall be unenforceable and void." Cal. Civ. Code § 1751, <u>recognized as preempted by DIRECTV, Inc. v. Imburgia</u>, 577 U.S. 47 (2015). Enforcement of the choice-of-law clause "would be the functional equivalent of a contractual waiver of the consumer protections under the CLRA and, thus, is prohibited under California law." <u>Am. Online, Inc. v. Superior Court</u>, 90 Cal. App. 4th 1, 5 (2001).

---

[3] In fact, Plaintiffs appear to concede this point, as they request leave amend the Complaint to include a claim under Section 41.600(2) if Nevada law applies. (Opp'n at 8 n.2.)

In response, Defendants argue that under Nevada's Unfair Trade Practice Act ("UTPA") Plaintiffs have a private action for injury to business or property. (Reply at 6 (citing Nev. Rev. Stat. § 598A.200).)  However, Defendants provide no explanation for how this provision redresses either the punitive damages or waiver issues.  The text of Section 598A.200 provides for "treble damages," but only for the "State, any district, municipal corporation, agency or other political subdivision of the State."  Nev. Rev. Stat. § 598A.200.  None of the Plaintiffs are state actors.  Thus, this provision does not demonstrate that applying Nevada law would not directly conflict with the CLRA.

Defendants instead minimizes these conflicts and assert that Nevada law merely offers "lesser protection than California law."  (Reply at 5.)  There is no conflict, Defendants contend, because Plaintiffs "still have legal remedies available to them, just according to Nevada law." (Reply at 7.)  The Court disagrees.  Application of Nevada law here implicates a fundamental policy of California, because "punitive damages are in fact a 'fundamental' part of [CLRA's] statutory scheme."  Walter, 682 F. Supp. 2d at 1041.  California law has long recognized punitive damages, and "the policies underlying punitive damages, punishment and deterrence, are held strongly today."  Stanley v. Novartis Pharm. Corp., 11 F. Supp. 3d 987, 1007 (C.D. Cal. 2014).  In Stanley, this Court held that a New Jersey state law that "precluded [the plaintiff] from recovering punitive damages" was contrary to California's fundamental policy.  Id. at 1006.  The Court reaches the same conclusion here.  Because application of Nevada law over the CLRA would preclude Kruzick from recovering punitive damages and contradict CLRA's anti-waiver provision, the Court finds that the NDTPA is contrary to a fundamental policy of California.

Defendants ask the Court to apply an elevated standard, where a law is contrary to a fundamental policy only when "a different state's law is so offensive to California public policy as to be prejudicial to recognized standards of morality and to the general interests of the citizens." (Reply at 5.)  None of the cases Defendants cite in support of this proposition are applicable.  First, Imai v. Diamond Resorts Corp., 2020 WL 2405267, at *5 (C.D. Cal. Apr. 13, 2020), an unpublished case, was reciting the public policy exception to the comity doctrine.  The test for determining whether foreign laws offend a state's fundamental policy has no bearing on the instant action.  Second, in 1-800-Got Junk? LLC v. Superior Court, 189 Cal. App. 4th 500, the court found that the laws of the choice-of-law state offered superior protection and, as such, application of those laws were not offensive.  This is not the case here.  Accordingly, the Court rejects this argument.

The Court finally determines whether California or Nevada has a materially greater interest in the resolution of this issue.  The Court finds that California "will suffer greater impairment of its policies if [Nevada's] law is applied."  Ruiz, 667 F.3d at 1323.  Plaintiffs argue persuasively that "California maintains a weighty and substantial interest in California's interest in the litigation "increases" when "Plaintiffs are California citizens who seek to represent a sub-class of California residents with respect to their CRLA [ ] claims."  Lloyd, 2018 WL 1757609, at *6.  Here, Kruzick is a resident of California who seeks to represent a putative subclass of other California citizens who joined IJL US.  (Opp'n at 7; SAC at ¶¶ 11, 70, 81.)  An IJL US representative allegedly told Kruzick that the company would set her up with dates in California,

and Kruzick relied on the representation to contract with IJL US.  (SAC ¶¶ 60-64.)  IJL International is also located in California and holds its principal place of business in California.  (Opp'n at 7; SAC ¶¶ 14, 80.)  These factors weigh in favor of applying California law.

Furthermore, Plaintiffs are individual consumers who seek the protection of California's consumer protection laws.  While Nevada is where IJL US resides and the choice-of-law clause in the contracts, these interests are not as great as California's interest in protecting its consumers.  (Mot. at 8.)  Even the choice-of-law provision in the Plaintiffs' contracts recognizes this interest, as it specifically excepts application of the choice-of-law when "any law expressly requires application of broader consumer protection laws of the state in which Client resides."  (See Mot., Ex. A.)  Defendants have "not produced any evidence to suggest that [Nevada] has a material interest in the resolution of this case."  Ruiz, 667 F.3d at 1324.  Accordingly, the Court concludes that California has a materially greater interest than Nevada in the resolution of this issue.

In sum, the Court concludes that California law applies to Plaintiffs' CLRA claim. Accordingly, the Court DENIES Defendants' Motion as to Count One.

### b.  Count Two: California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 et seq.

Count Two alleges violations of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 et seq., on behalf of Kruzick and a putative California subclass against Defendants IJL US and IJL International.  The Court considers whether application of Nevada law to this claim is contrary to a fundamental policy of California.

Plaintiffs argue that the UCL reflects fundamental policies of California.  (Opp'n at 8.) The Court agrees: Courts have recognized the UCL as such.  See, e.g., Lloyd, 2018 WL 1757609, at *5 ("Both the CLRA and UCL reflect multiple fundamental policies of the state of California aimed at protecting California consumers ….")  However, the choice-of-law analysis is more precise and requires the Court to determine whether Plaintiffs' specific cause of action under the UCL reflects a fundamental policy of California

Plaintiffs' UCL claim is for deceptive advertising.  (Opp'n at 9; SAC ¶¶ 14–15.)  The UCL prohibits "unfair competition," which includes "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising."  Cal. Bus. & Prof. Code § 17200; In re Pomona Valley Med. Grp., Inc., 476 F.3d 665, 674 (9th Cir. 2007).  Plaintiffs argue that the UTPA would not protect Kruzick.  (Opp'n at 9.)  But the basis for Plaintiffs' assertion is vague.  Plaintiffs state that the UTPA would not protect Kruzick, who is a consumer, as the UTPA's "purpose is to protect businesses, not consumers, from unfair trade practices," yet Plaintiffs cite no provisions of the UPTA or cases to support this statement.  (Id.) Defendants do not present any argument to address how Nevada laws are not contrary to the UCL or Kruzick's deceptive advertising claim.  Instead, Defendants make a conclusory

statement that "enforcing the Nevada choice-of-law provision in the contract between Plaintiffs and Defendants would not affect competition."[4]  (Reply at 7.)

The Court first compares the legislative purposes of the UCL and UTPA.  Courts have held that consumer protection is an integral purpose of the UCL.  The UCL's "purpose is to protect both consumers and competitors by promoting fair competition in commercial markets for goods and services."  Villanueva v. Fidelity Nat'l Title Co., 11 Cal. 5th 104, 111 n.1 (2021) (quoting Kwikset Corp. v. Superior Court, 51 Cal. 4th 310, 320 (2011)).  The UCL "governs 'anti-competitive business practices' as well as injuries to consumers."  Cel-Tech Commc'ns, Inc. v. L.A. Cellular Telephone Co., 20 Cal. 4th 163, 180 (1999) (emphasis added).

In contrast, the consumer protection goal is less apparent in the UTPA.  "Chapter § 598A relates to antitrust and restraints on trade."  Eruchalu v. U.S. Bank, Nat'l Ass'n, 2013 WL 2460404, at *6 (D. Nev. June 6, 2013).  Section 598A.030 declares the UTPA's legislative intent as follows: "It is the policy of this state and purpose of this chapter to: (a) Prohibit acts in restraint of trade or commerce, …. (b) Preserve and protect the free, open and competitive nature of our market system …. (c) Penalize all persons engaged in such anticompetitive practices…."  Nev. Rev. Stat. § 598A.030(1)(b)(2).  Consumer protection is not expressly stated as a policy goal.  However, the UTPA does not only protect businesses, as Plaintiffs content.  The UTPA's legislative findings declare that free and open competition "is necessary to the economic well-being of the citizens of the State of Nevada."  Id. § 598A.030(1)(a).  They also state that unfair competition results in "increased consumer prices," as well as increased economic hardships to "citizens of the State of Nevada."  Id. § 598A.030(1)(b) (emphasis added).  Citing to this provision, the Nevada Supreme Court has stated that "[t]he UTPA was intended to preserve competition for the benefit of consumers."  Nev. Recycling & Salvage, Ltd. v. Reno Disposal Co., 134 Nev. 463, 466 (2018).

The Court next compares the scope of California's UCL with that of Nevada's UTPA.  The UCL is "broad" and [i]ts coverage is 'sweeping, embracing anything that can properly be called a business practice and that at the same time is forbidden by law.'"  Cel-Tech Commc'ns, Inc., 20 Cal. 45h at 180 ("(internal citations omitted).").  As noted above, the UCL's scope includes "unfair, deceptive, untrue or misleading advertising," which encompasses Plaintiffs' deceptive advertising claim.  Cal. Bus. & Prof. Code § 17200.  A UCL claim also requires showing that a practice is "substantially injurious to consumers."  See Pirozzi v. Apple, Inc., 966 F. Supp. 2d 909, 921 (N.D. Cal. 2013) (describing the "unfair" prong of the UCL).  This evidences a strong goal of consumer protection.  Moreover, "[n]ot only public prosecutors, but also 'any person acting for the interests of … the general public,' may bring an action for relief

---

[4] The Court recognizes that Defendants make the statement in the context of distinguishing from Brack v. Omni Loan Co., 164 Cal. App. 4th 1312 (2008), a case Plaintiffs cite for the proposition that California law trumps a Nevada choice-of-law provision when consumer and regulatory protection are at issue.  Brack, however, considered California's Finance Lender Law, which is not at issue here.  Thus, the Court finds Brack has little impact on the instant analysis.  Even so, the Court takes issue with the Defendants' unsupported proposition.

under the UCL." <u>Kasky v. Nike, Inc.</u>, 27 Cal. 4th 939, 949–50 (2002); Cal. Bus. & Prof. Code §
17204 (actions available to "a person who has suffered injury in fact and has lost money or
property as a result of the unfair competition"); <u>Id.</u> § 17201 (defining "person" to include
"natural persons"). In addition, Plaintiffs can seek injunctive relief. Cal. Bus. & Prof. Code §
17203.

The UTPA is more proscribed. Section 598A.060 enumerates the prohibited activities,
which broadly consist of price fixing, division of markets, allocation of customers, tying
arrangements, monopolization of trade or commerce in Nevada, and consolidations and mergers
that result in monopolization of trade or commerce. Nev. Rev. Stat. § 598A.060. Plaintiffs could
not bring their deceptive advertising claim under the UTPA's scope. Even if Plaintiffs alleged an
unfair trade practice within the UTPA's scope, they would have no private right of action if they
only lost money. The UTPA only provides a private right of action for those who suffer injury or
threat of injury to their "business or property." <u>Id.</u> § 598A.210. Alternatively, Plaintiffs may
pursue a deceptive advertising claim under the NDTPA. <u>Id.</u> §§ 598.0977, 41.600(2). As the
Court previously discussed, however, the remedies available under those provisions are limited
and do not authorize injunctive relief. Similarly, Section 207.171 of the Nevada Revised Statute
expressly prohibits deceptive advertising. Nev. Rev. Stat. § 207.171. However, this law does not
provide a private right of action. <u>Coffee v. Wyndham Resort Dev. Corp.</u>, 2021 WL 1518873, at
*2; Nev. Rev. Stat. §§ 207.174, 207.175, 207.176. As such, the false advertising law is not a viable
avenue for Plaintiffs to pursue their claim. Accordingly, the Court finds that the UTPA conflicts
with the UCL.

And this conflict is material. The UCL, through its purpose and provisions, evidences a
fundamental policy of remedying injuries to the consumer, whereas the UTPA does not.
Moreover, not only does the UCL afford greater protections to individual consumers than the
UTPA, but also Plaintiffs could not bring their claim of deceptive advertising and seek injunctive
relief under Nevada law. This "difference in available remedies [may] implicate[] a fundamental
policy set out in California." <u>Walter</u>, 682 F. Supp. 2d at 1041. "[P]ublic injunctive relief under
the UCL, the CLRA and the false advertising law is relief that has 'the primary purpose and
effect of' prohibiting unlawful acts that threaten future injury to the general public." <u>McGill v.
Citibank, N.A.</u>, 2 Cal. 5th 945, 955 (2017). Accordingly, the Court finds that application of
Nevada law to Plaintiffs' Count Two is contrary to a California fundamental policy.

Finally, as with the CLRA claim, the Court finds that California "will suffer greater
impairment of its policies if [Nevada's] law is applied" to the UCL claim. <u>Ruiz</u>, 667 F.3d at 1323.
All of the relevant facts are the same, and the UCL is also a consumer protection law falling
under the scope of the choice-of-law clause's exception. Defendants have also failed to provide
any evidence that shows Nevada has a greater interest with respect to the UCL claim. The Court
concludes that California has a materially greater interest than Nevada in the resolution of this
issue.

In sum, the Court concludes that California law applies to Plaintiffs' UCL claim.
Accordingly, the Court DENIES Defendants' Motion as to Count Two.

**c. Counts Three: California False Advertising Law, Cal. Bus. & Prof. Code § 17500 et seq.**

Count Three alleges violations of California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code § 17500 et seq., on behalf of Kruzick and a putative California subclass against Defendants IJL US and IJL International. Specifically, Plaintiffs allege that Defendants conducted "untrue and misleading advertising." (SAC ¶ 109.) Accordingly, the Court considers whether application of Nevada law to this claim is contrary to a fundamental policy of California.

The FAL prohibits any "unfair, deceptive, untrue, or misleading advertising." Cal. Bus. & Prof. Code § 17500. "This statute makes it unlawful for a business to disseminate any statement 'which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading[.]'" Arevalo v. Bank of Am. Corp., 850 F. Supp. 2d 1008, 1023-24 (N.D. Cal. 2011) (internal citation omitted). The broad scope of the FAL "extend[s] beyond literal falsities," and encompasses "not only advertising which is false, but also advertising which, although true, is either actually misleading or which has a capacity, likelihood or tendency to deceive or confuse the public." Davis v. HSBC Bank Nev., N.A., 691 F.3d 1152, 1162 (9th Cir. 2012). "As with the UCL, an action for violation of the false advertising law may be brought either by a public prosecutor or by 'any person acting for the interests of itself, its members or the general public,' and the remedies available to a successful private plaintiff include restitution and injunctive relief." Kasky, 27 Cal. 4th at 950; Cal. Bus. & Prof. Code §§ 17500, 17535.

Nevada law also prohibits "false, deceptive or misleading advertising and other sales practices." Nev. Rev. Stat. § 207.171. In fact, Nevada's law largely mirrors the FAL. Id.; Cal. Bus. & Prof. Code § 17500. The law, like the FAL, does not require "[a]ctual deception … to create liability." Landex, Inc. v. State ex rel. List, 94 Nev. 469 (1978). "The standard for untrue or misleading statements is the likelihood that the public will be misled." Id.; Nev. Rev. Stat. § 207.173. A violation of Nevada's false advertising law is also a misdemeanor, which can be elevated to a gross misdemeanor, as well as a civil violation resulting in penalties. Nev. Rev. Stat. §§ 207.174, 207.175, 207.177. In many respects, Nevada's false advertising law is similar to the FAL. As noted above, however, Nevada's law does not provide a private right of action. Coffee, 2021 WL 1518873, at *2; Nev. Rev. Stat. §§ 207.174, 207.175, 207.176. Because Plaintiffs cannot bring their false advertising claim under Nevada law, it significantly conflicts with the FAL.

Like the UCL, the "sweeping" scope of the FAL is intended to "protect both consumers and competitors by promoting fair competition in commercial markets for goods and services." Bailey v. Rite Aid Corp., 338 F.R.D. 390, 399 (N.D. Cal. 2021); see also Kwikset Corp., 51 Cal. 4th at 320 ("The state's false advertising law (§ 17500 et seq.) is equally comprehensive within the narrower field of false and misleading advertising."). As such, the FAL evidences a fundamental policy of California. As with the UCL, the "difference in available remedies [may] implicate[] a fundamental policy set out in California." Walter, 682 F. Supp. 2d at 1041. The

FAL provides Plaintiffs with important remedies, such as the ability to pursue injunctive relief or restitution. <u>Kasky</u>, 27 Cal. 4th at 950. Application of Nevada law, which provides no private right of action, would preclude Plaintiffs from obtaining remedies available under the FAL. Injunctive relief is critical to the FAL's purpose. <u>McGill</u>, 2 Cal. 5th at 955. Accordingly, the Court finds that application of Nevada law to Count Three is contrary to a fundamental policy of California.

As with the CLRA and the UCL, the same analysis for whether California will suffer greater impairment than Nevada applies. Accordingly, the Court finds that California has a materially greater interest than Nevada in the resolution of this issue.

In sum, the Court concludes that California law applies to Plaintiffs' FAL claim. Accordingly, the Court DENIES Defendants' Motion as to Count Three.

### d. Count Four: Fraud and Deceit, Cal. Civ. Code §§ 1709, 1710

Count Four alleges statutory fraud and deceit claims under the California Civil Code, Cal. Civ. Code §§ 1709, 1710, on behalf of Kruzick and a putative California subclass against Defendants IJL US and IJL International. Accordingly, the Court considers whether application of Nevada law to this claim is contrary to a fundamental policy of California.

In California, "the elements of fraud, which gives rise to the tort action for deceit, are (a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage." <u>Small v. Fritz Cos., Inc.</u>, 30 Cal. 4th 167, 173 (2003) (quoting <u>Lazar v. Superior Court</u>, 12 Cal. 4th 631, 638 (1996)); <u>see also</u> <u>Craig v. Southwest Airlines Co.</u>, 205 WL 5918852, at *1 (C.D. Cal. Dec. 19, 2005). "Scienter" is "an essential ingredient of an action for fraud and deceit" in California. <u>Strand v. Librascope, Inc.</u>, 197 F. Supp. 743, 745 (E.D. Mich. 1961) (comparing fraud claims under California and Michigan law). "Except as otherwise provided by law, the burden of proof requires proof by a preponderance of the evidence." Cal. Evid. Code § 115.

Under Nevada common law, "to prevail on a fraud claim, a plaintiff must prove five elements by clear and convincing evidence: (1) a false representation, (2) the defendant's knowledge or belief that the representation is false, (3) the defendant's intention to induce the plaintiff's reliance (4) the plaintiff's justifiable reliance, and (5) damages." <u>Nev. State Euc. Ass'n v. Clark Cnty. Educ. Ass'n</u>, 137 482 P.3d 665, 675 (Nev. 2021) (citing <u>Bulman, Inc. v. Nev. Bell</u>, 108 Nev. 105, 110–11 (1992). These elements are the same as a fraud claim under California law. Nevada law also requires scienter, which can "spell the difference between the success and failure of a claim." <u>Mazza v. Am. Honda Motor Co.</u>, 666 F.3d 581, 592 (9th Cir. 2012) (discussing scienter requirements in the context of consumer protection laws). However, Nevada law raises the evidentiary burden on plaintiffs and requires proof "by clear and convincing evidence." <u>Bulman</u>, 108 Nev. at 111. This is not a trivial difference, and may

determine whether Plaintiffs succeed or fail on their fraud claim.  Accordingly, the Court finds that Nevada law conflicts with California law.

Nevada's higher standard of proof conflicts with California's fundamental policy.  "The function of a standard of proof … is to instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication."  People v. Mary H., 5 Cal. App. 5th 246, 255–56 (2016).  In California, "[t]he default standard of proof in civil cases is the preponderance of the evidence."  Conservatorship of O.B., 9 Cal. 5th 989, 998 (2020).  This is the law, unless another law requires a different standard.  Cal. Evid. Code § 115.  "Generally, a higher burden of proof applies only where particularly important individual interests or rights, which are more substantial than the loss of money, are at stake."  Baxter Healthcare Corp. v. Denton, 120 Cal. App. 4th 333, 365 (2004).  "[F]or example, the clear and convincing evidence burden of proof has been applied where constitutional due process rights or important general public policy considerations are implicated."  Id. (citing 1 Witkin, Cal. Evid. (4th ed. 2000) Burden of Proof and Presumptions, § 39, 188–90).  This is not such a case.  Accordingly, the Court finds that that application of Nevada law is contrary to a fundamental policy of California.

The Court concludes that California has a materially greater interest than Nevada in the resolution of this issue.  Accordingly, the Court concludes that California law applies to Plaintiffs' fraud and deceit claim.  The Court DENIES Defendants' Motion as to Count Four.

### e.   Count Five: Actual Fraud, Cal Civ. Code § 1572

Count Five alleges actual fraud under the California Civil Code, Cal. Civ. Code § 1572, on behalf of Kruzick and a putative California subclass against Defendants IJL US and IJL International.  Accordingly, the Court considers whether application of Nevada law to this claim is contrary to a fundamental policy of California.

In California, actual fraud claims are of the same nature as fraud and deceit claims in Sections 1709 and 1710 of the California Civil Code, but relate to contracts.  Jones v. Bank of Am., N.A., 2021 WL 3163758, at *7 (C.D. Cal. Feb. 26, 2021) ("In California, the elements of the misrepresentation torts (which are also denominated forms of 'deceit') are prescribed by statute (Cal. Civ. Code §§ 1572; 1710) …").  The elements of actual fraud are the same as the elements for fraud and deceit under Sections 1709 and 1710 of the California Civil Code.  Id. at 7 (listing the following elements: "(a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud (i.e., to induce reliance); (d) justifiable reliance; and (e) resulting damage")

In Nevada, "intentional misrepresentations of material facts in a contract, resulting in the intended deception, constitutes actual fraud."  Softwind Capital, LLC v. Global Project Solutions, LLC, 2012 WL 2105900, at *2 (D. Nev. June 11, 2012).  The elements a plaintiff must prove are that of fraud, previously listed.  As such, application of Nevada law to Plaintiffs' actual fraud claim results in the same conflicts with the required burden of proof.  The Court finds that

application of Nevada law to Count Five is contrary to a fundamental policy of California and concludes that California law applies to Plaintiffs' actual fraud claim. Accordingly, the Court DENIES Defendants' Motion as to Count Five.

### f.   Count Six: Virginia Consumer Protection Act, Va. Code. Add. § 59.1–196, et seq.

Count Six alleges violations of the Virginia Consumer Protection Act ("VCPA"), Va. Code. Add. § 59.1–196, et seq., on behalf of Vrugtman and a putative Virginia subclass. The Court considers whether application of Nevada law to this claim is contrary to a fundamental policy of Virginia. Plaintiffs do not oppose Defendants' Motion to dismiss the VCPA claim and "concede that Nevada law applies to Vrugtman's Virginia claims, which do not conflict with Nevada law." (Opp'n at 9 n.3.) The Court concludes that the choice-of-law provision is enforceable against Plaintiffs' claim under the VCPA. Accordingly, the Court GRANTS Defendants' Motion as to Count Six.

In sum, California law applies to Counts One through Five. Defendants' Motion to dismiss Counts One through Five is DENIED. Defendants' Motion to dismiss Count Six is GRANTED. Count Six is DISMISSED WITHOUT LEAVE TO AMEND.

## B.  Counts Eight through Ten: Preclusion by Nevada Economic Loss Doctrine

Defendants move to dismiss Plaintiffs' causes of action for fraudulent inducement, fraud, and unjust enrichment under Nevada common law on the basis that Plaintiffs' allege contract claims, rather than tort claims. Defendants argue that Nevada law's economic loss doctrine bars such claims.

Nevada's "economic loss doctrine is designed to maintain a distinction between damage remedies for breach of contract and for tort." Giles v. Gen. Motors Acceptance Corp., 494 F.3d 865, 873 (9th Cir. 2007). Contract law "is designed to enforce the expectancy interests of the parties," whereas tort law "imposes a duty of reasonable care and thereby generally encourages citizens to avoid causing physical harm to others." Luxeyard, Inc. v. Kay Holdings, Inc., 2016 WL 4941997, at *5 (D. Nev. Sept. 15, 2016) (quoting Davis v. Beling, 278 P.3d 501, 514 (Nev. 2012)). The economic loss doctrine may "bar recovery for other tort claims where the plaintiff's only complaint is that the defendant failed to perform what was promised in the contract." Giles, 494 F.3d at 879. The doctrine, however, "does not bar recovery in tort where the defendant had a duty imposed by law rather than by contract and where the defendant's intentional breach of that duty caused purely monetary harm to the plaintiff." Id. Instead, the doctrine only "bars a plaintiff from recovering 'purely economic losses' as a result of an unintentional tort." CH2E Nev., LLC v. Mahjoob, 2015 WL 6438297 (D. Nev. Oct. 21, 2015). Moreover, "Nevada courts apply the economic loss rule more narrowly than California courts." Aliya Medcare Fin., LLC v. Nickell, 156 F. Supp. 3d 1105, 1122 (C.D. Cal. 2015).

//
//

### 1. Fraudulent Inducement

The Court first considers whether the economic loss doctrine precludes Plaintiffs' fraudulent inducement claim under Nevada common law.  The parties dispute whether such a claim falls within the scope of Nevada's economic loss doctrine.  Generally, "[i]ntentional torts are not barred by the economic loss doctrine."  Halcrow, Inc. v. Eight Jud. Dist. Ct., 129 Nev. 394, 402 n.2 (2013) (citing Terracon Consultants W., Inc. v. Mandalay Resort Grp., 125 Nev. 66 (2009)).  "Thus, the economic loss doctrine does not preclude litigants from asserting claims of intentional misrepresentation."  Id.; see also Aliya Medcare Fin., 156 F. Supp. 3d at 1122 (holding that the economic loss doctrine does not "bar[ ] fraudulent inducement claim[s]—or any [ ] intentional tort claims, for that matter").  As both parties note, the economic loss doctrine primarily arises in the context of unintentional tort claims.[5]  See, e.g., Davis v. Beling, 128 Nev. 301, 230 (2012) (explaining that the economic loss "doctrine primarily functions to bar the recovery of purely monetary losses in certain products liability and unintentional tort actions," but "does not, however, bar the recovery of purely economic losses when the defendant intentionally breaches a duty that is imposed independently of the obligations arising from contract"); Gaming v. Trustwave Holdings, Inc., 2016 WL 5799300, at *4 (determining that a fraudulent inducement claim would not "be dismissed under Nevada's economic loss rule"); CH2E Nev., LLC v. Mahjoob, 2015 WL 6438297, at *4–5 (D. Nev. Oct. 21, 2015) (analyzing the plaintiff's negligent misrepresentation claims under the economic loss doctrine, but not plaintiff's fraudulent inducement claim).

The Ninth Circuit, however, has interpreted Nevada's economic loss doctrine to preclude intentional tort claims under very limited circumstances.  Giles, 494 F.3d at 880.  Giles distinguished between fraudulent inducement claims, which do not fall under the economic loss doctrine's scope, and "mere contract claim[s] cloaked in the language of tort," which do.  494 F.3d at 880.  Under Giles, a court must review whether a fraud claim alleges "fraud in the inducement rather than fraud in the execution or promissory fraud."  Id.  The test is whether the claim alleges "fraud 'extraneous' to the contract."  Id.  The test is not whether "the events giving rise to [the] fraud claim [ ] occur[ed] in the context of a contractual relationship between the parties."  Id.

//
//
//
//
//

---

[5] Plaintiffs cite to cases dismissing unintentional tort claims for the proposition that "the economic loss doctrine does not bar intentional torts."  (Opp'n at 10.)  Defendants counter that the absence of an affirmative case precluding an intentional tort does not prove the negative: that intentional torts are never precluded.  (Reply at 8.)  Both statements are true.  However, in light of the Nevada Supreme Court's statements in Harlow and Nevada's more narrow application of the economic loss doctrine, the Court finds Plaintiffs' argument more persuasive.

**CIVIL MINUTES—GENERAL**   Initials of Deputy Clerk MG

Some courts have stated that Giles appears to conflict with Nevada law.  See, e.g., Las Vegas Metro. Police Dep't v. Harris Corp., 2014 WL 3474278, at *2 (D. Nev. July 11, 2014) (finding that "[i]n contrast" to "express statements" in Halcrow, 129 Nev. 394 (2013), "the Ninth Circuit predicted that 'Nevada law may also bar recovery for other tort claims when the plaintiff's only complaint is that the defendant failed to perform what was promised in the contract").  The Court also observes that because Nevada applies the economic loss doctrine more narrowly, application of Giles may broaden Nevada's economic loss doctrine beyond its intended scope.  Even so, because Giles is binding on this Court, the Court applies Giles to the instant case.

Giles distinguishes between promises arising from the contract and promises that are separate and apart from the terms of the contract.  In Giles, the defendant had represented to plaintiffs that they needed to sign and back-date an assignment of funds as part of an existing floorplan agreement between the parties.  494 F.3d at 871, 879.  The Giles Court held that plaintiffs' fraud claim alleged "fraud in the inducement rather than fraud in the execution or promissory fraud."  Id. at 880.  The misrepresentation about the assignment was "based on behavior outside the contractual obligations and in violation of the duty imposed under Nevada law not to commit fraud."  Id. at 880.  Although the defendant had represented the assignment as part of signed contracts, the fraud arose not from those contracts but with respect to the assignment.  Id.  Moreover, defendant's conduct "went beyond what it was authorized to do under its contract in the event of breach."  Id.  Accordingly, the plaintiffs' fraud claim did "not duplicate a contract suit based on the rights and duties of the parties under the floorplan financing and wholesale security agreements," and were extraneous.  Id.

The Court also finds Davis v. Belling, 128 Nev. 301 (2012), instructive.  In Davis, the claim facing preclusion by the economic loss doctrine was not a fraudulent inducement claim but a statutory cause of action.  Id. at 320.  Nevertheless, the Nevada Supreme Court analyzed whether the claim alleged "a duty imposed by law rather than by contract."  Id. (citing Giles, 494 F.3d at 879).  The plaintiffs had hired the defendant real estate broker for both the sale and purchase of properties and executed agreements.  The plaintiffs alleged that the defendant had breached duties real estate licensees owe their clients when carrying out the services for which they had contracted.  The court held that "although the parties had agreements regarding [the properties], the [plaintiffs'] NRS 645.247 claims are not based upon a breach of an obligation arising from those agreements."  Id.  Instead, the "claims are predicated upon [the defendant's] intentional breach of separate duties, distinct from those arising from the parties' contractual dealings."  Id. at 320–21.  Accordingly, the court concluded that the economic loss doctrine did not preclude the plaintiffs' claim for statutory damages.

//
//
//
//
//

Plaintiffs argue that their fraudulent inducement claim, like in <u>Giles</u>, are promises separate from the terms of Plaintiffs' contracts with Defendants. (Opp'n at 10–11.)  The behavior at issue is Defendants' alleged representations through their employees that "they have 'multiple matches in mind' for prospective customers.'" (<u>Id.</u> at 10).  Plaintiffs allege that Plaintiffs' contracts do not speak to the content of those representations: that Defendants' employees "had in mind" individuals who met Plaintiffs' criteria.  (<u>Id.</u> at 11.)  As such, Plaintiffs assert that their claim is extraneous to the contracts with Defendants.

Defendants contend that Plaintiffs' claim is not extraneous, because it "boil[s] down to a failure to deliver what Plaintiffs were promised under their contracts with Defendants."  (Mot. at 14.)  An alleged misrepresentation about when, with whom, and where Defendants would match Plaintiffs corresponded to provisions in Plaintiffs' contracts specifying the number of matches, timeframe in which Defendants would provide dates, and the location of matched individuals. (Mot. at 12–13; Reply at 9–10.)  Because Plaintiffs simply allege "misrepresentation about the characteristics or quality of goods that are the subject of the contract," Plaintiffs' fraudulent inducement claim duplicates a contract claim.  (Mot. at 14–15 (quoting <u>Giles</u>, 494 F.3d at 880).)

Applying <u>Giles</u> and <u>Davis</u> and reviewing the pleadings, the Court finds that Plaintiffs have alleged a fraudulent inducement claim that does not arise from the terms of Plaintiffs' contracts with Defendant.  As Defendants acknowledge, the contents of the alleged misrepresentations and of the contract control whether Plaintiffs' claims are based in tort or contract.  The gravamen of Plaintiffs' claim is the alleged misrepresentations by Defendants' employees that they knew individuals in the matchmaking service that fit Plaintiffs' criteria.[6]  The promise is the existence of specific individuals.  That promise is separate and distinct from Defendants' contractual promises, which are procedural.  The contractual promises represent that Defendants will introduce Plaintiffs to matches according to specified guidelines.  Plaintiffs' claim does not duplicate these promises.  Moreover, no part of Plaintiffs' respective contracts addresses the misrepresentation of knowing specific individuals.  Accordingly, Defendants' alleged promise goes beyond what their contracts with Plaintiffs authorize.  <u>Giles</u>, 494 F.3d at 880.

Defendants argue that any fraud claim that is "related to the same subject matter addressed by provisions in the resulting agreement" are tort claims sounding in contract.  (Mot. at 14.)  Because Plaintiffs' claim relates to provisions in Plaintiffs' contracts, Defendants contend that the claim necessarily challenges "the services promised under their contractual relationship with Defendants."  (Mot. at 13.)  This is incorrect.  That Plaintiffs' fraud claim may <u>relate</u> to

---

[6] The Court notes that Plaintiffs seem confused about their position.  For example, Plaintiffs state that "the matches—the most important aspect of IJL US's and IJL [International's] service—were misrepresented in a way that was not covered by the contracts." (Opp'n at 12.)  Plaintiffs also argue that their claims allege misrepresentation of the "fundamental character of [Defendants'] services and its available dates, not the quality of their services." (<u>Id.</u>)  At this stage, however, the Court considers Plaintiffs' pleadings in the SAC. Taking the factual allegations in the SAC as true, Plaintiffs allege that Defendants misrepresented that they knew specific individuals with whom they could match Plaintiffs.

certain terms in Defendants' contract or "occur in the context of a contractual relationship between the parties" does not convert the fraudulent inducement claim to a contract claim. Giles, 494 F.3d at 880. As Defendants note, Plaintiffs' respective contracts do provide for the number of matched individuals Defendants would provide, in what timeframe these matches would occur, the location at which individuals reside, and specific criteria provided by clients that Defendants seek to meet. (See Mot., Ex. A.) But none of these duties address promises and representations Defendants' employees make during sales calls. While the duty governing the latter arises from Plaintiffs' contracts with Defendants, the duty governing the former is one "imposed under Nevada law not to commit fraud." Giles, 494 F.3d at 880.

Defendants' authority, Luxeyard, Inc. v. Kay Holdings, Inc., 2016 WL 4941997, at *5–6 (D. Nev. Sept. 15, 2016), does not undercut the Court's analysis. In Luxeyard, the plaintiff alleged that the defendant had made misrepresentations "in three subsections of the 'warranties and representations' portion of the written agreement." Id. at *5. The misrepresentations directly arose from express terms of the contract. Because the alleged misrepresentations were not extraneous from the contract, the court held that the plaintiff alleged a contract claim. Id. at *6. Here, Plaintiffs do not claim their misrepresentations arise from their contracts with Defendants. Therefore, Luxeyard is distinguishable.[7]

In sum, the Court finds that Nevada's economic loss doctrine does not preclude Plaintiffs' fraudulent inducement claims. Accordingly, the Court DENIES Defendants' Motion as to Count Eight.

### 2. Fraud

The Court next considers whether the economic loss doctrine precludes Plaintiffs' fraud claim under Nevada common law. Fraud is an intentional tort. Giles, 494 F.3d at 875 (reviewing whether the economic loss doctrine applied to a fraud claim). The same test the Court applied to Plaintiffs' fraudulent inducement claim applies here: Plaintiffs must allege fraud extraneous from the contract. Id.; but see First Nat'l Bank v. Progressive Cas. Ins. Co., 2012 WL 5944847, at *6 n.2 (D. Nev. Nov. 27, 2012) (determining that the economic loss doctrine "does not apply to intentional trots, such as fraud"). Because the alleged misrepresentations for Plaintiffs' fraud claim are the same as those for Plaintiffs' fraudulent inducement claim, the Court finds that the economic loss doctrine does not apply to Plaintiffs' fraud claim. (SAC ¶¶ 152–59.) Accordingly, the Court DENIES Defendants' Motion as to Count Nine.

//
//
//
//
//



---

[7] Luxeyard also applies New York law to define fraud and is further distinguishable on this ground.

### 3.   Unjust Enrichment

Finally, the Court considers whether the economic loss doctrine precludes Plaintiffs' unjust enrichment claim under Nevada common law.  "Unjust enrichment is an equitable substitute for a contract," or a "quasi contract" claim.  In re Zappos.com, Inc., 2013 WL 4830497, at *4 (Sept. 9, 2013) (citing Leasepartners Corp., Inc. v. Robert L. Brooks Trust, 113 Nev. 747 (1997)).  "The phrase 'unjust enrichment' is used in law to characterize the result or effect of a failure to make restitution of, or for, property or benefits received under such circumstances as to give rise to a legal or equitable obligation to account therefor." Leasepartners Corp., 113 Nev. at 755 (quoting 66 Am. Jur. 2d Restitution § 3 (1973)).  Defendants provide no authority for applying the economic loss doctrine to unjust enrichment claims under Nevada law, and the Court is not aware of any.  Accordingly, the Court DENIES Defendants' Motion as to Count Ten.

## V.   CONCLUSION

For the reasons above, the Court DENIES IN PART and GRANTS IN PART Defendant's Motion.  The Court DENIES Defendants' Motion as to Counts One, Two, Three, Four, Five, Eight, Nine, and Ten.  The Court GRANTS Defendants' Motion as to Count Six and DISMISSES Count Six WITHOUT LEAVE TO AMEND.  The September 27, 2021 hearing is VACATED.


**IT IS SO ORDERED.**