**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

John G. Balestriere*
Matthew W. Schmidt (Cal. Bar No. 302776)*
**BALESTRIERE FARIELLO**
225 Broadway, 29th Floor
New York, New York 10007
Telephone: (212) 374-5401
Facsimile:   (212) 208-2613
john.balestriere@balestrierefariello.com
matthew.schmidt@balestrierefariello.com
*Admitted Pro hac vice*

Anastasia Mazzella (Cal. Bar No. 245201)
**KABATECK LLP**
633 West Fifth Street, Suite 3200
Los Angeles, California 90071
Telephone: (213) 217-5007
Facsimile:   (213) 217-5010
am@kbklawyers.com
*Attorneys for Plaintiffs and the Classes*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **ROSANNE VRUGTMAN, TAMMY GILLINGWATER**, and **NICOLE KRUZICK,** individually, and for all others similarly situated,<br><br>Plaintiffs,<br><br>–against–<br><br>**IT'S JUST LUNCH INTERNATIONAL LLC**, IJL US LLC, IJL CANADA INC.<br><br>Defendants. | **Case No. 5:20-cv-02352 JGB-SP**<br><br>**NOTICE OF MOTION AND MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR CLASS CERTIFICATION, FOR APPOINTMENT OF CLASS REPRESENTATIVE AND CLASS COUNSEL, AND FOR LEAVE TO FILE THIRD AMENDED COMPLAINT**<br><br>**DATE:** May 15, 2023<br>**TIME:** 9:00 a.m.<br>**COURTROOM:** 1<br>**JUDGE:** Hon. Jesus G. Bernal |

# NOTICE OF MOTION

**TO DEFENDANTS AND THEIR ATTORNEY OF RECORD:**

PLEASE TAKE NOTICE that on May 15, 2023, or as soon thereafter as the matter may be heard in courtroom 1 of the above-caption Court, located at 3470 Twelfth Street, Riverside, CA 92501, Plaintiffs Rosanne Vrugtman ("Vrugtman"), Tammy Gillingwater ("Gillingwater") and Nicole Kruzick ("Kruzick") will and hereby do move the Court to grant class certification pursuant to Rule 23 of the Federal Rules of Civil Procedure. The grounds for the motion for class certification and for appointment of Class Counsel are as follows:

1) The proposed Classes satisfy the requirements of Rule 23(a) of the Federal Rules of Civil Procedure because the members of the proposed Classes are so numerous that joinder is impracticable, there are questions of law or fact common to the members of the Classes, the claims of the Plaintiffs are typical of the claims of other members of the Classes, and the Plaintiffs will fairly and adequately protect the interests of the Class.

2) The proposed Classes satisfy the prerequisites of Rule 23(b)(3) of the Federal Rules of Civil Procedure because common questions of law and fact predominate, and a class action is the superior method of adjudicating the claims asserted here.

3) The law firms Balestriere Fariello and Kabateck LLP ("KBK") should be appointed as Class Counsel because of the work counsel has done in identifying and investigating the potential claims in the action and in prosecuting this action to the verge of trial; counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; counsel's knowledge of the applicable

law; and the resources that counsel will commit to representing the Classes and has committed to the Classes over the last three years.

Plaintiffs also move for leave to file the attached Third Amended Complaint, which adjusts the class definition to cover defrauded IJL customers Nationwide by adding the following language to paragraph 70 of the complaint, on page 9, lines 16 through 18:

**National Class:**

All United States residents who joined IJL US on or after September 12, 2019.

These Motions are based on this Notice, the attached Memorandum of Points and Authorities, the declarations of John G. Balestriere and Anastasia K. Mazella; the Court's file and records in this action; and such arguments as may be presented at the hearing on this motion.

Dated: April 17, 2023          **BALESTRIERE FARIELLO**

By: _____

John G. Balestriere*

Matthew W. Schmidt*

*Attorney for Plaintiffs and Classes*

*Admitted Pro hac vice*

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................... iii

MEMORANDUM OF POINTS AND AUTHORITIES........................................1

I.   PRELIMINARY STATEMENT ....................................................1

II.  STATEMENT OF FACTS ...........................................................4

III. APPLICABLE RULES AND CLASS DEFINITIONS ...........................9

IV.  ARGUMENT.........................................................................11

   A.   THE PROPOSED CLASSES SATISFY THE REQUIREMENTS OF RULE 23(a) ...........................................11

      1.   The Members of the Proposed Classes Are So Numerous That Joinder Is Impracticable ...................................11

      2.   There Are Questions of Law or Fact Common to the Members of the Classes.........................................13

      3.   The Claims of Plaintiffs are Typical of the Claims of Other Members of the Classes.............................14

      4.   Plaintiffs will Fairly and Adequately Protect the Interests of the Classes ...................................15

   B.   THE PROPOSED CLASSES SATISFY THE PREREQUESITES OF RULE 23(b)(3) .......................................15

      1.   Common Questions of Law and Fact Predominace ...........16

         A. The Classes All Satisfy Predominance.............................17

           i. Defendants Committed Uniform Acts of Consumer Fraud..............................................................18

           ii. Defendants' Uniform Acts of Consumer Fraud Caused Inform Injury to Plaintiffs and the Classes..21

           iii. The Injury of Plaintiffs and the Classes Is Discernable on a Class-Wide Basis as the Value of their IJL Memberships .................................................21

2.      Class Action is the Superior Method of Adjudicating the Claims Asserted Here..................................................................23

C.   THE COURT SHOULD APPOINT BALESTRIERE FARIELLO AND KBK AS CLASS COUNSEL ......................................................24

D.   THE COURT SHOULD GRANT LEAVE FOR PLAINTIFFS TO FILE THE THIRD AMENDED COMPLAINT .................................24

V.   CONCLUSION ...........................................................................25

# TABLE OF AUTHORITIES

**Cases**

*Amgen Inc. v. Connecticut Ret. Plans and Trust Funds*
    568 U.S. 455 (2013) ................................................................16

*Armstrong v. Davis*
    275 F.3d 849 (9th Cir. 2001) .................................................14

*Californians for Disability Rights, Inc. v. Cal. Dep't of Transp.*
    249 F.R.D 334 (N.D. Cal. 2008) ...........................................15

*Callaway Golf Corp. v. Royal Canadian Golf Assn.*
    125 F. Supp. 2d 1194 (C.D. Cal. 2000) ................................24

*Capaci v. Sports Rsch. Corp.*
    No. CV193440FMOFFMX, 2022 WL 1133818, (C.D. Cal. Apr. 14, 2022)....12

*Ellis v. Costco Wholesale Corp.*
    657 F.3d 970 (9th Cir. 2011) .................................................15

*Hanlon v. Chrysler*
    150 F.3d 1011 (9th Cir. 1998) .........................................15, 23

*In re Myford Touch Consumer Litig.*
    No. 13-CV-03072-EMC, 2016 WL 7734558, (N.D. Cal. Sept. 14, 2016)........17

*In re Rubber Chemicals Antitrust Litig.*
    232 F.R.D 346 (N.D. Cal. 2005).............................................12

*In re Toyota RAV4 Hybrid Fuel Tank Litig.*
    534 F. Supp. 3d 1067 (N.D. Cal. 2021)..................................17

*Parsons v. Ryan*
    754 F.3d 657 (9th Cir. 2014) .................................................14

*Picus v. Wal-Mart Stores, Inc.*
    256 F.R.D. 651 (D. Nev. 2009)..............................................17

*Schwarzenegger v. Fred Martin Motor Co.,*
    374 F.3d 797 (9th Cir. 2004) .................................................24

*Tait v. BSH Home Appliances Corp.*
   289 F.R.D. 466 (C.D. Cal. 2012) ................................................................12, 17
*Torres v. Air to Ground Services, Inc.*
   300 F.R.D. 386 (C.D. Cal. 2014) ..........................................................................12
*United States ex rel. Terry v. Wasatch Advantage Grp., LLC*
   327 F.R.D. 395 (E.D. Cal. 2018)................................................................11, 25
*Want v. Chinese Daily News, Inc.*
   737 F.3d 538 (9th Cir. 2013) ..............................................................................13
*Willitis v. City of Los Angeles*
   No. CV 10-05782 CBM, WL 7767305 (C.D. Cal. Jan. 3, 2011) ......................15

**Statutes**
Nev. Rev. Stat. 598.0923 ..........................................................................................17
Va. Code § 59.1 ..........................................................................................................18

**Rules**
Fed R. Civ. P. 23(a).................................................................2, 9, 10, 11, 23, 14
Fed. R. Civ. P. 23(b) ..............................................................2, 3, 10, 13, 15, 16, 23
Fed. R. Civ. P. 23(g) ...............................................................................4, 24, 25

iv

## <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>[1]

## I.      PRELIMINARY STATEMENT

Defendants It's Just Lunch International LLC and IJL US LLC (collectively "IJL" or the "Company") engaged in a uniform and systematic course of fraud against consumers by misstating the nature of IJL's so-called "personalized matchmaking service." Rather than, as it advertises, offering individualized matchmaker services based on each customer's individual wishes, IJL is in fact designed, once it lures consumers in to pay thousands of dollars each for its service, to efficiently "match" its clients with *anyone* who meets a superficial list of interests. This is not a "personalized" matchmaking service at all, but an example of the same kind of fraud that resulted in IJL settling a similar class action barely months before the Class Period in this action began.

Due to IJL's structure—including the fact that it employs fewer than *one* matchmaker per ███ active users—it is structurally impossible for IJL to fulfill the promises made in its advertisements. This not only violates the consumer protection laws of California, Nevada, and Virginia, but makes this action perfectly suited for class-wide adjudication.

Plaintiffs Vrugtman, Gillingwater,[2] and Kruzick ("Plaintiffs") seek to certify a nationwide class (the "Class" or the "Nationwide Class"), with subclasses of current and former California and Virginia residents (the "California Subclass" and the "Virginia Subclass" respectively; combined

---

[1] All exhibits referenced herein are defined in the Declaration of John G Balestriere in Support of this Motion.

[2] Defendant IJL Canada Inc., the IJL franchise that had a relationship with Plaintiff Gillingwater, became defunct during the pendency of this lawsuit. (*See* Ex. B, Transcript Excerpts from Deposition of Rachel Wilson, at 64:19–25.) Accordingly, Plaintiff Gillingwater does not seek to represent a class, but her testimony is discussed herein as further evidence of IJL's uniform conduct making class certification appropriate.

with the Nationwide Class, the "Classes"). Plaintiffs assert nine causes of action, including violations of Nevada consumer protection laws on behalf of the Class for the Nationwide Class and California and Virginia residents for the respective subclasses of those states.

This action is ideally suited for class-wide adjudication. As set forth further below, Plaintiffs have met their burden of establishing each element required by Federal Rule of Civil Procedure ("Rule") 23(a) and 23(b)(3).

First, the Classes are so numerous that individualized adjudication would be unworkable. By IJL's own admission, the proposed California and Virginia Subclasses alone consist of more than 1,800 individuals, and the National Class contains ██████ more. This well exceeds the 40-person requirement for presumptive numerosity.

Second, common issues of law and fact predominate. As IJL's senior executives admitted in detail at their depositions, IJL is structurally designed in a way that makes it impossible for it to fulfill the promises it makes in its advertisements and instructs its salespersons to deliver to potential clients. Far from providing a personalized, individualized matchmaking service—a statement that is not puffery but describes a specific type of service—IJL in truth is no better than a free dating website. But unlike free dating websites, IJL charges customers thousands of dollars simply to have its "matchmakers" input data and then email clients about their "matches." And as Plaintiffs explained at their depositions, each was harmed by IJL in uniform way— paying for a service that had no value—that was the logical and expected result of IJL's system.

Third, Plaintiffs Vrugtman's and Kruzick's claims are each typical of the Classes. Each signed up for IJL based on IJL's representations of individualized matchmaking and each suffered harm that was the proximate result of IJL's knowing failure to provide the service it promised. As

discussed in further length below, despite IJL's counsel's repeated attempts to elicit testimony from each Plaintiff admitting that their harm was specific to themselves, the record shows that each Plaintiff's testimony explained in detail how the harm done to them was the same harm that applies to members of all the Classes.

Fourth, Plaintiffs have no conflict of interest with other class members and will adequately represent the interests of the proposed class. Plaintiffs' counsel—Balestriere Fariello and Kabateck LLP ("KBK")—similarly have considerable experience and success in litigating class actions and provide adequate class representation. Indeed, Balestriere Fariello is uniquely suited to represent the Classes' interests as it previously litigated similar claims in the United States District Court for the Southern District of New York, where Balestriere Fariello achieved class certification and a favorable class-wide settlement providing millions in compensation to class members. KBK similarly has considerable experience in litigating class actions, especially in this District. Together, both Balestriere Fariello and KBK have adequately litigated this matter from inception to the verge of trial and shall continue to adequately prosecute this action and protect the interests of the Classes.

Lastly, the proposed Classes satisfy the requirement of Rule 23(b)(3) because common class-wide issues predominate due to the uniform nature of IJL's false representations which resulted in class members uniformly failing to obtain the services they believed they were purchasing. This is shown from uniform evidence, including IJL's training manuals, testimony from their executives as to their internal processes, and other internal documents such as IJL's client files from its Customer Relationship Management ("CRM") system, which are at the heart of IJL's system that makes it effectively impossible for its clients to receive the services they paid

for. Damages are also easily calculable based on the amount of money that each member paid to IJL.

The Court should also permit Plaintiffs to file a Third Amended Complaint with an updated class definition to include a National Class. This amendment is appropriate because discovery in this action has revealed that the nature of IJL's fraud is indeed uniform across its customers Nationwide, so IJL will suffer no prejudice. Not only is there no relevant discovery that IJL needs to seek from the expanded class, but Plaintiffs initially pleaded a Nationwide class and have continued to assert claims under Nevada's consumer protection laws which, due to IJL's choice of law provision in its contracts, apply to the full National Class. Nor will this amendment cause any delay, and in fact amendment serves judicial economy as it prevents the need for a separate action brought by the members of the proposed National Class to enforce their rights.

IJL has defrauded and continues to defraud ███████ of consumers by failing to provide the service that IJL advertises. This fraud is foundational to IJL's entire corporate design, from the fact that it fails to employ sufficient "matchmakers" to provide the services that IJL promises, to how it designs its intake process to create false overlap of interests through leading questions. This case is ideally suited to resolution on a class-wide basis, and Plaintiffs respectfully request that this Court certify the Classes defined herein and designate Plaintiffs' counsel as Class Counsel pursuant to Rule 23(g).

## II.    STATEMENT OF FACTS

IJL positions itself as a premier "personalized" dating service, offering to connect individuals interested in romantic relationships. (Second Amended Complaint, Dkt. No. 29 ("SAC") ¶ 1.) The Company claims its highly trained experts offer personalized, sophisticated, and thoughtful

matchmaking services. (*Id.*) IJL, which advertises its services as "dating for busy professionals," was founded in 1991 in Chicago by a marketing executive named Andrea McGinty. (*Id.* at ¶ 17.) Since its formation, IJL has had tens of thousands of clients around the world, including in the United States, Canada, Australia, the United Kingdom, and Ireland. (*Id.* at ¶ 18.)

IJL advertises via its website, TV ads, social media ads, in-flight magazines, and direct marketing emails. (Ex. B at 68:22–69:14.) IJL's primary marketing proposition, displayed prominently on all advertisements, is that it is a "personalized matchmaking service." (Ex. C, Hemispheres Magazine articles, at IJL000347, IJL000351, IJL000353, IJL000355, IJL000357, IJL000359; Ex. D, Screenshots from IJL's Website at IJL000325, IJL000332; Ex. E, Screenshots of the Privacy Statement and Terms of Service from IJL's Website, IJL000338–339, IJL000341; and Ex. F, IJL advertisements, IJL000342–345; *see* Ex. B at 68:24–69:24.)

IJL currently has between ████████████ "active" clients, meaning a client who is "actively dating" with IJL." (Ex. B at 45:4–9, 49:10–23.) As IJL's CEO Rachel Wilson explained at her deposition, clients can go on "hold" status either voluntarily—for instance, when they meet a match they like and do not wish to be set up on further dates—or if the client does not respond to IJL for three consecutive days. (*Id.* at 45:10–17.)

When a potential client contacts IJL, they speak with a salesperson, who, notwithstanding their training focusing on simply bringing in paying customers to IJL, IJL nonetheless calls a "dating specialist." (*Id.* at 42:6–15.) IJL currently employs 30 salespeople who go by the name of dating specialists (including three sales managers), who make up nearly half of its 65 employees. (*Id.* at 41:25–42:5; *see* Ex. G, Transcript Excerpts from Deposition of Sandra Hatton, at 17:17–21.) As IJL's Vice President of Sales, Sandra Hatton, to whom all dating specialists report, explained in her

deposition, a typical initial call lasts 45 minutes to an hour, during which the dating specialist is "required" to "follow a script" and "follow their training materials." (Ex. G at 28:4–7.)

The "script" for this initial call is called the "ISR Phone Presentation," which stands for "Inside Sales Representative" Phone Presentation. (Ex. G at 27:20–22, 28:4–7.) In the first ten sentences of what IJL calls its "script," the IJL sales representative is instructed to make two separate representations that IJL is a "personalized matchmaking service":

- "Okay, first and foremost we are a *personalized matchmaking service* and we specialize in setting busy people up on first dates over lunch, brunch or drinks after work."

- "One of the reasons we're so successful is because we are a *very personal matchmaking service* so you will be working one-on-one with your very own matchmaker."

(Ex. H, IJL Dating Specialist Manual, at IJL000007 (emphasis added).) At the end of the process, a successful sales call results in the potential client signing a contract with IJL, which, in the case of U.S. residents, includes a Nevada choice of law provision. (*See* Ex. I, Kruzick Client File, at IJL000398; Ex. J, Vrugtman Client File at IJL000385.)

IJL previously faced a class action suit, *Rodriguez v. It's Just Lunch International*, Case. No. 07-CV-09227 (S.D.N.Y.), for similar conduct, represented by Balestriere Fariello and reaching a class-wide settlement creating a $4.75 million fund for as well as providing injunctive relief. *See id.* at Dkt. No. 475. There, IJL engaged in a scheme where its sales staff, among other wrongdoings like here, used scripts where it instructed its salespersons to promise that they had dates in mind for potential customer even when this was false. *See id.* at Dkt. No. 199. While IJL has gone out of its way to fix some of this very specific conduct—its training scripts no longer affirmatively

instruct its salespersons to lie regarding having specific dates in mind—it has only doubled down on other behavior, described herein, that now continues to defraud consumers seeking a personalized, premium dating service costing thousands of dollars each.

Despite its claimed focus on matchmakers, IJL employs only 15 matchmakers—well under half the number of salespersons that IJL employs, even though providing personalized service to the thousands of IJL customers would take much more time than any salesperson (who signs up a customer then moves on) need spend with a customer. (Ex. B at 43:1–2.) These matchmakers are not only responsible for selecting matches, but they are also charged with the time-consuming day-to-day aspects of the client relationship, including client contact, coordinating dates, making restaurant reservations, reminding clients of dates, receiving client feedback, and, in the words of IJL's CEO, "anything that has to do with the client experience." (*Id.* at 43:3–16.) And these 15 individuals supposedly do all this for the thousands of dollars that each Class member pays, notwithstanding that each matchmaker has on average over ███ customer relationships—meaning that a matchmaker working 40 hours per week would have ████████ *per customer* to provide all these services. (*See id.*)

IJL matchmakers and other staff work through IJL's CRM system, through which they access and update client files, which contain client information, including their dating profile and interests, and a log of communications they have with IJL. (*See* Ex. I at IJL000400–411, Ex. J at IJL000387–395, Ex. K, Gillingwater Client File, at IJL000364–381.)

Plaintiff Vrugtman, a Virginia resident, is a writer, editor, and publisher, who holds five degrees, including two Master's degrees and a PhD. (Ex. L, Transcript Excerpts from Deposition of Rosanne Vrugtman, at 25:9–26:16.) Vrugtman joined IJL on July 20, 2020, purchasing a Virginia

"Gold" membership for $2,595. (*See* Ex. J at IJL000384–386.) For this, Vrugtman was promised at least 12 dates. (*Id.*) However, as Vrugtman testified, she did not receive "the customized, personalized matching that [IJL] promise[d] on [its] website and in [its] contract." (Ex. L at 41:10–18; *see id.* at 48:6–18 ("I was expecting them to set me up with eligible people who met my requirements and for whom I met their requirements. That never happened.").) On the three "matches" that IJL arranged for Vrugtman, two cancelled after Vrugtman expressed concern to IJL about a lack of information about why she was matched with them, and a third—despite Vrugtman's stated importance of a date sharing her interest in reading and literature—read "only technical manuals." (*Id.* at 48:19–49:17.)

Plaintiff Kruzick, a California resident during the relevant time period, is a university and culinary school graduate who works in glass-glazing and food styling. (Ex. M, Transcript Excerpts from Deposition of Nicole Kruzick, at 17:3–18:18.) Kruzick joined IJL on June 25, 2020, purchasing a California "Platinum" membership for $2,495. (*See* Ex. I at IJL000398–399.) For this, Kruzick was promised at least 12 dates. (*Id.*) Despite promises of personalized matchmaking, Kruzick's first date was with a person who was "the opposite of everything that [she] had expressed that [she] was looking for in a match." (Ex. M at 40:2–4.) These included objective criteria such a lack of a flexible work schedule, financial stability, and someone who was "seeking a relationship." (*Id.* at 40:5–10.) Nor did Kruzick's match conceal this information: on their virtual date, he readily admitted that he was "just looking to meet people" and not interested in a relationship. Further, he was a professional DJ who worked weekends and evenings. (*Id.* at 41:24–42:17.) Kruzick received no other dates, and when Kruzick attempted (unsuccessfully) to obtain a refund, she was admonished for "inappropriate"

conduct towards IJL staff and threatened with cancellation of her membership. (*Id.* at 108:17–109:10, 112:14–17.)

Plaintiff Gillingwater, a resident of Toronto, Canada, is a medical sales manager. (Ex. N, Transcript Excerpts from Deposition of Tammy Gillingwater, at 8:14–9:4.) Gillingwater joined IJL on September 24, 2019, purchasing a "Photo Membership" for $6,160 Canadian, and was promised at least five dates. (*See* Ex. K at IJL000363.) When signing up with IJL, Gillingwater was promised that IJL provided "personal matchmakers" that "personally handpick[ed] and vet[ted] potential dates" based on "what characteristics [Gillingwater] look[ed] for in a partner. (Ex. N at 48:7–15.) Gillingwater specifically requested that, despite IJL's usual policies of parties splitting the cost of meals at dates, her date pay the full cost of the meal, as she "would never date a gentleman that would not pick up the check." (*Id.* at 50:24–60:23.) IJL represented to her it would comply with this request and "put a note in [her] file," but "[e]ach time," she was presented with separate checks, causing embarrassment on her dates. (*Id.*) Gillingwater was also repeatedly matched with men who failed to meet her stated criteria, including a healthy and fit lifestyle, a lack of common interests, and were not consistent with Gillingwater's desired physical descriptions. (*Id.*) Despite the lack of matches that met Gillingwater's criteria, Gillingwater was never told that IJL could not fulfill her matches. Instead, she was "told [IJL had] plenty of men" meeting her criteria. (*Id.*)

## III.   APPLICABLE RULES AND CLASS DEFINITIONS

Class certification in the District Court is governed by Rule 23. A party seeking class certification must first show that the class action satisfies the following four requirements set forth in Rule 23(a):

(1) The class is so *numerous* that joinder of all members is impracticable [numerosity],

9

(2)   There are questions of law or fact *common* to the class [commonality],

(3)   The claims or defenses of the representative parties are *typical* of the claims or defenses of the class [typicality], and

(4)   The representative parties will fairly and *adequately* protect the interests of the class [adequacy].

Fed R. Civ. P. 23(a) (emphasis added).

The party seeking class certification must also satisfy one of the categories set forth in Rule 23(b). Here, certification is sought pursuant to Rule 23(b)(3), requiring that:

[T]he court find[] that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members [predominance], and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy [superiority].

Fed. R. Civ. P. 23(b)(3) (emphasis added). This Rule states that matters pertinent to whether the superiority requirement has been met include:

a.   The interest of members of the class in *individually controlling the prosecution* or defense of separate actions;

b.   The extent and nature of *any litigation* concerning the controversy *already commenced* by or against members of the class;

c.   The desirability or undesirability of concentrating the litigation of the claims in *the particular forum;* and

d.   The difficulties likely to be encountered in the *management* of a class action.

*Id* (emphasis added).

10

Plaintiffs seek to certify a Nationwide Class and two subclasses, the California Subclass and the Virginia Subclass. The proposed Nationwide Class is defined as: "All United States residents who joined IJL US on or after September 12, 2019." Plaintiffs Vrugtman and Kruzick seek to serve as class representatives for the National Class.

The proposed California Subclass is defined as: "All California citizens who joined IJL US on or after September 12, 2019." Plaintiff Kruzick seeks to serve as class representative for the California Subclass.

The proposed Virginia Subclass is defined as: "All Virginia citizens who joined IJL Canada on or after September 12, 2019." Plaintiff Vrugtman seeks to serve as class representative for the Virginia Subclass.

Plaintiffs did not allege the National Class in the operative Second Amended Complaint (Dkt. No. 29), but subsequent discovery has confirmed that the scope and consistency of IJL's fraud was even greater than Plaintiffs anticipated, and Plaintiffs concurrently move to file a Third Amended Complaint containing the class definition for the National Class. *See United States ex rel. Terry v. Wasatch Advantage Grp., LLC*, 327 F.R.D. 395, 406 (E.D. Cal. 2018) (recognizing appropriateness of leave to amend pleading to expand definition "11 days after close of class discovery"). IJL will suffer no prejudice from this amendment, as there is no relevant discovery that IJL could have sought arising out of such a Class that it did not already seek and obtain.

## IV.   ARGUMENT

### A. THE PROPOSED CLASSES SATISFY THE REQUIREMENTS OF RULE 23(a)

#### 1. The Members of the Proposed Classes Are So Numerous That Joinder Is Impracticable

The action satisfies Rule 23(a)(1)'s numerosity requirement.

Numerosity is satisfied where the members of the class are "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). A class of "at least forty members" is large enough that it "presumptively satisfies the numerosity requirement." *Torres v. Air to Ground Services, Inc.*, 300 F.R.D. 386, 398 (C.D. Cal. 2014); *Tait v. BSH Home Appliances Corp.*, 289 F.R.D. 466, 473–74 (C.D. Cal. 2012); *Capaci v. Sports Rsch. Corp.*, No. CV193440FMOFFMX, 2022 WL 1133818, at *5 (C.D. Cal. Apr. 14, 2022). The Class has, by IJL's own admission, at least 1,814 members in the California and Virginia subclasses alone, and as many as ███ members or more Nationwide, who combined have likely paid more than $17.3 million. (Ex. O, IJL's Responses to Plaintiffs' Interrogatories, at 8.) This number, more than 45 times a figure that as a matter of law presumptively satisfies numerosity, is more than enough to satisfy the numerosity requirement.

Even aside from the number—which is more than enough to satisfy numerosity—the makeup and national distribution of the Classes makes it impracticable and unlikely that any substantial members of the Classes would bring suit on their own. *In re Rubber Chemicals Antitrust Litig.*, 232 F.R.D 346, 350–51 (N.D. Cal. 2005) (recognizing that a court "may make common sense assumptions to support a finding that joinder would be impracticable"). IJL targets "busy professionals" for highly personal matchmaking services, and even advertises the private nature of its services. (Ex. C at IJL000347, IJL000351, IJL000353, IJL000355, IJL000357, IJL000359; Ex. D at IJL000325, IJL000332; Ex. E at IJL000338–339, IJL000341; and Ex. F at IJL000342–345.) Indeed, as Plaintiff Vrugtman explained at her deposition, she had been "very private about [her] association with IJL," and had not even shared it with her family because her "private life should be private," and was "very upset" that she had been forced to bring this public suit. (Ex. L at 23:3–25.) Against this, IJL charges amounts that, while unconscionably

high for the services it actually provides (which have no value at all), are not high enough to justify individual litigations: Plaintiffs Vrugtman, Gillingwater, and Kruzick respectively paid $2,495, $6,160 Canadian (currently approximately $4,599 USD), and $2,595 for their IJL memberships. (Ex. O at 8.) It is thus not realistic that individual members of the Classes would bring separate suits in realistic number to seek redress. The Classes satisfy numerosity.

### 2. There Are Questions of Law or Fact Common to the Members of the Classes

The Rule 23(a)(2) commonality requirement is met. Rule 23(a)(2) requires "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). This is a "limited burden," where a plaintiff need not show that "even a preponderance" of questions in the case are capable of class-wide resolution: all that is required is "a single common question." *Want v. Chinese Daily News, Inc.*, 737 F.3d 538, 544 (9th Cir. 2013).

Here, numerous common questions exist. Indeed, most, or even all of the material questions to the claims of members of the Classes are common. These include, but are not limited to:

- Did IJL make false and misleading representations to members of the Classes as to the nature of quality of the dating service that IJL provided to members of the Classes?
- Does IJL fraudulently induce members of the Classes to join its service through such misrepresentations?
- Did IJL's service systematically fail to provide the services that it promised to its customers?
- Did the service IJL provide have any value at all?

These questions are not only common to the Classes and subject to class-wide resolution, they in fact are the principle questions at issue in this lawsuit and

will apply the same to all members of the Classes. As discussed further below in Plaintiffs' discussion of Rule 23(b)(3) (*infra* IV.B), these common questions predominate over individual issues. But such predominance is not necessary to show commonality, only that there exists one more common questions subject to class-wide adjudication. The Classes satisfy commonality.

### 3. The Claims of Plaintiffs are Typical of the Claims of Other Members of the Classes

Rule 23(a)(3)'s typicality requirement is satisfied. Rule 23(a)(3) requires that the claims of the representative Plaintiffs are "typical" of the claims of members of the Classes. Fed. R. Civ. P. 23(a)(3). This standard is "permissive" and requires only that the lead Plaintiffs' claims be "reasonably co-extensive" with (but "need not be substantively identical" to) those of absent class members. *Parsons v. Ryan*, 754 F.3d 657, 685 (9th Cir. 2014); *see Armstrong v. Davis*, 275 F.3d 849, 869 (9th Cir. 2001) (typicality found where all plaintiffs suffered deprivation of "services, programs or activities," or failed to receive the full benefits of such services provided by a prison board).

Plaintiffs' claims are typical of and nearly identical to those of other members of the Classes. Plaintiffs, like members of all the Classes, suffered harm from IJL's total failure to provide the services that it promised to customers. All three Plaintiffs—like the thousands of other members of the Classes—signed up for IJL based on material misrepresentations as to the nature of IJL's service. All members of the Classes suffered the same injury: they signed up for IJL's service based on representations that it provided individualized matchmaker services, while IJL did not provide that service to any of its customers, because IJL is structurally designed to be unable to provide such services. The Classes satisfy typicality.

**4. Plaintiffs will Fairly and Adequately Protect the Interests of the Classes**

Plaintiffs Vrugtman and Kruzick are adequate plaintiffs. Rule 23(a)(4) requires a showing that the representative plaintiffs will "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This requires (1) that Plaintiffs and their counsel lack conflicts with other members of the Classes, and (2) that Plaintiffs and their counsel will prosecute the action vigorously on behalf of the Classes. *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 985 (9th Cir. 2011); *Hanlon v. Chrysler,* 150 F.3d 1011, 1019 (9th Cir. 1998) (lead plaintiffs adequate because individuals not divided into conflicting discrete categories, small differences existed in damages and potential remedies, and counsel competent and prepared to try the case). Adequate representation is "usually presumed" in the "absence of contrary evidence." *Californians for Disability Rights, Inc. v. Cal. Dep't of Transp.*, 249 F.R.D 334, 349 (N.D. Cal. 2008); *Willitis v. City of Los Angeles*, No. CV 10-05782 CBM, WL 7767305 (C.D. Cal. Jan. 3, 2011) (citing Newberg on Class Actions § 7:24 at 78).

The answers to both questions favor certification here. Plaintiffs have no conflict with any of the Classes. Plaintiffs share a common interest with the Classes, they have suffered the same injuries, and their claims are typical of those other members of the Classes.

**B. THE PROPOSED CLASSES SATISFY THE PREREQUESITES OF RULE 23(b)(3)**

The Classes satisfy both requirements of Rule 23(b)(3), predominance and superiority. First, the common questions of law and fact predominate over individual questions, such that it is most efficient to resolve the claims of all members of the Classes in a single adjudication. This is not a dispute arising out of individual IJL employees making false representations to

individual clients. This is a case where IJL, through employees acting within the scope of their employment and following IJL's comprehensive training, consistently promised its customers a service that it did not and could not provide without a complete overhaul to its business model. And this is shown from common proof, including IJL's advertisements, training material, internal client clients, and testimony of its senior executives.

Second, a class action is superior to other methods for the fair and efficient adjudication of this controversy. In addition to the common issues of fact, discovery has shown that IJL is surprisingly efficient in its fraud, meaning that the universe of class-wide proof is quite small, and the overlap in potential individual actions would be substantial. Despite having thousands of active users at any given time, IJL employs only about 30 salespersons (or "dating specialists") and 15 matchmakers. (Ex. B at 41:25–42:5.) IJL recruits customers based on a small set of uniform advertising (*see* Exs. C, D, E, F) and trains its salespersons and matchmakers based off of a small set of uniform training material with minor changes over the class period (*see* Ex. H). And as Plaintiffs explained at their depositions in the face of IJL's counsel repeatedly trying to get them to concede that their disputes with IJL were based on specific individualized misrepresentations from specific staff, their complaints of IJL's service went to the fundamental nature of the services that IJL offered versus what it advertised. These are experiences that, by the very nature of IJL's services, would have been shared Class-wide. The Class satisfies the requirements of Rule 23(b)(3).

### 1. Common Questions of Law and Fact Predominate

The Class satisfies predominance. Rule 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). Predominance does "*not*" require that "each element" of the claims is

susceptible to class-wide proof, only that they "*predominate* over any questions affecting only individual class members." *Amgen Inc. v. Connecticut Ret. Plans and Trust Funds*, 568 U.S. 455, 569 (2013) (emphasis in original). But here, *each* element of Plaintiffs' consumer protection claims—which the Classes as a whole and each subclass assert—is subject to class-wide proof. The Classes satisfy predominance.

### A. The Classes All Satisfy Predominance

The questions of law and fact concerning the Classes are predominantly class wide. The National Class asserts a claim under the Nevada Deceptive Trade Practices Act ("NDTPA"), Nev. Rev. Stat. 598.0923, which is susceptible to class-wide proof. *Picus v. Wal-Mart Stores, Inc.*, 256 F.R.D. 651, 657 (D. Nev. 2009) (recognizing likelihood that Nevada Supreme Court would permit class-wide inference of reliance on NDTPA claims). The elements of an NDTPA claim are (1) an act of consumer fraud by the defendant that (2) caused (3) damage to the plaintiff. *Id.* at 658.

The California Subclass asserts claims under the California Legal Remedies Act ("CLRA") and Unfair Competition Law ("UCL"), which have substantially the same elements as the NDTPA, articulated as "whether members of the public are likely to be deceived." *Tait*, 289 F.R.D. at 480. Courts "routinely certify consumer class actions" under the CLRA and UCL. *Id.*

The Virginia Subclass asserts claims under the Virginia Consumer Protection Act ("VCPA"), Va. Code § 59.1, *et seq.*, which apples where there exists "a false representation, of material fact, made intentionally and knowingly, with intent to mislead, reliance by the party misled, and resulting damage." *In re Toyota RAV4 Hybrid Fuel Tank Litig.*, 534 F. Supp. 3d 1067, 1106 (N.D. Cal. 2021). While Virginia law prohibits class actions under the VCPA, courts in California and elsewhere recognize that this is a "procedural" bar,

and "does not apply" to claims brought in California federal courts. *In re Myford Touch Consumer Litig.*, No. 13-CV-03072-EMC, 2016 WL 7734558, at *27 (N.D. Cal. Sept. 14, 2016) (certifying class under VCPA).

           *i.*     *Defendants Committed Uniform Acts of Consumer Fraud*

First, Defendants have committed acts of consumer fraud by falsely purporting to offer a "personalized matchmaking service" to customers. This representation is one that is uniformly made to IJL customers through all of IJL's advertisements, including its website which refers to it as a "personalized matchmaking service," the "world's #1 personalized matchmaking service," or materially similar terms. (Ex. C, D, E, F.) This representation is also part of what IJL itself calls its sales "script," which salespersons are expected to deliver and which includes at the start the phrase, "first and foremost we are a *personalized matchmaking service.*" (Ex. H at IJL000007 (emphasis added).) IJL emphasizes this heavily—its sales script two sentences later reiterates that, "One of the reasons we're so successful is because we are a *very personal matchmaking service* so you will be working one-on-one with your *very own matchmaker.*" (*Id.* (emphasis added).) As Plaintiff Kruzick noted at her deposition, this term is understood to have a specific meaning, including that matchmaker will "find someone that aligns with" a client's "desires and values." (Ex. M at 70:13–17 ("Q. Okay. So in your mind then, you're tasking IJL not only with finding potential dates, but also finding chemistry between you and potential dates; is that correct? A. Matchmakers. That's their job.").

But IJL does not offer a personalized matchmaking service. As IJL's CEO admitted at her deposition, they currently have between ▮▮▮▮▮▮▮ "active" clients, meaning a client who is "actively dating" with IJL, with IJL matchmakers "calling them and presenting matches to them." (Ex. B at 45:4–9, 49:10–23.) This is a limited category and does not include clients who either

actively place their membership on "hold" due to either pursuing further dates with a match or simply fail to respond to IJL "consecutively for three days" and are placed on inactive "hold" status. (*Id.* at 45:10–17.)

However, IJL employs only 15 matchmakers, who are each "responsible for overseeing the entire client dating experience" for those active clients, meaning that each matchmaker is responsible for ███████ ████████████████████████, active clients at any given time. (*Id.* at 43:1–16.) These matchmakers are not only responsible for selecting potential dates, but also handling—every week, for every client—all the logistics of setting up the dates and related client communication, including "following up" with clients, "sending date confirmations," "reminding the clients of the date," "following up for date feedback," "managing any client concerns," and "anything that has to do with the client experience." (*Id.*) And as IJL's own client files, which contain communication logs, show, even simply scheduling dates for a single individual often requires a substantial amount of communication to confirm availability due to the schedules of its busy clients. (Ex. I at IJL000400–409.) To even attempt to do this individualized work would take more than the ██████████ per week that IJL matchmakers have on average to attend to each customer's needs.

All this alone is enough to show common consumer fraud: a reasonable juror could find that consumers signing up for a "personalized matchmaking service," and paying thousands of dollars for a set number of dates, would understand that to include a more personalized service than communication with a "matchmaker" who is serving as many as 300 other active clients at the same time. Plaintiff Vrugtman explained her typical experience with these too-busy matchmakers, who failed to provide their promised service while still downplaying their actual caseload, and often switching matchmakers to make matters even worse:

1  Q. But [IJL matchmakers] were – they stood ready to try to help

2  you find potential dates. Isn't that right?

3  A. I wouldn't say that. I can't say that. [Matchmaker] Udonna

4  informed me she had 43 other clients. She later told me that she

5  had more than that. She had 43 other clients, and she couldn't

6  spend all of her time on me. That is what she said.

7  That – that is how I felt *I'm not getting the service, I'm not going to*

8  *get the service.* And every three or four weeks, I got a new

9  matchmaker. That is not providing the personalized, customized

10  service, true human interaction, regular interaction,

11  communication that IJL promises as its contract – contract in

12  quotes – with its clients.

13  And at that point, I had completely given up on any willingness,

14  readiness or ability on the part of IJL.

15  (Ex. L at 101:4–20.)

16  But worse still, IJL achieves this economy of scale through a matching

17  process that makes personalized matches not simply difficult, but

18  impossible. Due to the workload (and, as Plaintiff Vrugtman experienced,

19  frequent switching of matchmakers), IJL matchmakers perform their

20  matching based off of information in their client files, which are filled in at

21  client intake. (Ex. K at IJL000379; Ex. I at IJL000406; Ex. J at IJL000393.) The

22  relevant portions consist largely of a selection of generic "interests" which

23  IJL prompts clients with during intake—for instance, "hiking," "general

24  fitness," "reading," and "writing." (Ex. J at IJL000393.) These forms do not

25  allow individualized filling in of additional interests, only to indicate

26  whether an interest is "strong" or "mild," with limited additional comments.

27  (Ex. K at IJL000379; Ex. I at IJL000406; Ex. J at IJL000393.) These additional

28  fields are rarely used in any meaningful manner: of the 34 (largely

overlapping) interests in the client files of Plaintiffs, all but one ("general fitness" for Plaintiff Vrugtman) was listed as a "strong interest." (*Id.*) This is the case even when the additional comments in the file conflict with a supposed "strong" interest in an area: Plaintiff Vrugtman's file indicates a "strong interest" in "hiking," but clarifies in notes that that only means "walks in the park," and Plaintiff Kruzick's file indicates a "strong interest" in "fishing," but in notes indicates, "sign her up for an *occasional* trip." (*Id.* (emphasis added).) This industrial approach to matchmaking—which provides no more personalized matching than a dating app, where an algorithm or technology would almost certainly provide *more* of a service than IJL does—is not consistent with IJL's representations to provide a personalized matchmaking service.

      ii.     *Defendants' Uniform Acts of Consumer Fraud Caused Inform Injury to Plaintiffs and the Class*

Defendants' failure to provide personalized service also harmed the Class in a uniform way. IJL's perfunctory note-taking and matching system is designed not only to streamline the work required by its staff, but to allow IJL to create the appearance of personalized matchmaking without actually providing the promised service while "matching" customers as quickly and easily as possible. But this process utterly fails to provide the promised result and cannot do so.

Plaintiff Vrugtman's experience is typical—a professional writer with a PhD, it was very important to her that she be matched with people who shared her passion for reading, and she conveyed that to IJL:

> I'm a writer. I'm a reader. I'm an editor and a publisher. *Writing and reading are important to me.* They are a part of – they are not just hobbies. They are sincere interests that I have. *I indicated – and*

*I'll bet my profile with IJL indicates that reading is an important element. I want someone who is a reader.*

(Ex. L at 48:19–49:17 (emphasis added).) But despite Plaintiff Vrugtman conveying these criteria to IJL, her profile did not reflect it in a way that allowed IJL to take meaningful action. Instead, among 13 categories of interest (12 of which were listed as "strong interest" in her profile), was inclusion of "reading" as an interest with no further explanation, and "writing" with the note, "[she] is a writer and writes [n]ovels"). (Ex. J at IJL000394.)

As would be expected by this lack of information, Plaintiff Vrugtman, like others, was matched with people who completely failed to match her stated criteria. On one match, Plaintiff Vrugtman's date, upon seeing a book that Vrugtman had been reading before he arrived, commented that it had "a lot of pages." (Ex. L at 48:19–49:17.) When in response, Vrugtman asked her date, point blank, "Do you read?" her date responded that he read "[o]nly technical journals" and "only the few pages that" that he "need[ed]" in order to do his job. (*Id.*) As Plaintiff Vrugtman testified in conclusion when explaining this date at her deposition: "That is not a match." (*Id.*)

Such failure to provide matches is the natural result of IJL's matching process, to an extent that even if a client did find a match acceptable, it was essentially by chance, as IJL completely fails to provide the "personalized matchmaking" service it promises. IJL's service is so deficient that it offers no better service than a free dating app, such that each Class member is uniformly harmed.

    iii.    *The Injury of Plaintiffs and the Class Are Discernable on a Class-Wide Basis as the Value of their IJL Memberships*

The third element of the NDTPA, damages, can also be discerned on a class-wide basis. Given IJL's utter failure to provide its promised

personalized matchmaking, a reasonable juror could find that the value of its service is, on a class-wide basis, zero. Accordingly, the damages to each Class member is the amount that the Class member paid for IJL's service, a figure that IJL tracks, including in its client files. (*See* Ex. I at IJL000400; Ex. J at IJL000387; Ex. K at IJL000364.)

All elements of the NDTPA—consumer fraud, causation, and damages—can be proven on a class-wide basis. The Classes satisfy predominance.

**2. Class Action is the Superior Method of Adjudicating the Claims Asserted Here.**

The Classes satisfy superiority. Rule 23(b)(3) requires that a class action be "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). This test looks to factors including whether the members of the Classes have an interest in individually controlling the prosecution of separate actions; the extent to which litigation concerning the controversy has already begun, the desirability of concentrating the litigation into a particular forum, and any likely difficulties in managing the action. Fed. R. Civ. P. 23(b)(3)(A)–(D).

Each of the superiority factors supports certifying this as a class action. First, since members of the Classes are located in geographically diverse areas, all members of the Classes have an interest in one consolidated class action that would prevent separate and possibly scattered actions. In addition, without class certification, most members of the Classes would be discouraged from even seeking relief because their potential recovery would be vastly outweighed by the costs of pursuing litigation. *See Hanlon*, 150 F.3d at 1023 (superiority found in class action where in most individual cases, "litigation costs would dwarf potential recovery"). Second, Plaintiffs are unaware of any ongoing litigation regarding the issues involved in this case.

Third, the Central District of California is the best forum for this case: a substantial part of the events from which this claim arises occurred in this District and IJL resides in this District. *See Callaway Golf Corp. v. Royal Canadian Golf Assn.*, 125 F. Supp. 2d 1194, 1199 (C.D. Cal. 2000) (traditional bases for jurisdiction include in-state physical presence and domicile); *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 801-02 (9th Cir. 2004) (specific non-resident jurisdiction requires defendant must purposefully direct activities towards forum or perform an act availing himself of forum's laws, the claim must arise out of these activities, and court's exercise of jurisdiction must be reasonable). IJL conducts significant business in this District and in the State of California. Fourth, there are no management or administration issues that would cause any difficulties going forward before or during trial. Class certification is simply the superior and very likely only way to preserve the rights of the members of all the Classes, and it provides the most practical and efficient means to do so.

## C. THE COURT SHOULD APPOINT BALESTRIERE FARIELLO AND KBK AS CLASS COUNSEL

Plaintiffs are represented in this action by Balestriere Fariello and KBK. Both Balestriere Fariello and KBK have consideration experience in litigation class actions, and Balestriere Fariello has the unique experience of having previously litigated against IJL and achieved a favorable settlement. For the reasons further set forth in the Declarations of John G. Balestriere and Anastasia K. Mazella, filed concurrently herewith, the Court should appoint Balestriere Fariello and KBK as Class Counsel pursuant to Rule 23(g).

## D. THE COURT SHOULD GRANT LEAVE FOR PLAINTIFFS TO FILE THE THIRD AMENDED COMPLAINT

The Court should also permit Plaintiffs to file a Third Amended Complaint with an updated class definition to include a National Class,

which Plaintiffs attach hereto in clean (Ex. P) and redline (Ex. Q) versions. California courts have recognized the appropriateness of amendment in similar situations. *See United States ex rel. Terry v. Wasatch Advantage Grp., LLC*, 327 F.R.D. 395, 406 (E.D. Cal. 2018) (recognizing appropriateness of leave to amend pleading to expand class definition "11 days after close of class discovery" and 12 days after Rule 30(b)(6) deposition). IJL will suffer no prejudice from such an amendment, nor will it cause any undue delay (Indeed, it will allow resolution of all claims against the Company in one action rather than result in the almost inevitable prosecution of a new action against IJL.) The Court should accordingly allow Plaintiffs to file the Third Amended Complaint.

## V.    CONCLUSION

IJL fraudulently misrepresents the quality of its services to all of its customers across the Nation. This case must proceed as a class action so Defendants will stop their fraud and compensate all members of the Classes for their losses. Vrugtman and Gillingwater respectfully requests that this Court issue an Order:

1. Certifying this action to proceed as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure;

2. Appointing Vrugtman and Kruzick to serve as representatives of the National Class; Vrugtman as representative as well for the Virginia Subclass; and Kruzick as well as representative of the California Subclass.

3. Appointing Balestriere Fariello and KBK to serve as class counsel pursuant to Rule 23(g) of the Federal Rules of Civil Procedure;

4. Granting Plaintiffs leave to file the Third Amended Complaint.

5. Granting such other and further relief as the Court deems just and proper.

Dated: New York, New York

       April 17, 2023

By: _____

John G. Balestriere*

Matthew W. Schmidt (Cal. Bar No. 302776)*

**BALESTRIERE FARIELLO**

225 Broadway, 29th Floor

New York, New York 10007

Telephone:   (212) 374-5401

Facsimile:    (212) 208-2613

john.balestriere@balestrierefariello.com

matthew.schmidt@balestrierefariello.com

*Attorneys for Plaintiffs and the Classes*

*\*Admitted Pro Hac Vice*

Anastasia K. Mazzella (Cal. Bar. No. 245201)

**KABATECK LLP**

633 West Fifth Street, Suite 3200

Los Angeles, California 90071

Telephone: (213) 217-5007

Facsimile: (213) 217-5010

am@kbklawyers.com

*Attorneys for Plaintiffs and the Classes*