1   Mark R. Seiden (Admitted *pro hac vice*)
      mrseiden@jonesday.com
2   JONES DAY
    250 Vesey Street
3   New York, New York 10281
    Telephone: +1.212.326.3939
4
    BROWN WEGNER LLP
5   Matthew K. Wegner (SBN 223062)
      mwegner@brownwegner.com
6   William J. Brown, Jr. (SBN 192950)
      bill@brownwegner.com
7   Jason P. Tkaczuk (SBN 341143)
      jtkaczuk@brownwegner.com
8   2010 Main Street, Suite 1260
    Irvine, California 92614
9   Telephone: 949.705.0080

10  Attorneys for Defendants
    IT'S JUST LUNCH INTERNATIONAL LLC and
11  IJL US LLC

12

13

14                  **UNITED STATES DISTRICT COURT**

15                  **CENTRAL DISTRICT OF CALIFORNIA**

16

17  ROSANNE VRUGTMAN,              | **Case No. 5:20-cv-02352 JGB-SP**
    TAMMY GILLINGWATER, and        |
18  NICOLE KRUZICK, individually, and | **MEMORANDUM OF POINTS AND**
    for all others similarly situated, | **AUTHORITIES IN SUPPORT OF**
19                                  | **MOTION FOR SUMMARY**
                                    | **JUDGMENT**
              Plaintiffs,           |
20                                  |
    v.                              |
21                                  |
    IT'S JUST LUNCH                 | **Date of Hearing:    06/26/2023**
22  INTERNATIONAL LLC,             | **Time:               9:00 a.m.**
    IJL US LLC,                     | **Courtroom:          1 (Riverside)**
23  IJL CANADA INC.,                | **Before the Hon. Jesus G. Bernal**
                                    |
24            Defendants.           | Date filed:          11/11/2020
                                    | Discovery Cut-off:   03/27/2023
25                                  | Final Pretrial Conf: 06/26/2023
                                    | Jury Trial:          07/11/2023
26

27

28

1

## **TABLE OF CONTENTS**

2
Page

3 I.    INTRODUCTION .......................................................................... 1

4 II.   LEGAL STANDARD ................................................................... 1

5 III.  STATEMENT OF FACTS ............................................................ 2

6     A.   IJL's Service ...................................................................... 3

7     B.   Plaintiffs' Experiences With IJL – In Their Words ................... 4

8          1.   Tammy Gillingwater ..................................................... 4

9          2.   Rosanne Vrugtman ....................................................... 6

10         3.   Nicole Kruzick ............................................................. 8

11    C.   Plaintiffs' Allegations—Then and Now .................................. 9

12 IV.  PLAINTIFFS CANNOT SHOW THAT IJL MISREPRESENTED ITS

13    SERVICES .................................................................................. 9

14    A.   Plaintiffs' Claims All Rely on the Fiction That IJL Does Not Offer

15         "Personalized Matchmaking" as Advertised. ........................... 9

16    B.   No Reasonable Juror Could Find That IJL Did Not Provide Personalized

17         Services to Plaintiffs. .................................................... 10

18         1.   Gillingwater .............................................................. 11

19         2.   Vrugtman ................................................................... 12

20         3.   Kruzick ..................................................................... 14

21    C.   Plaintiffs Abandoned Their Other Alleged Misrepresentations Because

22         No Evidence Supports Them. ............................................. 15

23 V.   PLAINTIFFS CANNOT PROVE THEIR THEORY OF DAMAGES OR

24    RESTITUTION. ......................................................................... 16

25    A.   No Reasonable Juror Could Find that IJL's Services are Worth Zero.... 17

26 VI.  CONCLUSION ............................................................................ 20

27

28

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Allen v. Similasan Corp.*
    306 F.R.D. 635 (S.D. Cal. 2015)..........................................................9, 16

*Anderson v. Liberty Lobby, Inc.*
    477 U.S. 242 (1986)...............................................................................2

*Celotex Corp. v. Catrett*
    477 U.S. 317, 323 (1986).....................................................................1, 2

*Chowning v. Kohl's Dep't Stores, Inc.*
    745 Fed. Appx. 924 (9th Cir. 2018).........................................................17

*City Sols., Inc. v. Clear Channel Commc'ns*
    365 F.3d 835 (9th Cir. 2004) ..................................................................9

*Clark v. Countrywide Home Loans, Inc.*
    732 F. Supp. 2d 1038 (E.D. Cal. 2010)...............................................10, 16

*Comcast Corp. v. Behrend*
    569 U.S. 27 (2013)...............................................................................17

*In re Oracle Corp. Sec. Litig.*
    627 F.3d 376 (9th Cir. 2010) ..................................................................2

*Krommenhock v. Post Foods, LLC*
    334 F.R.D. 552 (N.D. Cal. 2020)............................................................17

*Magpiong v. Superdry Retail LLC*
    304 F. Supp. 3d 983 (D. Nev. 2018) ...................................................10, 16

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*
    475 U.S. 574 (1986)...............................................................................2

*Picus v. Wal-Mart Stores, Inc.*
    256 F.R.D. 651 (D. Nev. 2009) ........................................................10, 16

*Pulaski v. Middleman, LLC v. Google, Inc.*
     802 F.3d 979 (9th Cir. 2015) ................................................................. 16

*Soffer v. Five Mile Cap. Partners, LLC*, No. 2:12-CV-1407 JCM GWF, 2013 WL
     638832 (D. Nev. Feb. 19, 2013) .................................................... 10, 16

*Stewart v. Kodiak Cakes, LLC*
     537 F. Supp. 3d 1103 (S.D. Cal. 2021) ............................................... 16

*WMCV Phase 3, LLC v. Shushok & McCoy, Inc.*
     750 F. Supp. 2d 1180 (D. Nev. 2010)................................................. 17

*Zeiger v. WellPet LLC*
     526 F. Supp. 3d 652 (N.D. Cal. 2021).................................... 17, 18, 19

**Statutes**

California Civil Code § 1572 ...................................................................... 10, 16
California Civil Code § 1709 ........................................................................ 9, 16
California Civil Code § 1710 ........................................................................ 9, 16

**Rules**

Fed. R. Civ. P. 56 ............................................................................................... 1

## I.      INTRODUCTION

Defendants It's Just Lunch International LLC and IJL US LLC (collectively, "IJL") move the Court to grant Summary Judgement against Plaintiffs Rosanne Vrugtman ("Vrugtman"), Nicole Kruzick ("Kruzick") and Tammy Gillingwater ("Gillingwater") (collectively, "Plaintiffs").  The Second Amended Complaint ("SAC") focused on the theory that IJL falsely represented to Plaintiffs that they "already had" matches available or them. Now, following the recent close of discovery in this case, Plaintiffs have abandoned the central allegations in the SAC—because they were disproved in discovery—and have changed position to assert that IJL misled them by promising, but failing to provide, personalized matchmaking services. This attempt to salvage their case by switching to a new theory fails because the evidence overwhelmingly establishes that IJL provided personalized services to Plaintiffs. Consequently, Plaintiffs cannot meet their burden to prove that IJL made a misrepresentation, which is an essential element of each of Plaintiffs' claims.

Summary Judgment should be granted here for a separate, independent reason that their damages case is doomed *ab initio*. Plaintiffs have not disclosed experts to calculate, and opine on, the measure of damages in this case, but instead put forth the theory that IJL's services have a value of zero, such that the measure of damages for each IJL client is the entirety of what that particular client paid to IJL. [*See* Declaration of Matthew Wegner ("Wegner Decl.") ¶ 16; Dkt. 76, 22:28-23:2] Because Plaintiffs' approach to damages leaves no room for gradations, they have the burden to show that, because of the alleged misrepresentation, the value of the IJL service for each Plaintiff was "zero." Based on the record developed through discovery, Plaintiffs cannot meet that burden.

## II.     LEGAL STANDARD

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party has the initial burden of identifying the portions of the pleadings and record that it believes demonstrate the absence of an issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the non-moving

party bears the burden of proof at trial, the moving party need not produce evidence negating or disproving every essential element of the nonmoving party's case. *Id.* at 325. Instead, the moving party need only prove there is an absence of evidence to support the nonmoving party's case. *Id.*; *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010). The moving party must show that "under the governing law, there can be but one reasonable conclusion as to the verdict." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

If the moving party has sustained its burden, the non-moving party must then show that there is a genuine issue of material fact that must be resolved at trial. *Celotex*, 477 U.S. at 324. The non-moving party must make an affirmative showing on all matters placed at issue by the motion as to which it has the burden of proof at trial. *Celotex*, 477 U.S. at 322; *Anderson*, 477 U.S. at 252. A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. "This burden is not a light one. The non-moving party must show more than the mere existence of a scintilla of evidence." *In re Oracle*, 627 F.3d at 387 (citing *Anderson*, 477 U.S. at 252). Summary judgment for the moving party is proper when a "rational trier of fact" would not be able to find for the non-moving party based on the record taken as a whole. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

As set forth below, summary judgment is appropriate in this case because no rational trier of fact could find that IJL did not provide personalized services to the Plaintiffs, and because no rational trier of fact could find that the value of IJL's services to each Plaintiff was zero.

## III. STATEMENT OF FACTS

The evidence in this case shows that, as Plaintiffs experienced, IJL offers a highly personalized matchmaking service that provided each of them with *some* value greater than zero.

### A.     IJL's Service

IJL has offered a personalized matchmaking service to its clients for over thirty years. The key steps in the IJL matchmaking process are performed by humans and are based on information and preferences gathered in personal interactions with the client. [Declaration of Julie Yarworth ("Yarworth Decl.") ¶ 3] None of them are performed by computers or algorithms. [Yarworth Decl. ¶ 3] The IJL process starts with a personal interview conducted over the phone by a Dating Specialist, who discusses and gathers the potential client's preferences, experiences and attitudes towards dating, to determine whether that person would be a good fit for IJL. [Declaration of Sandra Hatton ("Hatton Decl.") ¶ 3; *see also* Wegner Decl., ¶ 9, Exh. J; Deposition Transcript of Julie Yarworth ("Yarworth Dep.") 48:7-50:7, Exh. 1; IJL000380 ("IJL000380") ("Client answers to interview questions" and "Criteria for who the client wants to meet")] The initial interview typically runs 45 minutes or longer, and the average is about an hour long. [Yarworth Decl. ¶ 3] A typical IJL membership guarantees a client at least on()e date, and the IJL system is intended to present clients a series of twelve possible dates, depending on the membership. [Yarworth Decl. ¶ 3]

For clients who sign up with IJL, the next step is a face-to-face welcome interview with a Matchmaker that involves an interactive discussion used by the Matchmaker to personally hand-select matches for a first lunch date. The Matchmaker then hand-selects the first potential match based on personal judgment as to who in the IJL system might be a good fit. [*Id.*; *see also* Declaration of Mike Epstein ("Epstein Decl.") ¶¶ 5,6] The Matchmaker then gives a live match presentation to the client to determine if the client wants to go on a date with the proposed match. [Yarworth Decl. ¶ 3] If the potential match is accepted by both parties, the Matchmaker personally coordinates the schedules of both parties and the date location and time. [*Id.*; Epstein Decl. ¶ 7] Following the date, the client is encouraged to submit feedback so that IJL can tailor future potential matches to the client's specifications. Overall, IJL approaches personalized matchmaking as an art, and not a science, because it involves relationships and focuses on interpersonal dynamics and developing emotional connections. [Yarworth Decl. ¶ 3] IJL's matchmaking process is intended to gather personalized feedback from successive dates to

factor into selecting candidates to help match for further dates, so the process is continuously refined and personalized to fit clients' preferences and experiences, as shared with the Matchmakers. [*Id.*; Epstein Decl. ¶¶ 3, 4]

As will be explained in more detail below, the matchmaking process that Kruzick received illustrates this process. Mike Epstein was Kruzick's assigned IJL Matchmaker. [Epstein Decl. ¶ 5] He matched her with her first match, KC, because both expressed an interest in having children, were entrepreneurs, and, most importantly, had personalities that he thought would be socially compatible based on his conversations with both people and his experience as a matchmaker. [Epstein Decl. ¶ 5] Then, Epstein matched Kruzick with her second match (whom she declined to meet) based on her feedback from her first date with KC. [Epstein Decl. ¶ 6] For instance, because Kruzick reported that she felt KC was not sincerely looking for a serious romantic relationship, Epstein selected KR in part because KR reported he was looking for marriage and children. [Epstein Decl. ¶ 6] Also, Kruzick did not like that KC had to work nights and weekends, so Epstein considered that KR ran a non-profit organization, which might have less likelihood of working nights or weekends. [Epstein Decl. ¶ 6]

Put simply, IJL's matchmaking service is *ipso facto* "personalized," and each Plaintiff's testimony corroborates that fact.

## B.     Plaintiffs' Experiences With IJL – In Their Words

Each Plaintiff was frustrated with the results of their dating experience; but whether they were satisfied with the service is not the defining question in this case, and certainly not for purposes of summary judgment. A review of the evidence—with Plaintiffs' complaints and all—shows reveals that each Plaintiff received a personalized service, and that each derived an objective non-zero value from that service.

### 1.     Tammy Gillingwater

Tammy Gillingwater signed up for IJL Canada's services on September 24, 2019. Gillingwater claims IJL Canada made the following misrepresentations to her: (1) that IJL already had dates for her in mind [Wegner Decl. ¶ 4, Exh. E, Deposition Transcript of Tammy Gillingwater ("Gillingwater Dep.") 64:12-18]; (2) that IJL would contact her within 48 hours

[Gillingwater Dep. 64:19-22]; (3) that IJL would match her with men that had a "health and fitness" lifestyle [Gillingwater Dep. 66:19-67:2; 67:21-68:1]; and (4) that she would know ahead of time whether there would be food on the date. [Gillingwater Dep. 71:25-72:9] Gillingwater's primary complaint with IJL's services is that IJL did not match her with sufficiently attractive or "fit" prospective dates. [Gillingwater Dep. 104:18-105:2] Gillingwater's definition of a "match" is a person with dark hair and "rugged good looks" who is "fit." [Gillingwater Dep. 94:25-95:10, 99:13-100:19] While she acknowledges "handsomeness" is subjective, she contends being "fit" and having a "rugged good look" are objective traits. [Gillingwater Dep. 96:4-97:18, 107:23-109:3] In Gillingwater's opinion, IJL did not meet their commitment to her because they did not provide dates who were sufficiently physically fit. [Gillingwater Dep. 108:13-109:10]

Notwithstanding her allegations that IJL made false representations, Gillingwater worked with IJL for more than a year and was presented with nine potential matches. [Gillingwater Dep. 200:10-203:8] She was willing to go on an initial date with four of them. [Gillingwater Dep. 127:13-128:1; 136:3-10; 137:11-139:9; 154:22-155:17] On her first date, she reported back that she really liked the man. [Gillingwater Dep. 70:19-71:3] On her second date, she testified that "*I felt like he was a decent match.... I felt like he was the one decent match out of all of them. We just didn't have chemistry, but I don't hold them accountable for that.*" [Gillingwater Dep. 136:5-17 (emphasis added), Exh. D-47; Wegner Decl. ¶ 15, Exh. U] The fifth match IJL presented to Gillingwater passed her initial criteria, and she agreed to go on a date with him. [Gillingwater Dep. 137:11-139:9] (He ultimately failed to show for the date, purportedly because he mis-calendared it.) [Gillingwater Dep. 169:10-15] And the ninth match IJL presented to Gillingwater also met her initial qualifications. [Gillingwater Dep. 202:11-18] She was interested in a date but claims IJL did not follow up with her. [Gillingwater Dep. 155:8-15] Notably, IJL selected and proposed the ninth match—an Italian man—in direct response to input from Gillingwater that she wanted to date Italian men. [Wegner Decl. ¶ 9, Exh. J; Yarworth Dep. 48:7-50:7, Exh. 1; IJL000362-382 at 374-375 ("IJL000374-375")] All told, Gillingwater recalled *nine* men that IJL presented to her, *four* of whom met her criteria sufficiently enough

that she agreed to go on a date, *four* of whom she declined to meet, and *one* of whom she declined to meet because she had already independently decided to go on a date with him after meeting him on an different dating site.[1] Though she testifies that she was disappointed with the results, Gillingwater's story defines an iterative and personalized matchmaking process.

## 2. Rosanne Vrugtman

Rosanne Vrugtman returned to dating a year after her husband died, at the urging of friends. [Wegner Decl. ¶ 2, Exh. C, Deposition Transcript of Rosanne Vrugtman ("Vrugtman Dep.") 28:10-18][2] Her privacy is important to her, including privacy around her resumption of dating. [Vrugtman Dep. 23:3-15] She described herself to IJL as "very selective" in who she would ultimately date. [Vrugtman Dep. 80:3-9] In her interview with IJL's Dating Specialist, she admitted that she does not consider herself a "good match for *most* men" and that she has **exceptionally** high standards. [Vrugtman Dep. 82:4-83:22] When asked what misrepresentations IJL made to her before she signed the contract, she said the primary ones were that she would be provided "personalized matches." The primary inducement was that IJL told her that there were many quality clients available in the Charlottesville, Virginia area, all of whom wanted either marriage or a long-term relationship. [Vrugtman Dep. 29:13-30:16; 72:22-73:23, 105:2-16] The location of her prospective matches was among the most important factors for Vrugtman. [Vrugtman Dep. 37:15-18] She testified that, had she known she had to drive to Richmond, Virginia for a date, she would not have signed up. [Vrugtman Dep. 33:18-34:13] However, the contract she signed—and reviewed and thought over for a couple of days [Vrugtman Dep. 29:13-30:15]—does not indicate Charlottesville as a designated IJL location; the closest designated IJL location in her contract is in

---

[1] In other words, IJL happened upon, and introduced to Gillingwater, a gentleman that Gillingwater had herself independently chosen—and with whom she had previously scheduled a date—on a separate dating site. [Gillingwater Dep. 141:6-144:6]

[2] The cited excerpts from the Plaintiffs' deposition transcripts are attached to the Declaration of Matthew K. Wegner ("Wegner Decl.") as Exhibits C, D and E. In the body of this brief, the citations appear in this format.

Richmond, Virginia. [Wegner Decl. ¶ 11, Exh. L; Yarworth Dep. 60:23-63:7; IJL000384 ("IJL000384")]

Vrugtman admits IJL never guaranteed she would find love with any particular date, because "[t]hat was between [Vrugtman] and the person." [Vrugtman Dep. 48:6-18] Her complaints about the *only* date she went on were that he failed to show sufficient interest in reading,[3] had a poor relationship with his adult son who lived with him, complained about prices, and remarked that a two-hour drive was "too far" to meet her. [Vrugtman Dep. 48:19-49:17, 74:19-75:22, 78:24-79:21] Regardless, this date—which she refuses to acknowledge as such [Vrugtman Dep. 74:19-75:10]—lasted three and a half hours. [Wegner Decl. ¶ 12, Exh. R; Yarworth Decl. ¶ 6; IJL000412-413 ("IJL000412-413")] She acknowledges that IJL cannot control the level or quality of human interaction between her and a given date; indeed, "[t]he chemistry was a whole different thing. [IJL is] not responsible for that." [Vrugtman Dep. 50:16-51:9] She never expected IJL to find her future mate, and IJL never promised her as much. Vrugtman Dep. 80:24-81:1] She agrees IJL cannot make sure everyone she meets has something in common with her. [Vrugtman Dep. 51:19-52:6] But she was "more than happy to meet" the second and third individuals IJL presented to her. [Vrugtman Dep. 52:2-22][4] She never met the second match – Frank – even though she was open to it [Vrugtman Dep. 89:13-90:21; 107:3-16], because Frank declined to meet her. [Vrugtman Dep. 54:23-25; 54:8-10] And she never met the third match, James, whom she was also interested in meeting, because she was not willing to travel two hours, to Richmond, to meet him [Vrugtman Dep. 65:7-66:4] or meet him via Zoom during the Pandemic. [Vrugtman Dep. 67:11-68:7] Both Frank and James lived in the Charlottesville area. [Vrugtman Dep. 105:17-23]

Vrugtman never learned whether either man was interested in a long-term relationship because she never met them. [Vrugtman Dep. 105:24-106:4] Instead, three weeks after signing her contract, and after the single date she chose to attend, Vrugtman threatened to cancel the

---

[3] Vrugtman did not expect IJL to predict whether her date would feel as strongly about reading as she does. [Vrugtman Dep. 79:23-80:2]

[4] Indeed, IJL produced two dates in the course of just over one month – against a contract that committed to providing twelve dates, or work on her behalf for twelve months, whichever came first. [97:15-22]

subscription with IJL—even though the Matchmaker had not done anything wrong. [Vrugtman Dep. 86:9-87:11] Vrugtman ceased communicating with IJL on or about October 20, 2020. [Wegner Decl. ¶ 11, Exh. L; Yarworth Dep. 60:23-63:7, Exh. 3; IJL000393 ("IJL000393")] She has not spoken to any other client of IJL. [Vrugtman Dep. 18:16-19:10]

### 3. Nicole Kruzick

Nicole Kruzick signed up for IJL on June 25, 2020 (though her psychic advised her to wait until after July 12). [Wegner Decl., Exh. T; Yarworth Decl. ¶ 7; IJL000420 ("IJL000420")] According to Kruzick, the Dating Specialist told her that there was a "perfect match" meeting all of her criteria, that the Dating Specialist would always be available to support her, and that a Matchmaker would be in touch the next day. Kruzick insists these things were not true. [Wegner Decl. ¶ 3, Exh. D; Deposition Transcript of Nicole Kruzick ("Kruzick Dep.") 24:14-25] Though she signed her contract on June 25, 2020 and the Matchmaker contacted her the same day and made several attempts to interview her, she did not meet with her Matchmaker until July 8, 2020 (because Kruzick's schedule did not allow it). [Kruzick Dep. 35:6-9; Wegner Decl. ¶ 10, Exh. K; Yarworth Dep. 59:12-60:17, Exh. 2; IJL000400 ("IJL000400")] After that meeting, IJL's Matchmaker proposed a match within a week. [Kruzick Dep. 35:6-12] Kruzick had imposed a timeline by which she would meet "her person": September 2020, less than three months after she signed up. But she acknowledges IJL did not promise that would occur by her self-prescribed deadline. [Kruzick Dep. 69:8-12] Kruzick demanded a refund before she even met the first match IJL presented to her. [Kruzick Dep. 38:22-25; 41:10-17] Nevertheless, she ultimately agreed to go on a date with a match, and after meeting him decided that they were not compatible [Kruzick Dep. 41:18-23]—though she apparently agreed to go on a second date with him, even though he later cancelled. [*See* Wegner Decl., ¶ 13, Exh. S; Yarworth Decl. ¶ 7; IJL000418 ("[H]e asked me out but then cancelled the date.") ("IJL000418")] Thereafter, she rejected further attempts by the IJL Matchmaker to perform IJL's services.[5] [Wegner Decl. ¶ 5, Exh. F; Kruzick Dep. 59:15-60:2, Exh. D-25; 61:20-62:7] She "believe[s] IJL has a pool of

---

[5] She generically claims the Matchmaker was "bullying" her but has "zero recollection" of anything he said. [Kruzick Dep. 54:25-56:14].

open, available persons looking for relationships and looking to also find their match" [Kruzick Dep. 67:18-23]; but by early August 2020, less than two months into her contract, and having attended just one date, Kruzick refused to even hear of the next two matches IJL had ready for her. [Kruzick Dep. 72:1-74:8, Exhs. D-27 & D-28; Wegner Decl. ¶¶ 6,7, Exhs. G, H]

### C.    Plaintiffs' Allegations—Then and Now

Plaintiffs filed their Original Complaint on November 11. 2020 [Dkt. 1] The Original Complaint – and the First Amended Complaint that followed on March 15, 2021 [Dkt. 17] – alleged a nationwide putative class based on allegations that IJL had a pattern of falsely promising its clients that they had specific matches in mind, during the initial sales call. [Dkt. 17 at ¶¶ 26, 66, 67] Plaintiffs maintained this core theory of liability through the filing of their SAC, as this Court noted in its order on IJL's motion to dismiss. [Dkt. 40, 19 n.16; *see also* Dkt. 40, 2-3] However, after apparently realizing they had no evidence to support this core contention, Plaintiffs abruptly transitioned to a theory put forth in their Motion for Class Certification that at best played a bit-part in their SAC: that IJL represents its services as personalized when they are actually not personalized and cannot be personalized because IJL is structurally designed to be unable to meet its promises to clients. [Dkt. 76, 2:14-16, 7:10-19] As discussed below, this theory, just like their previous one, is meritless.

## IV.    PLAINTIFFS CANNOT SHOW THAT IJL MISREPRESENTED ITS SERVICES.

### A.    Plaintiffs' Claims All Rely on the Fiction That IJL Does Not Offer "Personalized Matchmaking" as Advertised.

Nine claims in Plaintiffs' Second Amended Complaint survived IJL's motion to dismiss. Eight of these are for either some variety of fraud or a violation of a consumer protection statute based on deception. All these claims, as pled, require the existence of misrepresentation as an element of the claim. *See Allen v. Similasan Corp.*, 306 F.R.D. 635, 647-648 (S.D. Cal. 2015) (CLRA and FAL); *Davis v. HSBC Bank Nev., N.A.*, 691 F.3d 1152, 1161–1162 (9th Cir. 2012) (UCL); *City Sols., Inc. v. Clear Channel Commc'ns*, 365 F.3d 835, 839 (9th Cir. 2004) (fraud and deceit, Cal. Civ. Code §§ 1709-1710); *Clark v. Countrywide*

*Home Loans, Inc.*, 732 F. Supp. 2d 1038, 1048 (E.D. Cal. 2010) (actual fraud, Cal. Civ. Code § 1572); *Picus v. Wal-Mart Stores, Inc.,* 256 F.R.D. 651, 657-658 (D. Nev. 2009) (NDTPA); *Magpiong v. Superdry Retail LLC,* 304 F. Supp. 3d 983, 989 (D. Nev. 2018) (Nevada common law fraudulent inducement); *Soffer v. Five Mile Cap. Partners, LLC*, No. 2:12-CV-1407 JCM GWF, 2013 WL 638832, at *8 (D. Nev. Feb. 19, 2013) (Nevada common law fraud). The final claim for unjust enrichment under Nevada law is based on an allegation that the Plaintiffs were fraudulently induced by IJL to sign up for its services, and therefore a misrepresentation likewise must be proven by Plaintiffs for this claim to survive. [*See* Dkt. 29 (SAC) ¶ 161]

The alleged misrepresentation that forms the basis for each of these claims, per Plaintiffs' Motion for Class Certification, is that IJL represents to potential clients that it provides personalized matchmaking, when it in fact does not provide a personalized service. [Dkt. 76, 7:5-19; 18:24-19:19; 20:16-21:12] Thus, as framed by Plaintiffs, all their claims fail if they cannot meet their burden to prove that matchmaking services IJL provided to them were not personalized. This case is ripe for summary judgment because the overwhelming evidence indicates that IJL's service is in fact personalized, such that no reasonable juror could find in favor of Plaintiffs on that issue.

## B.   No Reasonable Juror Could Find That IJL Did Not Provide Personalized Services to Plaintiffs.

The evidence in this case overwhelmingly proves that IJL provided services that are personalized to each Plaintiff, such that no reasonable juror could come to a contrary conclusion. Thus, IJL's representation that its services are personalized is not false and cannot be a misrepresentation, which is essential to each of Plaintiffs' claims. "Personalized" is generally defined as designed, made, or produced to meet someone's individual requirements or for a particular person.[6] A list of its synonyms includes

---

[6]   *See, e.g., Personalized*, *Cambridge Advanced Learner's Dictionary*, https://dictionary.cambridge.org/us/dictionary/english/personalized (last visited May 9, 2023); *Personalized*, *Oxford Learner's Dictionaries*, https://www.oxfordlearnersdictionaries.com/us/definition/english/personalized (last visited May 9, 2023).

"subjective" and "individualized" while "general," "generic," and "typical" are among its antonyms.[7]

In the instant case, a review of each Plaintiffs' internal IJL files and deposition transcripts reveals IJL provided personalized service to each Plaintiff—at least to the extent that each of them allowed IJL to do so. Importantly, that each Plaintiff claims to be dissatisfied with her IJL membership *does not change the fact that personalized services were indeed provided to each Plaintiff.*

### 1. Gillingwater

Though she was disappointed with the results, Gillingwater's story reflects an iterative and personalized matchmaking process. The communications log for Gillingwater is over fourteen pages long and depicts dozens of communications over the course of more than a year. [*See generally* Wegner Decl. ¶ 9, Exh. J; Yarworth Dep. 48:7-50:7, Exh. 1; IJL000365-379 ("IJL000365-379")] Gillingwater provided specific feedback regarding multiple dates arranged personally by IJL matchmakers, and IJL adjusted and personalized her service based on that feedback. [IJL000365-379; Gillingwater Dep. 177:20-178:11; 202:11-18] Thus, the experience of the only named plaintiff who did not abandon the service after her first date demonstrates that IJL provided service that is in fact personalized to each client's preferences.

Gillingwater was presented with nine potential matches. [Gillingwater Dep. 200:10-203:8] She agreed to go on a first date with four of them. [Gillingwater Dep. 127:13-128:1; 136:3-10; 137:11-139:9 & 154:22-155:17] On her first date, she reported back that she really liked the man. [Gillingwater Dep. 70:19-71:3] On her second date, she testified that "*I felt like he was a decent match. . . . We just didn't have chemistry, but I don't hold them accountable for that.*" [Wegner Decl. ¶ 15, Exh. U; Gillingwater Dep. 136:5-17 (emphasis added), Exh. D-47] She also agreed to go on a date with the fifth match IJL presented to her, but he didn't show up because of a calendaring error. [Gillingwater Dep. 137:11-139:9; 169:10-15] And the ninth match IJL presented to Gillingwater also met her initial qualifications. [Gillingwater Dep.

---

[7] *Personalized, Merriam-Webster.com,* https://www.merriam-webster.com/thesaurus/personalized (last visited May 9, 2023).

202:11-18] She was interested in a date but claims IJL did not follow up with her. [Gillingwater Dep. 155:8-15] Notably, IJL selected and proposed the ninth match—an Italian man—in direct response to input from Gillingwater that she wanted to date Italian men. [IJL000374-375] All told, Gillingwater recalled *nine* men that IJL presented to her, *four* of whom met her criteria sufficiently enough that she agreed to go on a date, *four* of whom she declined to meet, and *one* of whom she declined to meet because she had already independently decided to go on a date with him after meeting him on a different dating site.[8] These personalized matches were all a result of the iterative IJL process which allowed IJL to hand select matches for Gillingwater based on her stated preferences and continuous feedback.

### 2. Vrugtman

Plaintiff Vrugtman, on the other hand, allowed IJL to provide service to her for only a short period because she refused to go on any dates after the first one that IJL's Matchmaker arranged for her. But during the short time she *did* cooperate with IJL, Vrugtman got exactly what she bargained for: a personalized matchmaking service. Just four days into her membership, her matchmaker was already considering individual matches for her and assessing their suitability based on their characteristics and her desires, as well as her characteristics and their desires. The relevant entry in the communication log reads in part,

> I tried to match her with 77 year old Bayne [redacted] – he declined. I don't want to try James [redacted] or Kenneth [redacted] yet because it is her first match and it would be a huge flex on height. Michael [redacted] is [African American], and she will ONLY date Caucasian. Can't flex Kenneth or Charles on her age, they aren't interested.

The Matchmaker found a match for Vrugtman five days later.  [*See* Wegner Decl. ¶ 11, Exh. L; Yarworth Dep. 60:23-63:7, Exh. 3; IJL000388 ("IJL000388")] Vrgutman went on this date but was disappointed to find out that her match did not enjoy reading as much as she did, had a poor relationship with his adult son who lived with him, complained about prices, and remarked that a two-hour drive was "too far" to meet her. [Vrugtman Dep. 48:19-49:17; 74:19-75:22, 78:24-

---

[8] In other words, IJL happened to select and introduce to Gillingwater a gentleman that she herself had independently chosen and with whom had previously scheduled a date on a different dating site. [Gillingwater Dep. 141:6-144:6]

79:21] Nevertheless, she and her date reported to IJL that they spent three and a half hours together [IJL000412-413], so the experience could not have been completely valueless to her.

This was the last IJL date that Vrugtman would attend, as she demanded a refund less than two weeks later. [Wegner Decl. ¶ 11, Exh. L; Yarworth Dep. 60:23-63:7, Exh. 3; IJL000390 ("IJL000390")] When she was not given a refund, she demanded that IJL open a new venue for dates in Charlottesville, VA, despite her contract not listing Charlottesville as one of the designated locations to receive dates. [Wegner Decl. ¶ 11, Exh. L; Yarworth Dep. 60:23-63:7, Exh. 3; IJL000383 ("IJL000383")] She softened this demand briefly, per a phone call with Kayla Coleman on September 2, 2020, but by September 17, she reiterated that driving to Richmond was not acceptable to her, despite Richmond being the closest designated IJL location. [Wegner Decl. ¶ 11, Exh. L; Yarworth Dep. 60:23-63:7, Exh. 3; IJL000391-392 ("IJL000391-392")] She also consistently refused to meet any matches over Zoom, the COVID-19 Pandemic notwithstanding.  [Vrugtman Dep. 94:1-95:3; Wegner Decl. ¶ 11, Exh. L; Yarworth Dep. 60:23-63:7, Exh. 3; IJL000391 ("IJL000391")] Nevertheless, Vrugtman acknowledged that one gentleman she refused to meet—solely because of the location of the date—was otherwise a viable match. [Vrugtman Dep. 89:13-90:21]

Thus, because of *Vrugtman's own* refusal to accept service performed by the IJL matchmaker for her, IJL was not able to arrange more than one date for her. Kayla Coleman even explained this to Vrugtman over their September 2 phone call. [IJL000391] Regardless, IJL's employees did the best they could to accommodate her and nevertheless provided her personalized service. For example, when she requested a new matchmaker in communications on September 2 and September 4, she was assigned to a new one. [IJL000391-392]. [Yarworth Decl. ¶ 4] Similarly, on August 27, Ellen Kuhm offered to put Vrugtman's membership on hold until another IJL venue opened in Charlottesville. [IJL000391] However, Vrugtman refused, and, because of her own self-imposed limitations on how and where she would meet matches, IJL was not able to arrange more initial dates for her. As a consequence, IJL did not receive the client feedback from those dates that it needed to fine-tune further matches for Vrugtman. [*See* Epstein Decl. ¶¶ 3-4]

Vrugtman may complain that she was unhappy with the results of IJL's service, but no reasonable juror could find based on the record of evidence in this case that IJL did not afford her "personalized" service.

### 3. Kruzick

Kruzick's experience was similar to Vrugtman's, but her lack of cooperation was even more extreme. At first—and while she was still cooperating with IJL—Kruzick was receiving exactly the personalized service that she was promised. In her intake interview with a Dating Specialist, IJL recorded information Kruzick provided about her most recent relationship and what she was looking for in a match [Wegner Decl. ¶ 10, Exh. K; Yarworth Dep. 59:12-60:17, Exh. 2; IJL000410 ("IJL000410")]; in her welcome call with her Matchmaker, he recorded her characteristics, desire for a serious romantic relationship, and hobbies and interests. [IJL000400 (comment to welcome call)] Her Matchmaker then used this information to hand-select her first match, which was proposed within a week of her initial meeting with her IJL Matchmaker. [Epstein Decl. ¶ 5; Kruzick Dep. 35:6-12]

But her cooperation soon ended, despite IJL's continued efforts to provide service to her. Notably, Kruzick demanded a refund before she even met that first match. [Kruzick Dep. 38:22-25; 41:10-17] Nevertheless, she ultimately agreed to go on a date with that match, and after meeting him ultimately decided that they were not compatible—though in her feedback regarding the date, she indicated "he asked me out but then cancelled the date[,]" implying she agreed to go on a second date with him. [Kruzick Dep. 41:18-23; IJL000418] She also repeated her demand for a refund in her feedback regarding the date. [IJL000418] Thereafter, she rejected further attempts by the IJL Matchmaker to perform IJL's services[9] She "believe[s] IJL has a pool of open, available persons looking for relationships and looking to also find their match" [Kruzick Dep. 67:18-23], but by early August 2020, less than two months into her contract, and having attended just one date, Kruzick refused to even hear of the next two matches IJL had ready for her. [Wegner Decl. ¶¶ 6,7, Exhs. G, H; Kruzick Dep. 72:1-74:8, Exhs. D-27 & D-28]

---

[9] She generically claims the Matchmaker was "bullying" her but has "zero recollection" of anything he said. [Kruzick Dep. 54:25-56:14].

As they did with Vrugtman, IJL's employees explained to Kruzick that they could not perform matchmaking service for her if she would not let them do so. [Wegner Decl. ¶ 10, Exh. K; Yarworth Dep. 59:12-60:17, Exh. 2; IJL000409 ("IJL000409")] Yarworth further expressed that IJL wanted to continue servicing her account in a subsequent email on October 26. [IJL000409] [Yarworth Decl. ¶ 5]

Thus, while Kruzick was unhappy with her purchase of an IJL membership, a reasonable juror could not find that IJL did not provide her personalized service.

* * *

In sum, all three Plaintiffs received personalized service from IJL, exactly as promised. That they were ultimately dissatisfied with their purchase does not change this. Gillingwater was presented with nine matches, agreed to go on dates with four of them, and rejected one of them because she had already met him through a separate dating site. This resulted directly from IJL's iterative process that generates matches for clients based on each client's preferences and characteristics, as well as the feedback each client provides after dates. Vrugtman and Gillingwater also received a personalized service to the extent that they cooperated with IJL's employees and allowed them to perform their promised services. Of course, once each of these Plaintiffs stopped cooperating with IJL, it was impossible for IJL to continue providing them with matches hand-selected by its Matchmakers.

## C. Plaintiffs Abandoned Their Other Alleged Misrepresentations Because No Evidence Supports Them.

IJL's purported failure to provide personalized services was not the focus of the SAC. Instead, as this Court previously pointed out in ruling on IJL's motion to dismiss, the thrust of Plaintiffs' allegations was that IJL's dating specialists falsely told prospective members that they already had a match in mind to entice them to join. [Dkt. 40 at 19 n.16; *see also* Dkt. 40 at 2-3]. But since they filed their Second Amended Complaint almost two years ago, Plaintiffs' allegations in this case have morphed significantly to focus on whether the services IJL provided were personalized. The reason for this change is simple: the Plaintiffs have no evidence to support the allegation

that a Dating Specialist ever falsely told any of the Plaintiffs they had a potential date in mind for that client. Rather, the testimony of Plaintiffs shows there are no grounds to suggest any such statements were false.[10]

In short, there is an absence of evidence for a reasonable factfinder to conclude that IJL's Dating Specialists falsely told prospective clients that they already had a match or matches in mind, so they abandoned that theory. The problem for them, though, is that their new theory suffers from that same fatal flaw: no reasonable juror could find that IJL does not provide any personalized service.

## V.    PLAINTIFFS CANNOT PROVE THEIR THEORY OF DAMAGES OR RESTITUTION.

Summary judgment should be granted for the second, and separate, reason that Plaintiffs have not met their burden of establishing that IJL's services were worth "zero." Plaintiffs' claims under the NDTPA, CLRA, UCL, FAL, and the various varieties of fraud claims all require a plaintiff to prove damages or injury as an element of the claim, to establish standing, or to be awarded restitution. *Picus,* 256 F.R.D. at 657 (NDTPA); *Allen*, 306 F.R.D. at 648 (CLRA); *Pulaski v. Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 988 (9th Cir. 2015) (explaining economic injury is part of two-part test required for standing to assert UCL claim); *Stewart v. Kodiak Cakes, LLC*, 537 F. Supp. 3d 1103, 1125-26 (S.D. Cal. 2021) (FAL); *City Sols.*, 365 F.3d at 839 (fraud and deceit, Cal. Civ. Code §§ 1709-1710); *Clark*, 732 F. Supp. 2d at 1048 (actual fraud, Cal. Civ. Code § 1572); *Magpiong*, 304 F. Supp. 3d at 989 (Nevada common law fraudulent inducement); *Soffer*, 2013 WL 638832, at *8 (Nevada common law fraud). Similarly, Plaintiffs' claim for unjust enrichment under Nevada common law requires

---

[10] For instance, Gillingwater asserts that the Dating Specialist mentioned that she already had a man named "John" in mind for her, but Gillingwater admits she was in fact presented with a potential match named John (who Gillingwater wanted to meet). [Gillingwater Dep. 137:11-138:13] Likewise, Vrugtman alleges that a Dating Specialist told her IJL had matches available who lived in the Charlottesville area, and Vrugtman was presented with two matches who lived in Charlottesville; she refused to meet with one of them because she did not want to drive to Richmond or meet via videocall, and the other one declined to be matched with her (although she admitted he was otherwise a match). [Vrugtman Dep. 89:13-90:21, 105:17-23, 107:3-16; IJL000391; IJL000393]

showing a benefit was conferred on the defendant by the plaintiff in circumstances where it would be inequitable for the defendant to retain the benefit. *WMCV Phase 3, LLC v. Shushok & McCoy, Inc.*, 750 F. Supp. 2d 1180, 1196 (D. Nev. 2010).

**A.    No Reasonable Juror Could Find that IJL's Services are Worth Zero.**

Plaintiffs' damages theory is based solely on their own allegations and is not supported by any evidence in this case. A model of damages must only measure damages attributable to the plaintiff's theory of liability. *See Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013) (holding consumer did not offer model that isolated damages from only anti-competitive conduct at class certification stage). While price premiums are generally accepted as valid measures of damages in UCL cases, "a 'full refund' (that is, a price premium worth the same or more than the actual price of the product) *can only be given if the product is actually worthless to the consumer*." *Zeiger v. WellPet LLC*, 526 F. Supp. 3d 652, 675 (N.D. Cal. 2021) (emphasis added). "The law is clear that a full refund model is only justified when the plaintiffs prove the products have no value." *Id.* (citing *Krommenhock v. Post Foods, LLC*, 334 F.R.D. 552, 577-78 (N.D. Cal. 2020); *Chowning v. Kohl's Dep't Stores, Inc.*, 745 Fed. Appx. 924, 925 (9th Cir. 2018)).

In *Zeiger*, the District Court for the Northern District of California granted summary judgment to the defendant pet food company on the issue of damages because it found that the plaintiff consumer's proffered damages model was inadmissible. 526 F. Supp. 3d at 686, 689. *Zeiger* concerned a putative class action over pet food that was allegedly tainted with unsafe levels of arsenic, lead, and BPA. The consumer alleged that the pet food had no value because it was unsafe, and his proffered damages model therefore proposed a full refund. *Id.* at 675. The court rejected the damages model of the consumer's expert for two reasons. First, it was "inarguable" that consumers derived some value from the pet food at issue because their pets consumed it and received nutrients. *Id.* Second, the consumer's expert failed to show that any of the pet food was unsafe. *Id.* The *Zeiger* court therefore ruled that the consumer's damages model was

inadmissible, and, as a result, granted the pet food company's motion for summary judgment as to damages and restitution since the consumer could not show the level of damages or restitution to which he was entitled. *Id.* at 686.

The facts of the instant case present an even stronger case for summary judgment than those in *Zeiger*.

First, Plaintiffs do not even attempt to offer an expert's damages model like the consumer did in *Zeiger*. Indeed, Plaintiffs have not designated any expert for use at trial. [Wegner Decl. ¶ 16] Instead, they merely allege without any proof that "that "a reasonable juror could find that the value of [IJL's] service is, on a class-wide basis, zero." [Dkt. 76, 22:28-23:2] This allegation is unsupported by any evidence. Summary judgment on damages and restitution is therefore even more appropriate here than in *Zeiger*, where the consumer at least attempted to substantiate his damages model with expert testimony.

Second, as in *Zeiger*, it is indisputable in this case that IJL provided some value to the Plaintiffs. All of them went on at least one date, and Gillingwater agreed to four. [Gillingwater Dep. 127:13-128:1; 136:3-10; 137:11-139:9, 154:22-155:17] Vrugtman's only date, which she refuses to acknowledge as such [Vrugtman Dep. 74:19-75:10], lasted three and a half hours—from 1:30pm to 5:00pm. [IJL000412-413] It is impossible that Vrugtman derived no value from this experience at all if she voluntarily chose to remain at the location of her date for three and a half hours. And Kruzick apparently agreed to go on a second date with the only match she met, even though he later cancelled. [IJL000418 ("[H]e asked me out but then cancelled the date.")]

Moreover, aside from the enjoyability of the dates themselves, Plaintiffs received value from other aspects of IJL's services. IJL arranged all Gillingwater's and Vrugtman's in-person dates, making restaurant reservations and finding mutually agreeable times for them and their matches, so they did not have to do so themselves. [*See, e.g.,* Wegner Decl. ¶ 9, Exh. J; Yarworth Dep. 48:7-50:7, Exh. 1; IJL000366 ("IJL000366") (October 4-5, 2019 communication log entries indicating IJL set-up

Gillingwater's date with Maurizio); Wegner Decl. ¶ 11, Exh. L; Yarworth Dep. 60:23-63:7, Exh. 3; IJL000389 ("IJL000389") (August 3, 2020 communication log entry indicating IJL made reservations for Vrugtman's date); Yarworth Decl. ¶ 3; Epstein Decl. ¶ 7] Similarly, IJL set-up Kruzick's videocall with her match so she did not have to. [Wegner Decl. ¶ 10, Exh. K; Yarworth Dep. 60:23-63:7, Exh. 2; IJL000402-403 ("IJL000402-403")] And every Plaintiff received the benefit of having their dating information treated confidentially, as IJL does not publicly disclose the identities of its members, dating preferences, or history—unlike some of its well-known competitors. [Yarworth Decl. ¶ 3] Vrugtman even mentioned in her deposition that she "felt that my private life should be private, including any resumption of dating." [Vrugtman Dep. 23:3-15] The Plaintiffs thus inarguably received *some* value from IJL's services, making its value to them greater than zero.

Third, just as the *Zeiger* court found that the consumer's expert failed to establish that the pet food at issue was unsafe, the Plaintiffs here have failed to establish that IJL's service is not personalized for all the reasons already stated in this Motion. [*See, e.g.,* IJL000380 ("Client answers to interview questions" and "Criteria for who the client wants to meet"); Yarworth Decl. ¶ 3; IJL000400 (comment to welcome call with Kruzick listing her characteristics, preferences, and hobbies); IJL000388 (coordinator call comment on July 24, 2020, describing internal email from matchmaker attempting to match Vrugtman based on her personal preferences and preferences of male members in IJL's system)]

* * *

This Court should grant summary judgment on the issue of damages because Plaintiffs have simply offered no evidence to support their contention that IJL's services are worth nothing. Plaintiffs have not even attempted to offer expert testimony on this issue or cite any other evidence other than their own personal disappointment with the eventual results. Further, it is without question that IJL provided at least some value to each Plaintiff. Each went on at least one date that they found enjoyable at the time. IJL also handled the logistics of all the Plaintiffs' dates and kept their dating status and

preferences private. Finally, Plaintiffs have not and cannot prove the central contention of their damages model, namely, that IJL does not provide personalized services. For these reasons, no reasonable juror could find Plaintiffs received no value from IJL's services, and this Court should grant summary judgment to IJL on this issue.

## VI.   CONCLUSION

The Court should grant IJL's Motion for Summary Judgment on all claims as to each and every Plaintiff because none of them can establish that IJL misrepresented its services, that they were damaged, or that IJL unjustly retained a benefit conveyed to it.

DATED:  May 15, 2023            BROWN WEGNER LLP


                                /s/ Matthew K. Wegner
                                _____
                                Matthew K. Wegner
                                Attorneys for Defendants
                                IT'S JUST LUNCH INTERNATIONAL LLC
                                and IJL US LLC