UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **EDCV 20-2352 JGB (SPx)** | Date | August 25, 2023 |
|---|---|---|---|
| Title | ***Rosanne Vrugtman, et al. v. Its Just Lunch International LLC*** | | |

Present: The Honorable    JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE

| MAYNOR GALVEZ | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| None Present | None Present |

**Proceedings:**      **Order (1) DENYING Plaintiffs' Application to Seal (Dkt. No. 75); (2) DENYING Plaintiffs' Motion for Class Certification (Dkt. No. 76); (3) GRANTING Defendants' Application to Seal (Dkt. No. 80); (4) GRANTING Defendants' Motion for Summary Judgment (Dkt. No. 84); (5) GRANTING  Defendants' Application to Seal (Dkt. No. 86); and (6) VACATING the September 11, 2023 Hearing  (IN CHAMBERS)**

Before the Court are: (1) Plaintiffs Rosanne Vrugtman ("Vrugtman"), Tammy Gillingwater ("Gillingwater"), and Nicole Kruzick's ("Kruzick") (collectively, "Plaintiffs") motion for class certification pursuant to Federal Rule of Civil Procedure 23 and leave to file a third amended complaint ("Class Cert. Mot.," Dkt. No. 76); and (2) Defendants It's Just Lunch International LLC ("IJL International") and IJL US LLC's ("IJL US") motion for summary judgment ("MSJ," Dkt. No. 84) (collectively, "Motions").   The Court determines this matter appropriate for resolution without a hearing.  See Fed. R. Civ. P. 78; L.R. 7-15.  After considering all papers filed in support of and in opposition to the Motions, the Court **DENIES** the Class Cert. Mot., **GRANTS** the MSJ, and **VACATES** the September 11, 2023 hearing.

## I.      BACKGROUND

On November 11, 2020, Vrugtman and Gillingwater filed a class action complaint against IJL International.  ("Complaint," Dkt. No. 1.)  On March 15, 2021, Vrugtman and Gillingwater filed a First Amended Complaint.  ("FAC," Dkt. No. 17.)  The FAC added plaintiff Kruzick, as well as defendants IJL US LLC and IJL Canada Inc.  (See id.)  On June 11, 2021, the Court

approved a stipulation to allow Plaintiffs to file a second amended complaint. (Dkt. No. 28.) On June 14, 2021, Plaintiffs filed a second amended complaint against IJL International, IJL US LLC, and IJL Canada Inc. ("SAC," Dkt. No. 29.)

The SAC alleges ten causes of action. First, on behalf of Kruzick and the California Subclass, Plaintiffs allege the following four California law claims against Defendants IJL US and IJL International: (1) violations of the Consumers Legal Remedies Act, Cal. Civ. Code § 1750 et seq. ("Count One"); (2) violations of the Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 et seq. ("Count Two"); (3) false advertising in violation of Cal. Bus. & Prof. Code § 17500 et seq. ("Count Three"), (4) fraud and deceit in violation of Cal. Civ. Code §§ 1709, 1710 ("Count Four"); and (5) actual fraud in violation of Cal. Civ. Code § 1572 ("Count Five"). (See id.)

Second, on behalf of Vrugtman and the Virginia Subclass, Plaintiffs allege violations of the Virginia Consumer Protection Act, Va. Code Ann. § 59.1-196, et seq. ("Count Six"), against Defendants IJL US and IJL International. (See id.) Finally, on behalf of all Plaintiffs, Plaintiffs allege the following four Nevada common law and statutory claims against all defendants: (1) violation of the Nevada Deceptive Trade Practices Act ("NDTPA") ("Count Seven"); (2) fraudulent inducement ("Count Eight"); (3) fraud ("Count Nine"); and (4) unjust enrichment ("Count Ten").

On September 24, 2023, the Court granted-in-part and denied-in-part IJL US and IJL International's (collectively, "Defendants") Partial Motion to Dismiss the SAC. ("MTD Order," Dkt. No. 40.) The Court denied Defendants' Motion as to Counts One, Two, Three, Four, Five, Eight, Nine, and Ten. (Id.) The Court granted Defendants' Motion as to Count Six and dismissed Count Six without leave to amend. (Id.) Plaintiffs did not file an amended complaint. On October 22, 2021, Defendants answered the SAC. ("Answer," Dkt. No. 43.) On March 25, 2022, the parties stipulated to a protective order. ("Protective Order," Dkt. No. 53.)

On April 17, 2023, Plaintiffs filed a motion for class certification and leave to file a third amended complaint. (See Class Cert. Mot.) In support of the Class Cert. Mot., Plaintiffs filed the following documents:

- Declaration of John G. Balestriere ("Balestriere Decl.," Dkt. No. 76-2) and various exhibits ("Balestriere Exs. A–Q," Dkt. No. 76-4–20);
- Declaration of Anastasia Mazella ("Mazella Decl.," Dkt. No. 76-3); and
- Application to File Under Seal Documents Designated as Confidential by Another Party ("Pls.' Appl. to Seal," Dkt. No. 75).

On May 1, 2023, Defendants opposed the Class Cert. Mot. ("Class Cert. Opp'n," Dkt. No. 79.) In support of the Class Cert. Opp'n, Defendants filed the following documents:

- Declaration of Julie Lopez ("Lopez Decl.," Dkt. No. 79-1) with attached exhibits;

- Declaration of Matthew K. Wegner ("Wegner Decl.," Dkt. No. 79-2) with attached exhibits;
- Declaration of Julie Yarworth ("Yarworth Decl.," Dkt. No. 79-3);
- Declaration of Sandra Hatton ("Hatton Decl.," Dkt. No. 79-4);
- Request for Judicial Notice ("RJN 1," Dkt. No. 79-5);
- Application for Leave to File Under Seal ("Class Cert. Appl. to Seal," Dkt. No. 80) with attached exhibits; and
- Declaration of Matthew K. Wegner in Support of Application for Leave to File Under Seal ("Wegner Decl. ISO Appl. to Seal," Dkt. No. 81).

On May 15, 2023, Plaintiffs replied. ("Class Cert. Reply," Dkt. No. 85.) In support of the Class Cert. Reply, Plaintiffs filed the following documents:

- Declaration of John G. Balestriere ("Balestriere Reply Decl.," Dkt. No. 85-1) with attached exhibits; and
- Declaration of Anastasia Mazella ("Mazella Reply Decl.," Dkt. No. 85-2).

On May 22, 2023, Defendants filed a supplemental request for judicial notice in support of their Class Cert. Opp'n. ("RJN 2," Dkt. No. 88.) On May 31, 2023, Plaintiffs filed a response to Defendants' RJN 2. ("Response to RJN 2," Dkt. No. 95.) On May 22, 2023, Defendants filed a notice of objection to evidence to Plaintiff's Class Cert. Reply, or in the alternative request for leave to file a surreply. ("Obj. to Evidence," Dkt. No. 89.) On May 31, 2023, Plaintiffs filed a response to Defendants' Obj. to Evidence. ("Response to Obj. to Evidence," Dkt. No. 96.)

On May 15, 2023, Defendants filed the MSJ. ("MSJ," Dkt. No. 84.) In support of the MSJ, Defendants filed the following documents:

- Statement of Uncontroverted Facts and Conclusions of Law ("DSUF," Dkt. No. 84-2);
- Declaration of Matthew K. Wegner ("Wegner MSJ Decl.," Dkt. No. 84-3) with attached exhibits;
- Declaration of Julie Yarworth ("Yarworth MSJ Decl.," Dkt. No. 84-4);
- Declaration of Sandra Hatton ("Hatton MSJ Decl.," Dkt. No. 84-5);
- Declaration of Michael Epstein ("Epstein MSJ Decl.," Dkt. No. 84-6);
- Application for Leave to File Under Seal ("MSJ Appl. to Seal," Dkt. No. 86) with attached exhibits; and
- Declaration of Jason P. Tkaczuk ("Tkaczuk Decl. ISO Appl. to Seal," Dkt. No. 87) with attached exhibits.

On May 30, 2023, Plaintiffs opposed Defendants' MSJ. ("MSJ Opp'n," Dkt. No. 93.) In support of its opposition, Plaintiffs filed the following documents:

- Declaration of John G. Balestriere ("Balestriere MSJ Decl.," Dkt. No. 93-2) with attached exhibits; and

- Statement of Genuine Disputes ("PSGD," Dkt. No. 94).

On June 12, 2023, Defendants replied.  ("MSJ Reply," Dkt. No. 107.)  On June 20, 2023, Defendants filed a response to Plaintiffs' PSGD.  ("Response to PSGD," Dkt. No. 115.)

## II.    LEGAL STANDARD

### A.  Class Certification

Federal Rule of Civil Procedure 23 ("Rule 23") governs the litigation of class actions. A party seeking class certification must establish the following prerequisites under Rule 23(a):

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a); Hanon v. Dataproducts Corp., 976 F.2d 497, 508 (9th Cir. 1992), overruled on other grounds by Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338 (2011) ("Dukes").

After satisfying the four prerequisites of numerosity, commonality, typicality, and adequacy, a party must also demonstrate one of the following under Rule 23(b): (1) a risk that separate actions would create incompatible standards of conduct for the defendant or prejudice individual class members not parties to the action; (2) the defendant has treated the members of the class as a class, making appropriate injunctive or declaratory relief with respect to the class as a whole; or (3) common questions of law or fact predominate over questions affecting individual members and that a class action is a superior method for fairly and efficiently adjudicating the action.  See Fed. R. Civ. P. 23(b)(1)–(3).[1]

Because "Rule 23 does not set forth a mere pleading standard," a "party seeking class certification . . . must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." Dukes, 564 U.S. at 350 (emphasis in original).  Plaintiffs bear the burden of proving every Rule 23 requirement "by a preponderance of the evidence." Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC, 31 F.4th 651, 665 (9th Cir. 2022), cert. denied sub nom. StarKist Co. v. Olean Wholesale Grocery Coop., Inc., 143 S. Ct. 424 (2022).

---

[1] While some circuits have adopted an "ascertainability" prerequisite to certification, the Ninth Circuit has not.  Briseno v. ConAgra Foods, Inc., 844 F.3d 1121, 1124 n.4 (9th Cir. 2017) (noting that the Ninth Circuit has not "adopted an 'ascertainability' requirement" and has, instead, "addressed the types of alleged definitional deficiencies other courts have referred to as 'ascertainability' issues . . . through analysis of Rule 23's enumerated requirements").

A trial court has broad discretion over whether to grant or deny class certification. Bateman v. Am. Multi-Cinema, Inc., 623 F.3d 708, 712 (9th Cir. 2010). This is because class certification is a procedural mechanism, and "[d]istrict courts are in the best position to consider the most fair and efficient procedure for conducting any given litigation." Id. (internal quotation marks and citation omitted). Even so, a district court must conduct a "rigorous analysis" that frequently "will entail some overlap with the merits of the plaintiff's underlying claim." Dukes, 564 U.S. at 351. The court "need only consider 'material sufficient to form a reasonable judgment on each [Rule 23(a)] requirement.'" Sali v. Corona Reg'l Med. Ctr., 909 F.3d 996, 1005 (9th Cir. 2018) (alteration in original) (quoting Blackie v. Barrack, 524 F.2d 891, 901 (9th Cir. 1975)).

## B. Summary Judgment

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party has the initial burden of identifying the portions of the pleadings and record that it believes demonstrate the absence of an issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The moving party must show that "under the governing law, there can be but one reasonable conclusion as to the verdict." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).

"When the moving party also bears the burden of persuasion at trial, to prevail on summary judgment it must show that 'the evidence is so powerful that no reasonable jury would be free to disbelieve it.'" Shakur v. Schriro, 514 F.3d 878, 890 (9th Cir. 2008). This is "ordinarily a heavy burden." Barnes v. Sea Haw. Rafting, LLC, 889 F.3d 517, 537 (9th Cir. 2018). By contrast, where the non-moving party bears the burden of proof at trial, the moving party need not produce evidence negating or disproving every essential element of the non-moving party's case. Celotex, 477 U.S. at 325. Instead, the moving party "must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." Nissan Fire & Marine Ins. Co. v. Fritz Cos., Inc., 210 F.3d 1099, 1102 (9th Cir. 2000).

"If a moving party fails to carry its initial burden of production, the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial." Id. However, if the moving party has sustained its burden, the non-moving party must show that there is a genuine issue of material fact that must be resolved at trial. Celotex, 477 U.S. at 324. The non-moving party must make an affirmative showing on all matters placed at issue by the motion as to which it has the burden of proof at trial. Id. at 322; Anderson, 477 U.S. at 252. A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson, 477 U.S. at 248. "The non-moving party must show more than the mere existence of a scintilla of evidence." In re Oracle Corp. Sec. Litig., 627 F.3d 376, 387 (9th Cir. 2010) (citing Anderson, 477 U.S. at 252).

When deciding a motion for summary judgment, the court construes the evidence in the light most favorable to the non-moving party. <u>Barlow v. Ground</u>, 943 F.2d 1132, 1135 (9th Cir. 1991). Summary judgment for the moving party is proper when a "rational trier of fact" would not be able to find for the non-moving party based on the record taken as a whole. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." <u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007).

## C. Leave to Amend

Generally, a court considers a motion for leave to amend pleadings pursuant to the permissive standard of Federal Rule of Civil Procedure 15(a) ("Rule 15(a)"). <u>Eminence Capital, L.L.C. v. Aspeon, Inc.</u>, 316 F.3d 1048, 1051 (9th Cir. 2003); Fed. R. Civ. P. 15(a) (stating that leave to amend "shall be freely given when justice so requires"). The Ninth Circuit holds "'[t]his policy is to be applied with extreme liberality.'" <u>Eminence Capital, L.L.C. v. Aspeon, Inc.</u>, 316 F.3d 1048, 1051 (9th Cir. 2003) (quoting <u>Owens v. Kaiser Found. Health Plan, Inc.</u>, 244 F.3d 708, 712 (9th Cir. 2001)). But leave to amend is not automatic. The Ninth Circuit considers five factors when considering a motion for leave to amend: (1) bad faith, (2) undue delay, (3) prejudice to the opposing party, (4) the futility of amendment, and (5) whether the plaintiff has previously amended his or her complaint. <u>Nunes v. Ashcroft</u>, 375 F.3d 805, 808 (9th Cir. 2004). The Ninth Circuit instructs that "it is the consideration of prejudice to the opposing party that carries the greatest weight." <u>Eminence Capital</u>, 316 F.3d at 1052. "The party opposing amendment bears the burden of showing prejudice, unfair delay, bad faith, or futility of amendment." <u>United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Intl Union, AFL-CIO, CLC v. ConocoPhillips Co.</u>, 2009 WL 650730, at *2 (C.D. Cal. Mar. 12, 2009) (citing <u>Eminence Capital</u>, 316 F.3d at 1052; <u>DCD Programs, Ltd. v. Leighton</u>, 833 F.2d 183, 186–87 (9th Cir. 1987)).

However, once the district court enters a scheduling order establishing a deadline for amending pleadings, Federal Rule of Civil Procedure 16(b) ("Rule 16(b)") applies. <u>Coleman v. Quaker Oats Co.</u>, 232 F.3d 1271, 1294 (9th Cir. 2000). This is because once a scheduling order is in place, the court must consider whether to modify the scheduling order to permit an amendment. <u>Uddin v. Radio Shack, Inc.</u>, 2013 WL 1767963, at *2 (C.D. Cal. Apr. 22, 2013) (citing W. Schwarzer, A. Tashima & M. Wagstaffe, <u>Federal Civil Procedure Before Trial</u> (2006) § 8:405). As such, "a motion seeking to amend pleadings is governed first by Rule 16(b), and only secondarily by Rule 15(a)." <u>Jackson v. Laureate, Inc.</u>, 187 F.R.D. 605, 607 (E.D. Cal. 1999).

Rule 16(b)(4) provides that a scheduling order shall be modified "only for good cause." Fed. R. Civ. P. 16(b)(4). "Unlike Rule 15(a)'s liberal amendment policy which focuses on the bad faith of the party seeking to interpose an amendment and the prejudice to the opposing party, Rule 16(b)'s 'good cause' standard primarily considers the diligence of the party seeking the amendment." <u>Johnson v. Mammoth Recreations, Inc.</u>, 975 F.2d 604, 609 (9th Cir. 1992). Accordingly, while the court may consider the "existence or degree of prejudice" to the

opposing party, the focus of the court's inquiry is upon the moving party's explanation for failure to timely move for leave to amend. Id. "The pretrial schedule may be modified 'if it cannot reasonably be met despite the diligence of the party seeking the extension.'" Zivkovic v. S. Cal. Edison Co., 302 F.3d 1080, 1087 (9th Cir. 2002) (quoting Johnson, 975 F.2d at 609).

### III.   PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

#### A.  Applications to Seal

Both parties filed applications to file documents under seal.  (Dkt. Nos. 75, 80, 86) (collectively, "Applications").)  The parties rely on the stipulated Protective Order, pursuant to which the parties agreed certain discovery information could be designated as "Confidential." (See Protective Order.)

Pursuant to Central District Local Rule 79-5.2.2, in a non-sealed civil case where a party has designated documents confidential pursuant to a protective order, the parties must meet and confer at least 3 days before "in an attempt to eliminate or minimize the need for filing under seal by means of redaction."  L.R. 79-5.2.2(b).  If the parties cannot agree on suitable redactions, the filing party must include a supporting declaration describing the meet and confer efforts.  Id. The designating party must then file a declaration "establishing that all or part of the designated material is sealable . . . with citations to the applicable legal standard."  L.R. 79-5.2.2(b)(i). "Failure to file a declaration or other required document may be deemed sufficient grounds for denying the Application."  Id.

As to Plaintiffs' application to seal, Plaintiffs seek to seal Defendants' CEO's, Rachel Wilson, testimony where she reveals the number of Defendants' active users.  (Pls.' Appl. to Seal at 2.)  Plaintiffs describe their meet and confer efforts with Defendants and assert that they do not agree that such information is properly confidential, but that they filed the application to seal because Defendants designated the information confidential pursuant to the Protective Order. (Id.)  Defendants, as the designating party, should have filed a declaration "establishing that all or part of the designated material is sealable."  See L.R. 79-5.2.2(b)(i).  As of the date of this order, Defendants have failed to do so.  Accordingly, the Court **DENIES** Pls.' Appl. to Seal.  See Beaulieu Grp., LLC v. Bates, 2016 WL 11811633, at *3 (C.D. Cal. Sept. 13, 2016) (denying application to seal where the designating party failed to file a declaration that established that all or part of the designated material was sealable).

As to Defendants' first and second applications to seal, Defendants seek to seal communication logs which they contend contain "sensitive private personal information of consumers that were conveyed in confidence to Defendants as part of Defendants' dating service."  (Class Cert. Appl. to Seal at 2; MSJ Appl. to Seal at 2.)  A review of the documents filed in connection to Defendants' applications to seal demonstrates that Defendants adhered to the procedural requirements of the Local Rules.  See L.R. 79-5.2.2(a).  The Court thus turns to whether the documents are sealable under applicable law.

"A party seeking to seal court records must overcome a strong presumption in favor of the public's right to access those records." Fodera v. Equinox Holdings, Inc., 341 F.R.D. 616, 634 (N.D. Cal. 2022).  In the Ninth Circuit, a party must demonstrate "'compelling reasons' to seal filings where 'the motion at issue is more than tangentially related to the underlying cause of action.'" Id. (quoting Ctr. for Auto Safety v. Chrysler Grp., LLC, 809 F.3d 1092, 1096 (9th Cir. 2016)).  "When the motion is not related or only tangentially related to the merits, a party need only show 'good cause' to seal." Id. (quoting Ctr. for Auto Safety, 809 F.3d at 1096).  "Courts within this circuit apply the compelling reasons standard to motions to seal documents relating to class certification." Id.; see Adtrader, Inc. v. Google LLC, 2020 WL 6391210, at *2 (N.D. Cal. Mar. 24, 2020) (collecting cases).  Under the compelling reasons standard, a party must "articulate compelling reasons supported by specific factual findings that outweigh the general history of access and the public policies favoring disclosure, such as the public interest in understanding the judicial process." Kamakana v. City & Cnty. of Honolulu, 447 F.3d 1172, 1179 (9th Cir. 2006) (internal quotes omitted).  "[C]ompelling reasons sufficient to outweigh the public's interest in disclosure and justify sealing court records exist when such court files might have become a vehicle for improper purposes, such as the use of records to gratify private spite, promote public scandal, circulate libelous statements, or release trade secrets." Id. (internal quotes omitted).  "The mere fact that the production of records may lead to a litigant's embarrassment, incrimination, or exposure to further litigation will not, without more, compel the court to seal its records." Id.

Defendants contend that the documents they seek to seal consist of communication logs of the three Plaintiffs that reflect discussion and other information about intimate or private details that were shared or used to arrange dates and evaluate possible candidates for each Plaintiff to date.  (Wegner Decl. ISO Appl. to Seal ¶ 3; Tkaczuk Decl. ISO Appl. to Seal ¶ 3.)  The communication logs also contained private information and candid opinions about other It's Just Lunch members who were date prospects.  (Id.)  Defendants assert that disclosure of this information would violate the privacy interests of those mentioned in, or who provided information for, the communication logs.  (Id.)  The Court finds that Plaintiffs' privacy interests and the privacy interests of It's Just Lunch members in the communication logs are compelling reasons to seal the communication logs.  Accordingly, the Court **GRANTS** Defendants' Class Cert. Appl. to Seal and the MSJ Appl. to Seal.

## B.  Requests for Judicial Notice

Defendants request that the Court take judicial notice of two opinions issued in the United States District Court for the Southern District of New York and two opinions issued in the United States District Court for the Eastern District of New York.  (See RJN 1; RJN 2.)  The Court declines to take judicial notice of these opinions because they are not necessary to resolve the Motions.  See Baron v. Hyrecar Inc., 2022 WL 17413562, at *6 (C.D. Cal. Dec. 5, 2022) (declining to take judicial notice of documents that were not necessary to resolve the pending motion).  Accordingly, the Court **DENIES** the RJN 1 and RJN 2.

//

## C.  Class Certification

The gravamen of Plaintiffs' suit is that Defendants did not provide personalized matchmaking services to any of its customers because Defendants are structurally designed to be unable to provide such services.  (Class Cert. Mot. at 14.)  Plaintiffs seek to certify the following classes:

> California Subclass: All California citizens who joined IJL US on or after September 12, 2019.

> Virginia Subclass: All Virginia citizens who joined IJL US on or after September 12, 2019.

(Class Cert. Mot. at 11.)  Plaintiffs assert that the proposed classes satisfy the requirements of Rule 23(a) and Rule 23(b)(3).  (See id.)  Defendants argue that: (1) Plaintiffs misstate the numerosity of the proposed classes; (2) Plaintiffs fail to demonstrate commonality; (3) Plaintiffs' claims and/or defenses are not typical of the classes; (4) common questions do not predominate over individualized inquiries; and (5) Plaintiffs' counsel does not adequately represent the class. (See Class Cert. Opp'n.)

### 1.  Rule 23(a) Factors

#### a.  Numerosity

A proposed class satisfies the numerosity requirement if the "class is so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  To be impracticable, joinder must be difficult or inconvenient, but need not be impossible.  Keegan v. Am. Honda Motor Co., 284 F.R.D. 504, 522 (C.D. Cal. 2012).  While there is no numerical cutoff used to determine sufficient numerosity, 40 or more members will generally satisfy numerosity.  See id.

Plaintiffs assert that there are at least 1,814 class members in the California and Virginia subclasses.  (Mot. at 12.)  Defendants argue that Plaintiffs misconstrue the amount of class members in the sub-classes because the majority of the putative class members are subject to agreements to submit disputes to arbitration instead of litigating them in court.  (Opp'n at 10.) Thus, according to Defendants, there are only 197 members in total in the sub-classes.  (Id.) Regardless of which calculation is correct, the parties agree that there are more than 40 members, and thus, the Court finds that the numerosity requirement is met.

#### b.  Commonality and Predominance

The Court analyzes commonality under Rule 23(a) and predominance under Rule 23(b)(3) together, because the latter is an extension of the former, and is more stringent. Comcast Corp. v. Behrend, 133 S. Ct. 1426, 1432 (2013) ("Rule 23(b)'s predominance criterion is even more demanding than Rule 23(a) . . . Rule 23(b) requires that courts take a close look at

whether common questions predominate over individual ones.") (citations omitted).  The Rule 23(a)(2) commonality and Rule 23(b)(3) predominance inquiries require the Court to engage in a "rigorous" analysis and may "entail some overlap with the merits of the plaintiff's underlying claim." In re Capacitors Antitrust Litig. (No. III), 2018 WL 5980139, at *2 (N.D. Cal. Nov. 14, 2018) (internal quotes omitted).

To satisfy the commonality requirement under Rule 23(a)(2), Plaintiffs are required to show "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2).  A common question "must be of such a nature that it is capable of classwide resolution—which means that the determination of its truth or falsity will resolve an issue that is central to the validity of each of the claims in one stroke." Dukes, 564 U.S. at 350.  "By contrast, an individual question is one where members of a proposed class will need to present evidence that varies from member to member." Olean Wholesale Grocery Coop., Inc., 31 F.4th at 663.  What matters is not the raising of common questions in droves, but the "capacity of a class-wide proceeding to generate common answers apt to drive to the resolution of the litigation.  Dissimilarities within the proposed class are what have the potential to impede the generation of common answers." Dukes, 564 U.S. at 350.

Plaintiffs contend that Defendants engaged in a uniform and systematic course of fraud against consumers by misstating the nature of Defendants' "personalized matchmaking service." (Class Cert. Mot. at 1.)  Plaintiffs assert that common questions include whether Defendants: (1) made false and misleading representations to members of the classes as to the nature and quality of the dating service that Defendants provided to members of the classes; (2) fraudulently induced members to join its service through the misrepresentations; (3) systemically failed to provide the services that it promised to its customers; and (5) offered a service that has no value. (Mot. at 13.)  Defendants contend that Plaintiffs fail to show commonality because none of these questions are bona fide questions as they all hinge on Plaintiffs ultimately proving that Defendants did not offer personalized services, which is a contention that Defendants argue is not supported by the evidence and requires individualized inquiries.  (Class Cert. Mot. at 11-13.)

Defendants analogize to Dukes in support of their contention that Plaintiffs' proffered common questions do not generate common answers that drive the resolution of this case.  (Id. at 11.)  In Dukes, the Supreme Court found that because respondents provided "no convincing proof of a companywide discriminatory pay and promotion policy," respondents did not establish "the existence of any common question." Dukes, 564 U.S. at 359.  Here, unlike in Dukes, Plaintiffs have identified and provided evidence that Defendants engaged in a common course of conduct—they tell consumers that they offer personalized matchmaking services.  (Class Cert. Mot. at 5; Class Cert. Opp'n at 12.)  Thus, Plaintiffs have identified a uniform practice and the question of whether Defendants offer personalized services is a common issue under Rule 23(a). However, Plaintiffs have not established that under Rule 23(b)(3) this common issue is amenable to class-wide proof.

For the predominance inquiry under Rule 23(b)(3), Plaintiffs must show that the "proposed classes are sufficiently cohesive to warrant adjudication by representation." Tyson

<u>Foods, Inc. v. Bouaphakeo</u>, 577 U.S. 442, 453 (2016) (internal quotes omitted).  "The predominance inquiry asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." <u>Id.</u> at 453 (internal quotes omitted).  "If each class member could have relied on the plaintiffs' evidence to establish liability if he or she had brought an individual action, and the evidence could have sustained a reasonable jury finding on the merits of a common question, then a district court may conclude that the plaintiffs have carried their burden of satisfying the Rule 23(b)(3) requirements as to that common question of law or fact."  <u>Olean Wholesale Grocery Coop., Inc.</u>, 31 F.4th at 667 (internal quotes, alterations, and citations omitted).  "The rule that the evidence need merely be capable of resolving a common question on a class-wide basis holds true whether the common question concerns an element of plaintiffs' claim, or a fact that must be determined to establish liability."  <u>Id.</u> (internal citations omitted).  "When individualized questions relate to the injury status of class members, Rule 23(b)(3) requires that the court determine whether individualized inquiries about such matters would predominate over common questions."  <u>Id.</u> at 668.  "In carrying the burden of proving facts necessary for certifying a class under Rule 23(b)(3), plaintiffs may use any admissible evidence."  <u>Id.</u>  "Plaintiffs frequently offer expert evidence, including statistical evidence or class-wide averages, to prove that they meet the prerequisites of Rule 23(b)(3)."  <u>Id.</u>  "Considering whether questions of law or fact common to class members predominate begins . . . with the elements of the underlying cause of action."  <u>Erica P. John Fund, Inc. v. Halliburton Co.</u>, 563 U.S. 804, 809 (2011).

Plaintiffs' claims under the CLRA, the UCL, the FAL, the NDTPA, and the various varieties of fraud claims all require a plaintiff to prove a misrepresentation, reliance, and damages as elements of the claims.  <u>See</u> <u>Lucas v. Breg, Inc.</u>, 212 F. Supp. 3d 950, 969 (S.D. Cal. 2016) (CLRA, UCL, and FAL claims require a showing of a misrepresentation, reliance, and damages); <u>Picus v. Wal-Mart Stores, Inc.</u>, 256 F.R.D. 651, 657-658 (D. Nev. 2009) (under NDTPA, a consumer needs to prove that (1) an act of consumer fraud by the defendant (2) caused (3) damage to the plaintiff; finding actual reliance part of causation element); <u>Magpiong v. Superdry Retail LLC</u>, 304 F. Supp. 3d 983, 989 (D. Nev. 2018) (under a Nevada common law fraudulent-inducement claim, a plaintiff must prove a false representation, reliance, and damages); <u>Soffer v. Five Mile Cap. Partners, LLC</u>, 2013 WL 638832, at *8 (D. Nev. Feb. 19, 2013) (under a Nevada common law fraud, a plaintiff must prove a misrepresentation, reliance, and damages); <u>City Sols., Inc. v. Clear Channel Commc'ns</u>, 365 F.3d 835, 839 (9th Cir. 2004) (under California law, fraud and deceit require a showing of misrepresentation, reliance, damages); <u>Clark v. Countrywide Home Loans, Inc.</u>, 732 F. Supp. 2d 1038, 1048 (E.D. Cal. 2010) (under California law, actual fraud requires a showing of misrepresentation, reliance, and damages).

Defendants assert that individual inquiries predominate because the Court will have to engage in an individual reliance and damages inquiry for every class member.  (Class Cert. Opp'n at 21.)  Defendants' reliance argument has no merit.  Where "the [D]efendant[s'] representations were allegedly made on a uniform and classwide basis, individual issues of reliance do not preclude class certification."  <u>Moyle v. Liberty Mut. Ret. Ben. Plan</u>, 823 F.3d 948, 964–65 (9th Cir. 2016), <u>as amended on denial of reh'g and reh'g en banc</u> (Aug. 18, 2016).  Here, Plaintiffs present evidence and Defendants concede that they made the representation that

they offer personalized services on a uniform and class-wide basis through their website, marketing emails, sales calls, and other advertisements. (Class Cert. Mot. at 5; Class Cert. Opp'n at 12.) Accordingly, individual issues of reliance are not a barrier to class certification.

In their second argument, Defendants assert that all class members will have received differing levels of service and a corresponding different amount of value from Defendants, which would result in individualized mini-trials for every class member to establish injury and the amount of damages. (Class Cert. Opp'n at 21.) The Court agrees. In support of their contention, Defendants cite Bowerman v. Field Asset Services, Inc., 60 F.4th 459 (9th Cir. 2023) ("Bowerman"). In Bowerman, the Ninth Circuit reversed the district court's decision to certify a class of independent contractors because the Ninth Circuit found the individualized questions relating to injury and damages outweighed any common questions. Id. at 469. There, 156 individuals who worked for the defendant argued they were misclassified as independent contractors instead of employees. Id. at 466. The district court initially held that predominance was satisfied because "it understood that individualized injury and damages assessments would not be prohibitively cumbersome." Id. at 469. But after the plaintiffs withdrew their expert, the plaintiffs were left without any representative evidence and were left to rely on "individual testimony to establish the existence of an injury and the amount of damages." Id. This resulted in a "series of mini-trials concerning the work history and credibility of each individual class member," to establish liability and damages, which the Ninth Circuit distinguished from other cases where calculating individuals damages for each individual was straightforward. Id. at 470. The Ninth Circuit also determined that while class members provided some common evidence, the common issue that evidence helped resolve was "outweighed by the complexity of the individualized inquiries that remain[ed]." Id. at 470. The Ninth Circuit concluded that "in light of the complexity of the individualized questions and the absence of any representative evidence introduced to fill the class members' evidentiary gaps, the individual issues predominate[d] over the common questions," and thus, class certification was improper. Id. at 471.

Defendants contend that unlike in Bowerman, where the plaintiffs initially bolstered their theory with expert evidence, Plaintiffs have no class-wide proof that Defendants do not offer personalized services or that damages could easily be discerned on a class-wide basis. (Class Cert. Opp'n at 21.) For example, Plaintiffs offer their own individual testimony, not any representative evidence, to prove that they did not receive personalized services. (Class Cert. Opp'n at 18-19.) Plaintiffs respond that they only offered their individual experiences as examples. (Class Cert. Reply at 6.) Plaintiffs point to two sources of common proof to prove that Defendants' services are not personalized: (1) the fact that Defendants only employ 15 matchmakers in total and (2) Plaintiffs' contention that Defendants' client intake forms are generic. (Id., Class Cert. Mot. at 20.) The Court finds that Plaintiffs' evidence is insufficient to "sustain[] a reasonable jury finding on the merits" of the common question: did Defendants offer personalized services or not. Olean Wholesale Grocery Coop., Inc., 31 F.4th at 667 (internal quotes omitted); see Marlo v. United Parcel Serv., Inc., 639 F.3d 942, 949 (9th Cir. 2011) (while a court cannot weigh the evidence, it can evaluate the type of evidence necessary to support a class-wide finding of a plaintiff's claims and the bearing of those considerations on a Rule 23 certification).

As to the first piece of evidence, Plaintiffs argue that because there are only 15 matchmakers and each has hundreds of clients, Plaintiffs calculate that each matchmaker working 40 hours per week has 15 minutes per customer which Plaintiffs contend is insufficient time for Defendants to provide personalized services. (Class Cert. Mot. at 7.) This is speculative as Plaintiffs provide no evidence for their contention that matchmakers only work 40 hours per week and that they only spend 15 minutes a week per member. Additionally, even if a matchmaker only spends 15 minutes a week per member, Plaintiffs provide no evidence such as expert or statistical evidence to show that such amount of time is insufficient to provide personalized services.

As to the second piece of evidence, Plaintiffs contend that Defendants' intake forms for clients "consist largely of a selection of generic interests", "do not allow individualized filling in of additional interests," and include an additional comment section that is "rarely used in any meaningful manner," which shows that Defendants do not provide personalized services. (Class Cert. Mot. at 20.) As an example of how the intake forms are used, Plaintiffs point to Vrugtman's client file which indicates that she has a strong interest in hiking and clarifies in the additional comment section that this interest refers to "walks in the parks." (Id. at 21.) Plaintiffs' evidence of *one* client file is insufficient to show that the additional comment section in the intake form is "rarely used in any meaningful manner" on a class-wide basis. More importantly, Plaintiffs' use of Vrugtman's client file shows that the Court will need to make individual inquiries to assess how client intake forms are filled out and used for each class member to determine whether Defendants' services are personalized.

The Court finds that Plaintiffs' evidence is not able to sustain a reasonable jury finding on the merits of the common question of whether Defendants offer personalized services because it is not enough to merely present evidence of the number of matchmakers that exist and the client intake form to establish liability. Plaintiffs also need to present evidence that shows that having 15 matchmakers makes it more likely than not that Defendants do not offer personalized services and that the client intake forms are used in a manner that prevents services from being personalized. The only evidence that Plaintiffs have provided are the client files and testimony from three Plaintiffs, not the type of common proof that each class member would be able to rely on to establish liability if he or she brought an individual action. Thus, Plaintiffs have not "carried their burden of satisfying the Rule 23(b)(3) requirements as to that common question of law or fact." Olean Wholesale Grocery Coop., Inc., 31 F.4th at 667.

As to damages, Plaintiffs argue that given Defendants' failure to provide its personalized matchmaking services on a structural basis, a reasonable juror could find that the value of its service is, on a class-wide basis, zero. (Class Cert. Mot. at 23.) According to Plaintiffs, the damages to each class member is the amount that the class member paid for Defendants' service. (Id.) But Plaintiffs' fail to show by a preponderance of the evidence that Defendants cannot provide personalized matchmaking services on a structural basis, and thus, the Court will need to engage in individualized inquiries to determine the value of Defendants' service to each of the class member as each may have had a different experience.

Like in <u>Bowerman</u>, the Court will have to rely on "individual testimony to establish the existence of an injury and the amount of damages" which will result in a "series of mini-trials" concerning whether class members received personalized matchmaking services. <u>Bowerman</u>, 60 F.4th at 469-470; <u>see</u> <u>Castillo</u>, 980 F.3d at 732 (finding no predominance where determination of defendant's liability to each class member would require individualized assessment and could not be established on a class-wide basis). The Court concludes that Plaintiffs' common evidence is insufficient to allow a factfinder to make a class-wide judgment as to whether Defendants' services were personalized or not, and thus individual issues predominate over the common questions in this case. Because the Court finds that Plaintiffs' proposed classes do not satisfy the predominance requirement under Rule 23(b)(3), the Court need not address the remaining Rule 23 requirements. Plaintiffs' Class Certification Motion is **DENIED**.

## IV.   THIRD AMENDED COMPLAINT

Plaintiffs move to amend the SAC almost a year after the Court's April 25, 2022 deadline for amended pleadings. ("Scheduling Order," Dkt. No. 50.) Accordingly, the Court applies a two-part test to the request for leave to amend.

To modify the Scheduling Order, pursuant to Rule 16(b), Plaintiffs must first "show good cause for not having amended their complaint[ ] before the time specified in the scheduling order expired." <u>Coleman v. Quaker Oats Co.</u>, 232 F.3d 1271, 1294 (9th Cir. 2000); <u>see</u> Fed. R. Civ. P. 16 ("A schedule may be modified only for good cause and with the judge's consent."). The focus of the Rule 16(b) inquiry is upon the moving party's "reason for seeking modification . . . if that party was not diligent, the inquiry should end." <u>In re W. States Wholesale Nat. Gas Antitrust Litig.</u>, 715 F.3d 716, 737 (9th Cir. 2013), <u>aff'd sub nom.</u> <u>Oneok, Inc. v. Learjet, Inc.</u>, 575 U.S. 373 (2015) (internal alterations omitted) (the good cause standard is typically not met when the "party seeking to modify the scheduling order has been aware of the facts and theories supporting amendment since the inception of the action"). Second, Plaintiffs must establish that leave to amend should be granted pursuant to Rule 15. <u>See</u> <u>Jackson v. Laureate, Inc.</u>, 187 F.R.D. 605, 607 (E.D. Cal. June 16, 1999) ("[O]nce the district court has filed a pretrial scheduling order pursuant to Rule 16 which establishes a timetable for amending pleadings, a motion seeking to amend pleadings is governed first by Rule 16(b), and only secondarily by Rule 15(a)."). In determining whether a plaintiff should be granted leave to amend under Rule 15, courts consider: "bad faith, undue delay, prejudice to the opposing party, futility of the amendment, and whether the party has previously amended his pleadings." <u>Bonin v. Calderon</u>, 59 F.3d 815, 845 (9th Cir. 1995). Courts should "freely give leave when justice so requires." Fed. R. Civ. P. 15.

The Court first addresses whether Plaintiffs have shown good cause under Rule 16(b). Plaintiffs seek to file a third amended complaint to include the following national class: All United States residents who joined IJL US on or after September 12, 2019. (Class Cert. Mot. at 4.) They argue that good cause exists because discovery has revealed that the nature of Defendants' fraud is uniform across its customers nationwide. (<u>Id.</u>) Defendants argue that good cause does not exist because: (1) Plaintiffs agreed to withdraw their nationwide allegations early

in the case and offer no tangible reason why they should be permitted to convert this action into a nationwide class now; and (2) Plaintiffs fail to cite to any evidence obtained during discovery to support Plaintiffs' contention. (Class Cert. Opp'n at 7-8.) Plaintiffs' original complaint and FAC alleged a nationwide putative class, but Plaintiffs' SAC, the operative complaint, removed the nationwide class in favor of three sub-classes: California, Virginia, and Canada. (See Compl. at ¶ 62, FAC at ¶ 77, and SAC ¶ 70.) In reply to Defendants' contentions, Plaintiffs explain that they seek to add back in a nationwide class because discovery revealed that Defendants have 15 matchmakers for thousands of clients, which they contend shows that it is impossible for Defendants to provide personalized matchmaking services nationwide. (Class Cert. Reply at 3.) Plaintiffs also assert that they were diligent because they sought amendment ten days after completing Defendants' CEO's deposition where it was revealed the number of matchmakers that Defendants have. (Id. at 13-14.)

It is unclear to the Court why Plaintiffs removed their nationwide allegations from the SAC, but it seems that they were diligent under Rule 16 in seeking leave to amend since they filed their motion only 10 days after discovering the number of matchmakers employed by Defendants. (Class Cert. Reply at 14.) However, under Rule 15, the Court finds that justice does not require amendment and that amendment is futile because the proposed national class suffers from the same deficiencies as Plaintiffs' proposed sub-classes. Both the nationwide class and the sub-classes rely on the same common proof evidence which, as the Court explains above, is insufficient to satisfy the predominance requirement. Accordingly, granting Plaintiffs the opportunity to amend the SAC would be nothing more than an exercise in futility. Thus, the Court **DENIES** Plaintiffs' request to leave to file a third amended complaint.

## V.   MOTION FOR SUMMARY JUDGMENT

Defendants move for summary judgment on all of Plaintiffs' claims on the basis that Plaintiffs cannot meet their burden to prove that: (1) Defendants made a misrepresentation; and (2) Defendants' service was worth zero to each Plaintiff. (MSJ at 1.)

## A. Evidentiary Objections

"A trial court can only consider admissible evidence in ruling on a motion for summary judgment." Orr v. Bank of America, NT & SA, 285 F.3d 764, 773 (9th Cir. 2002); see Fed. R. Civ. Proc. 56(e). At the summary judgment stage, district courts consider evidence with content that would be admissible at trial, even if the form of the evidence would not be admissible at trial. See, e.g., Fraser v. Goodale, 342 F.3d 1032, 1036 (9th Cir. 2003). The Court considers the parties' objections only where necessary.[2] All other objections are **OVERRULED AS MOOT**.

---

[2] "[O]bjections to evidence on the ground that it is irrelevant, speculative, and/or argumentative, or that it constitutes an improper legal conclusion are all duplicative of the summary judgment standard itself" and are thus "redundant" and unnecessary to consider here. Burch v. Regents of Univ. of California, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006); see also

## B. Undisputed Facts

Except as noted, the following material facts are sufficiently supported by admissible evidence and are uncontroverted.  They are "admitted to exist without controversy" for purposes of the Motion.  See Fed. R. Civ. P. 56(e)(2); L.R. 56-3.

### 1.  Defendants' Services

Defendants advertise that they offer "personalized matchmaking services."  (Balestriere MSJ Decl., Exs. A-C.)  Defendants' process starts with a personal interview conducted over the phone by a Dating Specialist, who discusses and gathers a potential client's preferences, experiences, and attitudes towards dating to determine whether a customer is a good fit for Defendants.  (Yarworth Decl. ¶ 3.)  Dating Specialists get to know each potential client's preferences according to their relationship goals and gather information that a matchmaker can use to curate individualized selections of possible matches.  (Hatton Decl. ¶ 3.)  Dating Specialists input the potential client's information into an electronic form on Defendants' web portal.  (Balestriere MSJ Decl., Ex. G at 12.)  Dating Specialists asks the potential customers about their activities and hobbies.  (Id.) The interview typically lasts 45 minutes to an hour.  (Yarworth Decl. ¶ 3.)  The processes and procedures for Dating Specialists were in place and were used during the time that all three Plaintiffs were interviewed to become Defendants' clients.  (Hatton Decl. ¶ 4.)  Defendants employ 30 Dating Specialists.  ("Wilson Dep.," at 41:25-42:5, Balestriere MSJ Decl., Ex. F.)

For clients who sign up with Defendants, the next step following the Dating Specialist interview is a face-to-face welcome video meeting with a matchmaker.  (Yarworth Decl. ¶ 3.)  Defendants employ 15 matchmakers.  (Wilson Dep. at 43:1-2.)  The matchmaker selects potential matches based on the matchmaker's personal judgment as to who may be a good fit.  (Yarworth Decl. ¶ 3.)  The matchmakers then give a live presentation to the client to determine if the client wants to go on a date with the proposed match.  (Id.)  If accepted by both participants, the matchmaker coordinates a date location and time.  (Id.)  Following the date, the client has the opportunity to provide feedback.  (Id.)  Defendants' matchmaking process is intended to apply the interview information provided by the client and to gather personalized feedback after successive dates to help select candidates for further dates.  (Id.)  Defendants' matchmaking processes for Plaintiffs were performed by humans based on information and preferences gathered in personal interactions with the Plaintiffs.  (DSUF ¶ 1.)[3]

_____

Anderson, 477 U.S. 242, 248 (1986) ("Factual disputes that are irrelevant or unnecessary will not be counted.")

[3] Plaintiffs dispute this fact by stating that the evidence shows that Defendants' matchmaking process is not "meaningfully" performed by matchmakers, nor does it take into account client preferences.  (PSGD ¶ 1.)  Plaintiffs' cited evidence for this contention does not

### 2. Vrugtman

Vrugtman joined IJL US on July 20, 2020. ("Vrugtman's IJL Client File," at 5, Balestriere MSJ Decl., Ex. H.) Vrugtman's client file indicates that she has a strong interest in different categories including: (1) reading (with a note that she is an editor) and (2) writing (with a note that she is a writer and writes novels). (Id. at 12.) Vrugtman testified that she thought she was "buying the service of a personalized matchmaker that would match [her] with someone, another client who met [her] requirements and for whom [she] met his requirements" but that this "never happened." ("Vrugtman Dep.," at 42:11-17, Wegner MSJ Decl., Ex. C.)

Four days into her membership, her matchmaker was considering matches based on Vrugtman's preferences. (DSUF ¶ 28.) Five days later, her matchmaker found a match. (Id. ¶ 29.) Defendants arranged her in-person date by making restaurant reservations and finding a mutually agreeable time to meet. (Id. ¶ 39.) Vrugtman went on a date with that match and the date lasted three and half hours. (Id. ¶ 19.) Vrugtman testified that when her date first saw her, he asked her "how far did you have to drive?" (Vrugtman Dep. at 74:19-75:3.) She responded that she drove two hours and her date shook his head and said, "that is too far." (Id. at 75:3-4.) Although he never said it, Vrugtman understood his response to mean that this was not a match because he seemed unwilling to drive that far to see her in the future. (Id. at 75:5-22.)

Vrugtman testified that she and her first match "had nothing in common except politics." (Vrugtman Dep. at 45:10-15.) She testified that she indicated to Defendants that reading is important to her. (Id. at 49:1-3.) Vrugtman brought a book that she wrote to her date. (Id. at 49:5-6.) When her date asked about her hobbies and interests, Vrugtman told him that that she is a writer and showed him her book. (Id. at 49:6-9.) She testified that her date did not ask her questions about it and simply said that it was a lot of pages. (Id. at 49:10-13.) Vrugtman then asked him if he reads and he said, "only technical journals and only the few pages that [he] needs." (Id. at 49:15-17.) Vrugtman concluded that he was not a match for her. (Id. at 49:16-17.) When asked whether she would not have dated him even if everything else about her date had been great except that he didn't like to read, Vrugtman responded that she may have considered having a follow-up meeting with him somewhere halfway between their two locations. (Id. at 79:2-12.) Vrugtman stated that her date's lack of interest in reading was not the only thing she didn't like about him, but it was an "important thing" for her. (Id. at 79:13-17.) Vrugtman also noted that she didn't like that he complained about prices and that he had issues with his son. (Id. at 79:13-17.) It was Vrugtman's impression that Defendants were randomly matching her. (Id. at 50:3-8.) That was the only date Vrugtman went on. (DSUF ¶ 19.)

---

contradict Defendants' assertion. Plaintiffs cite to: (1) a deposition testimony excerpt from Defendants' CEO that states the number of dating specialists and matchmakers employed by Defendants; (2) a section of Defendants' dating manual which includes the webform that is filled out to reflect a client's preferences; and (3) an excerpt of Plaintiff Vrugtman's file that includes her listed preferences. (Id.) None of that evidence is contrary.

The location of her prospective matches was an important factor for Vrugtman. (<u>Id.</u> ¶ 16.) Vrugtman communicated that she wanted matches in the Charlottesville, Virginia area because that was close to where she lived. (Vrugtman Dep. at 33:20-34:1.) The second and third individuals that Defendants presented to Vrugtman lived in the Charlottesville area and Vrugtman was "more than happy to meet" them. (DSUF ¶¶ 21, 22.) Vrugtman did not meet with either of those individuals. (<u>Id.</u> ¶ 23.) As to the second individual, Vrugtman did not meet him because she did not want to travel to Richmond for their date; Richmond is the closest designated IJL location in Vrugtman's contract to where Vrugtman lives. (Vrugtman Dep. at 46:7-22.) As to the third individual, Vrugtman did not meet him because he decided to not go on a date with her. (<u>Id.</u> at 52:16-22.) Three weeks after signing her contract, Vrugtman threatened to cancel her subscription with Defendants. (DSUF ¶ 24.) Defendants offered to put Vrugtman's membership on hold until another IJL venue opened in Charlottesville, but she refused. (<u>Id.</u> ¶ 27.)

### 3. Kruzick

Nicole Kruzick joined IJL on June 25, 2020. (Wegner MSJ Decl., Ex. T; Yarworth Decl. ¶ 7). Kruzick testified that she went over her dating preferences three times, once with the Dating Specialist, a second time with another employee, and a third time with Mike Epstein ("Epstein"), her assigned matchmaker. ("Kruzick Dep.," at 33:18-34:5, Balestriere MSJ Decl., Ex. O.) Within a week of her initial meeting with Epstein, Kruzick was matched with someone. (DSUF ¶ 33.) Epstein matched Kruzick with her first match for the following reasons: (1) they both expressed an interest in having children; (2) both were entrepreneurs; and (3) Epstein had spoken with both of them and thought their personalities were compatible with one another. (DSUF ¶ 30.)

Kruzick asked for a refund before she met her first match. (<u>Id.</u> ¶ 34.) Kruzick eventually went on a date with the match. (<u>Id.</u> ¶ 35.) Defendants arranged a videocall between Kruzick and her match. (<u>Id.</u> ¶ 40.) Kruzick testified that in response to asking her date what he was looking for, he responded "Oh, I'm just looking to meet people" and she interpreted that to mean that he was not emotionally available or looking for a relationship. (Kruzick Dep. at 42:6-10.) Her date also told her that he is a DJ and that he works weekends and evenings. (<u>Id.</u> at 42:11-14.) Kruzick interpreted that as meaning that he did not have a flexible work schedule. (<u>Id.</u> at 42:15-17.) Kruzick informed Defendants that at the end of the date, her date asked her out but then he cancelled the date. ("Kruzick Client File" at IJL000418, Wegner MSJ Decl., Ex. S.) Because her date did not have a flexible work schedule and he seemed emotionally unavailable, Kruzick concluded that a relationship would not work between them. (Kruzick Dep. at 42:15-17.)

Epstein then matched Kruzick with a second match based on her feedback from her first date, his knowledge of her and her second match's personality, and experience as a matchmaker. (DSUF ¶ 31.) Kruzick informed Epstein that her first match was not sincerely looking for a serious relationship, that his professional career was not up to her standards, and that she did not like that he worked nights and weekends. (Epstein Decl. ¶ 6.) Epstein matched Kruzick with her

second match for the following reasons: (1) he was looking for marriage and children; (2) he had an MBA from Columbia; (3) he ran a non-profit organization; (4) he was active and fit; and (5) based on Epstein's interactions with both of them he thought their personalities would complement each other. (Id.) Kruzick refused to hear about this second match or a third one. (DSUF ¶ 37.) Kruzick testified that her matchmaker had "zero understanding" of what she was looking for. (Kruzick Dep. at 55:11-21.)[4]

## C. Misrepresentation

Defendants move for summary judgment on all of Plaintiffs' claims on the basis that Plaintiffs cannot meet their burden to prove that Defendants misrepresented that their matchmaking services are personalized. (MSJ at 10.) Defendants contend that the record reflects that their advertised "personalized matchmaking services" are in fact personalized. (Id.) Plaintiffs assert that the evidence reflects that Defendants' services are not personalized. (MSJ Opp'n at 1.)

Eight out of Plaintiffs' nine remaining claims require the existence of a misrepresentation as an element of the claim. See Allen v. Similasan Corp., 306 F.R.D. 635, 647-648 (S.D. Cal. 2015) (CLRA, UCL, FAL); City Sols., Inc., 365 F.3d at 839 (fraud and deceit, Cal. Civ. Code §§ 1709-1710); Clark, 732 F. Supp. 2d at 1048 (actual fraud, Cal. Civ. Code § 1572); Picus, 256 F.R.D. at 657-658 (NDTPA); Magpiong, 304 F. Supp. 3d at 989 (Nevada common law fraudulent inducement); Soffer, 2013 WL 638832, at *8 (Nevada common law fraud). The alleged misrepresentation that forms the basis for each of those claims is Defendants' representation to potential clients that it provides personalized matchmaking services. (SAC ¶¶ 1, 27, 58, 59, 154.) Plaintiffs argue that in evaluating whether Defendants' misrepresentation is misleading, the Court must use the "reasonable consumer" test. (MSJ Opp'n at 10.) Plaintiffs' claims for violations of the CLRA, FAL, and UCL are indeed "governed by the 'reasonable consumer' test." Williams v. Gerber Products Co., 552 F.3d 934, 938 (9th Cir. 2008) (quoting Freeman v. Time, Inc., 68 F.3d 285, 289 (9th Cir. 1995)). But Plaintiffs cite no authority, and the Court has found none, that supports Plaintiffs' contention that their remaining claims are evaluated under such test. Thus, the Court will evaluate Plaintiffs' CLRA, UCL, and FAL claims separately from the remaining claims.

### 1. Counts One, Two, and Three

California's consumer protection laws, CLRA, UCL, and FAL, all prohibit "unlawful, unfair, or fraudulent business practices." Ebner v. Fresh, Inc., 838 F.3d 958, 963 (9th Cir. 2016)

---

[4] The Court notes that although there is a third plaintiff, Gillingwater, Plaintiffs assert that because the IJL franchise that had a relationship with Gillingwater became defunct during the pendency of the lawsuit, Gillingwater is asserting no claims against the remaining Defendants. (Opp'n at 1 n.1.) Accordingly, the Court does not discuss any facts related to Gillingwater.

(citing Cal. Bus. & Prof. Code §§ 17200, 17500; Cal. Civ. Code § 1770).  They "prohibit not only advertising which is false, but also advertising which, although true, is either actually misleading or which has a capacity, likelihood or tendency to deceive or confuse the public."  Williams., 552 F.3d at 938 (internal quotes and alterations omitted).  The CLRA, UCL, and FAL are governed by the "reasonable consumer test" which requires Plaintiffs to show that Defendants' representation probably could mislead "a significant portion of the general consuming public or of targeted consumers, acting reasonably in the circumstances."  Brazil v. Dole Packaged Foods, LLC, 660 F. App'x 531, 533 (9th Cir. 2016) (internal quotes omitted) (quoting Lavie v. Procter & Gamble Co., 129 Cal. Rptr. 2d 486, 495 (2003).)  Plaintiffs have the "burden of proving by a preponderance of the evidence that a challenged advertisement is false or misleading."  Sonner v. Schwabe N. Am., Inc., 911 F.3d 989, 992 (9th Cir. 2018)  (UCL and CLRA); Daghlian v. Devry Univ., Inc., 2007 WL 5625508, at *5 (C.D. Cal. Dec. 10, 2007) (FAL).  "In evaluating whether a statement is misleading, the court looks primarily to the words of the statement itself, and compares those words to the actual facts."  Daghlian, 2007 WL 5625508, at *3.

Plaintiffs contend that a reasonable consumer would understand "personalized matchmaking service" to mean "a process where a matchmaker works with a customer to find a match based on that customer's preferences and desired traits."  (MSJ Opp'n at 11.)  For purposes of the MSJ, Defendants accepts that definition of personalized matchmaking.  (MSJ Reply at 3 n.1.)  Defendants assert that a review of Plaintiffs' internal client files and deposition transcripts reveals that Defendants provided personalized services to each Plaintiff.  (MSJ at 11.)

As to Vrugtman, Defendants assert that on the fourth day of her membership, the record shows that her matchmaker was already considering matches for Vrugtman based on her stated preferences and desired traits as to the physical appearance, age, and race of her matches.  (MSJ at 12; DSUF ¶ 28.)  Defendants also assert that they worked with Vrugtman to match her with two individuals who lived in the Charlottesville area, an area where she had reiterated to Defendants that she wanted her matches to be located.  (DSUF ¶ 16, Vrugtman Dep. at 33:20-22.)  Defendants further assert that when Vrugtman requested a new matchmaker she was assigned to one and that Defendants offered to put her membership on hold until another one of Defendants' venue opened in Charlottesville, the location where Vrugtman wanted to go on dates.  (MSJ at 13; Vrugtman Client File at IJL000391.)  Defendants argue that this evidence shows that Vrugtman was provided with a process where a matchmaker worked with her to find a match based on her preferences and desired traits.  (MSJ Reply at 5.)

Plaintiffs respond that Defendants did not offer personalized matchmaking services to Vrugtman because they did not match her with someone who is a reader.  Plaintiffs point to Vrugtman's testimony where she testified that her profile with Defendants "indicates that "reading is an important element" because she wants a partner who is a reader.  (Vrugtman Dep. at 48:19-49:3.)  Vrugtman's client profile with Defendants indicates that she has a "strong interest" in reading and writing, with a note next to her reading interest that she enjoys reading and is an editor and with a note next to her writing interest that she is a writer and writes novels.  (Vrugtman's IJL Client File at 12.)  Among these two interests, there are seven other interests that are marked as a "strong interest" for Vrugtman, each with their own notes.  (Id.)  Plaintiffs

argue that a matchmaker looking at Vrugtman's file would have no way of knowing the high importance that Vrugtman placed on reading since many of her other interests were marked as a "strong interest". (MSJ Opp'n at 15.)

As to Kruzick, Defendants provide evidence that the Dating Specialist recorded information about what she was looking for in a match, that her matchmaker recorded Kruzick's characteristics, and that her matchmaker used this information to match her first date. (MSJ at 14; Kruzick Client File at IJL000400, IJL000410.) Kruzick's matchmaker matched her with her first date because he though their personalities would go well together, they both expressed an interest in having children, and they were both entrepreneurs. (MSJ Reply at 5; DSUF ¶ 30.) Defendants also highlight that Kruzick agreed to go on a second date with her first date. (MSJ Reply at 8; DSUF ¶ 36.) Defendants also point out that after Kruzick informed her matchmaker that her first date was not sincerely looking for a relationship, that his professional career was not up to her standards, and that she did not like that he worked nights and weekends, Kruzick's matchmaker adjusted to her feedback. (DSUF ¶ 37.) For her second date, Kruzick's matchmaker matched her with someone who was looking for marriage, ran a non-profit organization, and was active and fit. (DSUF ¶ 37.) Such traits fit her preferences of someone who is looking for a steady relationship, is driven, and is active. (Kruzick Client File at IJL000410.) In opposition, Plaintiffs respond that Kruzick testified that her first date did not have a flexible work schedule and was not emotionally available, which led her to believe that her matchmaker had "zero understanding" of what she was looking for in a partner, and thus, she did not receive personalized services. (MSJ Opp'n at 16; Kruzick Dep. at 55:11-21.)

Apart from their experiences, Plaintiffs also highlight Defendants' internal processes as support for their contention that Defendants' services are not personalized. Plaintiffs assert that Defendants' system relies on limited information that eliminates any personalized determination from Defendants' matchmaking. (MSJ Opp'n at 3.) Plaintiffs point to the fact that Dating Specialists input potential clients' information into a form on Defendants' web portal, (Balestriere MSJ Decl., Ex. G at 12), and that Defendants employ only 15 matchmakers, (Wilson Dep. at 43:1-2). (MSJ Opp'n at 5-7.) Plaintiffs argue that this evidence shows that matchmakers focus on superficial matches based on whether a customer has indicated an interest in categories such as hiking or reading to allow matchmakers to quickly make matches that appear personalized, but are actually based on a series of checkboxes that could have been matched by an algorithm. (MSJ Opp'n at 7.) Defendants respond that their practice of having Dating Specialists input client preferences and interests into a webform based on a conversation that they have with clients, and then having matchmakers use that information to match clients based on their preferences and desired traits, demonstrates that Defendants provide an interactive and personalized matchmaking service according to Plaintiffs' definition of personalized matchmaking. (MSJ Reply at 2-3, 5.)

When comparing Plaintiffs' definition of a reasonable consumer's understanding of the phrase "personalized matchmaking services" to the record, the Court concludes that Plaintiffs fail to show "that there is a genuine issue of material fact that must be resolved at trial." Celotex, 477 U.S. at 324. The record reflects that Defendants have a process that complies with

Plaintiffs' definition of personalized matchmaking services: "a process where a matchmaker works with a customer to find a match based on that customer's preferences and desired traits." (MSJ Opp'n at 11.)

As to Vrugtman, the record shows that Vrugtman's matchmaker had a call with her to take note of her preferences and desired traits, that her matchmaker considered several potential matches for Vrugtman and did not present those that did not fit Vrugtman's preferences, and that although Vrugtman was not matched with a reader, her matchmaker did consider and match her with individuals that had her other desired traits, such as race, physical appearance, and location. (DSUF ¶ 28; Vrugtman Client File at IJL000389.) Such evidence fits Plaintiffs' proposed definition of personalized matchmaking. As to Kruzick, although her first match did not have the desired traits of a flexible work schedule, he did have the desired trait of wanting children. (DSUF ¶ 30.) And Kruzick's second match had her desired trait of wanting marriage, being fit, and a job that her matchmaker believed would not require work in the evenings and weekends. (Epstein Decl. ¶ 6.) The record also reflects that Vrugtman and Kruzick gave feedback to their matchmakers and that their matchmakers worked on finding matches based on that feedback. (Epstein Decl. ¶ 6; Vrugtman Client File at IJL000388.) Defendants, as the moving party, have presented "evidence negating" that they engaged in a misrepresentation and have shown that Plaintiffs do "not have enough evidence" to prove otherwise and "to carry [their] ultimate burden of persuasion at trial." Nissan Fire & Marine Ins. Co., 210 F.3d at 1102. Thus, the Court finds that Plaintiffs have failed to show a triable issue of fact as to whether Defendants' representation of "personalized matchmaking services" is misleading to a reasonable consumer. Accordingly, the Court **GRANTS** Defendants' summary judgment as to Plaintiffs' CLRA, UCL, and FAL claims.

### 2. Counts Four, Five, Seven, Eight, and Nine

For Plaintiffs' remaining California claims, Count Four (fraud and deceit) and Count Five (actual fraud), a misrepresentation is proven by showing that a defendant's representation was false. See Judicial Council of California Civil Jury Instruction No. 1900 Intentional Misrepresentation (2023); Trujillo v. F.D.I.C., as Receiver of Empire Nat. Bank, 1988 WL 235959, at *8 (C.D. Cal. Jan. 13, 1988), aff'd sub nom. Trujillo v. Fed. Deposit Ins. Corp., 865 F.2d 265 (9th Cir. 1988) ("Where statements complained of are true, they will not support a charge of fraud or deceit.") Similarly, for Plaintiff's Count Seven (NDTPA) and Count Nine (Nevada common law fraud) a misrepresentation is shown by proving that Defendants made a false representation. See Nev. Rev. Stat. Ann. § 598.0915(15) (consumer fraud under NDTPA encompasses deceptive practices, including knowingly making a "false representation in a transaction"); Weingartner v. Chase Home Fin., LLC, 702 F. Supp. 2d 1276, 1289 (D. Nev. 2010) (the elements of common law fraud includes a false representation made by defendant). As to Plaintiffs' Count Eight (fraudulent inducement under Nevada law), Plaintiffs must prove by "clear and convincing evidence" that "a false representation" was made by a party. J.A. Jones Const. Co. v. Lehrer McGovern Bovis, Inc., 89 P.3d 1009, 1018 (Nev. 2004).

Based on the evidence discussed above, the Court concludes that Plaintiffs have failed to raise a triable issue of fact as to the falsity of Defendants' representation that they provide "personalized matchmaking services." The record reflects that Plaintiffs are dissatisfied with Defendants' services because some of their matches did not have some of Plaintiffs' desired traits. (Vrugtman Dep. at 45:10-15; Kruzick Dep. at 42:15-17.) But it is undisputed that Defendants provided Plaintiffs with personalized matchmaking services because the record reflects that Defendants worked with each of them to find a match based on their preferences and desired traits. (See Section VI.B.2.) Personalized services are not a guarantee of results. Accordingly, the Court **GRANTS** Defendants summary judgment as to Plaintiffs' Counts Four, Five, Seven, Eight, and Nine. Given that the Court granted summary judgment to Defendants on the basis that Plaintiffs' failed to present a triable issue of fact as to Defendants' alleged misrepresentation, the Court need not consider Defendants' second grounds for summary judgment.

### 3. Count Ten

As to Plaintiffs' final claim for unjust enrichment under Nevada law, the Court dismisses this claim because it is premised on the Plaintiffs' contract with Defendants. Plaintiffs allege that the fees paid to Defendants by Plaintiffs "far exceeded the reasonable value of the service rendered by" Defendants and that "[b]y refusing to adequately provide services to class members, [Defendants] have benefitted at the expense of Plaintiffs and class members." (SAC ¶¶ 162, 163.) Thus, Plaintiffs request that Defendants make "full restitution of all monies wrongfully obtained" and to "[d]isgorge all ill-gotten revenues." (Id. ¶ 164.) Plaintiffs' allegations are premised on their written contract with Defendants for Defendants' services.

"Under Nevada law, unjust enrichment is an equitable doctrine that allows recovery of damages whenever a person has and retains a benefit which in equity and good conscience belongs to another." Rueckl v. InMode, Ltd., 2020 WL 4289374, at *7 (D. Nev. July 27, 2020) (internal quotes omitted). "However, where there is an express contract, an unjust enrichment claim is unavailable." Id. (citing Leasepartners Corp. v. Robert L. Brooks Trust, 113 Nev. 747, 755 (1997) ("unjust enrichment is not available when there is an express, written contract, because no agreement can be implied where there is an express agreement"); see Williams v. JPMorgan Chase Bank, 452 F. App'x 799, 801 (9th Cir. 2011) (affirming district court's dismissal of plaintiffs' unjust enrichment claim because plaintiffs failed to sufficiently allege the required elements and because their allegations indicate that their claim is premised on express written agreements). Here, because Plaintiffs' allegations are premised on the fees they paid to Defendants under their contracts, unjust enrichment is not available, and the Court **DISMISSES** that claim.

## VI.   CONCLUSION

For the foregoing reasons, the Court **ORDERS** as follows:

1. Plaintiffs' Application to Seal is **DENIED**;

2. Plaintiffs' Motion for Class Certification is **DENIED**;

3. Plaintiffs' leave to file a third amended complaint is **DENIED**;

4. Defendants' Class Cert. Appl. to Seal and the MSJ Appl. to Seal are **GRANTED**;

5. Defendants' Motion for Summary Judgment is **GRANTED**;

6. The September 11, 2023 hearing is **VACATED**; and

7. The Clerk is directed to close the case.

**IT IS SO ORDERED.**